Q One point when you were later looking out the window towards Carlo's did you throw a jacket down to someone down there?
A Yes.
Q And you told the police that it had blood, that jacket had blood on it?
A Yes.
Q And you told the police that Buzzy had been wearing that jacket?
A Correct.
Q You were with Buzzy at the end when you say you were dropped off, when you were all taken home?
A Correct.
Q And you saw that Buzzy still had that jacket at that time?
A Correct.
Q That's at his--at Buzz's house when he got dropped off?
A Yes.

MR. ANDERSON: Can I have a moment, your Honor? Nothing further at this time.

THE COURT: Mr. Fahey.

MR. FAHEY: Thank you, your Honor.

CROSS-EXAMINATION BY MR. FAHEY

Q Now it is fair to say, Mr. Roy, isn't it that you gave four different statements?

A Correct.
Q And the second statement that you gave on December 4, 1994?
A Yes.
Q You recall that?
A Yes.
Q And the that was at the Milford Police Department?
A Yes.
Q And that was after earlier you had talked with your uncle, is that correct?
A Correct.
Q You talked to your Uncle Chuckie on the first statement, December 2nd, is that correct?
A What?
Q December 2nd?
A Correct.
Q And were you aware of the fact that when you're talking to your Uncle Chuckie on the phone at the police station that members of the police station were listening to your conversation?
A Yes.
Q Did they tell you that?
A Yes.
Q And did they tell you before you made the call that they were going to monitor your conversation?

A No.
Q Is it fair to say that they told you after you made the call to your Uncle Chuckie at the police station that the conversation was monitored?
A Yes.
Q And did they tell you whether or not they had recorded that conversation?
A No.
Q And did they tell you before--strike that. Did they tell you at that point that they had heard everything you said and did they repeat verbatim what you had said to your uncle?
A No.
Q So did you ever find out from the police or the State of Rhode Island Attorney General or anybody else up to this date if the police actually did know what you said to your uncle?
A No.
Q Now, you're not the only one in the Roy family with the name Chuckie Roy are you?
A Nope.
Q It's fair to say that your uncle is Chuckie Roy, Sr.
A Yup.
Q And it's fair to say that you have two cousins with the name Chuckie Roy?

A I got one.
Q One cousin?
A Yup.
Q And who is his father?
A My Uncle Chuck's son, his father.
Q And who's the other Chuckie Roy, Jr.
A That's his son.
Q So there's three Chuckie Roys, is that correct?
A Correct.
Q Four including your father?
A No.
Q Three including your father?
A My father's name ain't Chuckie. My uncle's name is Chuckie.
Q Excuse me. Strike that. Your uncle's name is Charles Roy, Sr., is that correct?
A Correct.
Q And then there's two Charles Roy, Jr.'s?
A No, one.
Q You're the only Charles Roy Jr.
A No, I got a little brother, a stepbrother that's named Charles Robert Roy, Jr.
Q And on that day when you came to Woonsocket in December you were coming to get tattoos, is that correct?
A Correct.

Q And you're fifteen years old?
A Correct. I was fifteen.
Q And did you have your parents permission to get a tattoo?
A Yup.
Q And your brother was with you, is that correct?
A What brother?
Q Your brother Tommy?
A No, cousin.
Q Tommy is your cousin?
A Yup.
Q How old is Tommy?
A Seven or eight.
Q And does Tommy have a tattoo at seven or eight years of age?
A Yes, he does.
Q And could you describe to the jury and his Honor and myself and everyone in this room what your cousin, seven or eight year old, his tattoo looked like and where it is located.
MS. SOCCIO: Objection.
THE COURT: Sustained.
Q And to your knowledge did your seven or eight year old cousin have permission from his father or mother to get a tattoo?

MS. SOCCIO: Objection.
THE COURT: Sustained.
Q Now, how were the tattoos going to be paid for?
A I had money. I had a job.
Q How much money did you have on you?
A I had no money on me.
Q So you were going to pay for the tattoos later?
A Yup.
Q Was that a prearranged agreement?
A Yup.
Q And who did you make that prearranged agreement with?
A Ponch.
Q And when did you make that prearranged agreement?
A When I got to Carlo's house.
Q And your uncle's house in Woonsocket you had stayed there before, haven't you?
A Yes.
Q Had you lived there?
A Yes.
Q And what periods of time had you lived at that address in Woonsocket?
A Only the month of November.
Q November of 1994?
A Correct.
Q And were you enrolled in school in Woonsocket?

A No, I wasn't.
Q Where were you enrolled in school?
A Oxford.
Q That's in Massachusetts?
A Yes.
Q And how did you come to live with your Uncle Chuckie Roy when you were enrolled in school in Oxford, Massachusetts?
A Because I was expelled.
Q Excuse me?
A I was expelled from school.
Q And so when you were expelled you went to live with your uncle?
A Correct.
Q And was this with your parents permission?
A Correct.
Q And it would be fair to say that you were quite close to your uncle, is that correct?
A Correct.
Q And did your uncle have a wife?
A Correct.
Q And what was her name?
A Cheryl.
Q And were you close to her too?
A No.

Q And where had your Uncle Chuckie lived prior to Woonsocket, Rhode Island, if you know?
A What?
Q Where had your Uncle Chuckie lived prior to living in Woonsocket?
A My house.
Q And where was that located?
A Milford.
Q Milford, Massachusetts?
A Yup.
Q And were you ever enrolled in the school system in Milford, Massachusetts?
A Yes, I was.
Q And when was that?
A Since I lived there.
Q And what grade are you in?
A I'm in tenth.
Q And being familiar with your Uncle Chuckie do you know if he has Aids?
A Yes, I do.
MS. SOCCIO: Objection.
THE COURT: Sustained. Motion to strike is granted. Disregard that completely. It has no bearing on this case whatsoever.
MR. FAHEY: Might I approach, your Honor?

THE COURT: At the side bar?

THE COURT: Yes.

(THE FOLLOWING TOOK PLACE AT THE SIDE BAR)

MR. FAHEY: Your Honor I have some DNA evidence in this case. While I haven't said anything that Charles Roy's blood was there, I think it's a relevant issue.

THE COURT: I don't.

MR. FAHEY: Contaminated blood, your Honor, that was in the apartment or that was--

THE COURT: What's that got to do with this case? What's that got to do whether your client's guilty of murder or not because someone else who no longer is a party to this suit had Aids or didn't have Aids.

MR. FAHEY: Well, you have heard right now, your Honor, Luis DeJesus' been named as doing some of the stabbing too.

THE COURT: So what? That's not in evidence before this jury. What we heard in chambers isn't necessarily--

MR. FAHEY: Well, it might be in evidence your Honor.

THE COURT: It might be.

MR. FAHEY: As part of the defendant's case, your Honor.

THE COURT: I don't want Aids mentioned in this

case. It has no bearing in this case whatsoever. That's my ruling.

MR. FAHEY: Note my objection.

THE COURT: Yes.

(END OF SIDE BAR CONFERENCE)

THE COURT: Disregard that last statement about any infection this man might or might not have had. It has no bearing on this case.

Q Now in the statement that you gave to Angela Bucci, Chief of the Juvenile Unit on February 9, 1995, do you remember that statement, correct?

A Correct.

Q And that was after three previous statements, correct?

A Correct.

Q Do you remember saying in that statement on Page 4 upon a question from Angela Bucci "that's a lie"?

THE COURT: Well, read the question to him. Give him the whole question.

Q "Question: Now, okay, all right. So then Luis and Buzz come up and say some guy is getting beat up. So what do you do? You run down to your apartment where they are and then what do you see when you open the apartment?" You have here, "I went to open the door. The guy heard the door open. He started wrestling with Carlo. Answer: That's a lie".

A Correct.
Q You said that?
A Yes.
Q And who were you referring to? Who was lying?
A Myself.
Q So you were admitting to the Chief Juvenile Unit investigator Angela Bucci that you were lying?
A Correct.
Q And earlier on your December 4th statement, Page 1, "Do you remember this Charles, by talking to other people I believe that you left out some very important parts of your statement, is that true? Is this true? Yes." Did you say that?
A Yes.
Q "And I also believe that you may have changed some parts of the story and then some parts are not accurate, is this true? Yes".
A Yes.
Q So on December 4th you admitted that you left things out and changed your story and things weren't accurate, is that correct?
A Correct.
Q And then on February 9th you admitted some three months later that you lied?
A Correct.

Q Now, are you a member of a gang?
A Nope.
Q Did you ever hear of the Kool-Aid Gang?
A Nope.
Q Were the people that were picked up in Woonsocket, excuse me, people that were picked up in Massachusetts and brought to Woonsocket with you on December 1st members of a gang?
MS. SOCCIO: Objection.
THE COURT: Sustained.
Q So it's fair to say you have never been a gang member?
A Nope.
THE COURT: No, you have not been a gang member?
A No.
THE COURT: All right.
Q Now, Luis DeJesus, you know him, is that correct?
A Correct.
Q And he was there on December 1st?
A Correct.
Q And is it fair to say that he was in both your Uncle Chuckie's apartment and Carlo Belloli's apartment?
A Correct.
Q And would it be fair to say that Luis DeJesus was in Carlo Belloli's apartment when you were there?
A Correct.

is that true?
A Yes.
Q And it is fair to say that most of those statements are different?
A Yes.
Q And which statement was it that you gave when you were threatened to be locked up if you didn't give a statement?
A The last one.
Q And by the "last one" do you mean the February 9, 1995 with Attorney General's Office?
A No.
Q And what police force threatened you or what person threatened you?
A I don't remember.
Q And were you told what you were going to be locked up for?
A For not telling the truth.
Q And did you hear the word perjury?
A I don't remember.
Q Do you know what perjury is?
A No, I don't.
Q And is it fair to say that in one of your statements--strike that. It's fair to say that in the interview with Angela Bucci, as I went over yesterday,

A Yes, your Honor. I'm trying to think. I think so, I don't know.
Q Well, is it fair to say that you and Luis and Daniel Dunbar on the day and night that you allegedly made all these observations at Carlo Belloli's house at some point went to visit Tara Francis?
A Yes, we did.
Q So it's fair to say that if you went to visit her that day she lived in Rhode Island on that date?
A Yes.
Q And what was the purpose of your visiting her?
A Because she was one of my sister's friend and I knew her half of my live.
Q And how soon after you arrived in the van with twelve other people from Milford, Massachusetts did you go to Tara Francis' house with Luis DeJesus and Daniel Dunbar?
A When Carlos and my Uncle Chuck went to pick up Ponch.
Q And what time was that, approximately, if you know?
A I don't know.
Q And how long did you stay at Tara Francis' house?
A For like ten minutes.
Q And while you were at Tara Francis' house did you consume any alcoholic beverages or use any drugs?
A We were drinking.
Q And you were drinking over at Tara Francis' house?

Q And did Daniel Dunbar drink some butter shots?
A No, he couldn't.
Q How old is Daniel Dunbar, if you recall?
A He's seventeen.
Q And were you aware of the fact that you were a minor? You weren't supposed to be drinking, correct?
A Correct.
Q Now, from your own personal knowledge do you know if Daniel Dunbar ever said that you were a member of quote, "his gang"?
A No.
Q So you never heard him use the terminology referring to you is that you are part of his gang?
A No, we--just a bunch of kids that hang around. We ain't no gang.
Q Now you testified yesterday that your main purpose in coming down to--strike that. You testified yesterday that you came down to Milford for one of the purposes was to get some tattoos, is that correct?
A We came down to Woonsocket.
Q Down to Woonsocket, excuse me.
A Yes.
Q And the other friends of yours that hang around with you they came down to get some tattoos too, is that correct?
A Correct.

Q And who were you talking to specifically?
A I was talking to the lady that lived upstairs from Carlos (sic).
Q And what's her name, if you know?
A I don't know it.
Q And who else?
A Whoever was there.
Q Do you remember who you talked to?
A I talked to Tracey.
Q Who's Tracey? Peloquin?
A Yes. I talked to Danny.
Q Danny Dunbar?
A Danny Dunbar, yes.
Q That's all you talked to, three people?
A Yes.
Q And how long did that conversation last?
A Only a couple of minutes. They just asking me if it's scary in there.
Q Now, turning attention to your December 4th 1994 statement to the police. You remember that, correct?
A Yes, I do.
Q And was your parents or guardian present with you at that time when you made that statement?
A Yes, she was.
Q And that was your mother was with you?

A Yes.
Q And if you recall, that was the statement where you were told that you had left a lot of things out and you changed a lot of things around from the other statement?
A Yes.
Q And you acknowledged that, right?
A Yes.
Q And, in fact, you acknowledged that out of the four or five different statements that are all different?
A Yes.
Q And you also acknowledged that you lied in some of the statements?
A Yes.
Q And in this December 4th statement do you remember on Page 4--
MR. FAHEY: Might I show--
THE COURT: Certainly.
MR. FAHEY: Would you like to see Page 4?
THE WITNESS: Yes.
MR. FAHEY: At the bottom where the answer is.
Q That refresh your recollection?
A Yes.
Q And each and every one of these statements you signed them, didn't you?
A Yes, I did.

A No.
Q You testified yesterday something about immunity. Who did you ask for immunity?
A One of the police officers.
Q Do you remember which one?
A I do not.
Q You never talked to me or anyone else from the Department of Attorney General about immunity, is that correct?
A I think my mom talked to Angela about it.
Q But, in fact, are you aware that the only person who can request immunity on your behalf is the State's Attorney, correct?
A Right.
MR. FAHEY: Objection.
THE COURT: Ground?
MR. FAHEY: Too far removed. It calls for a thing he doesn't know.
THE COURT: She asked if if he knew. He said, yes, he did.
Q And, in fact, you were told on a number of occasions from members of the Woonsocket Police Department that you weren't going to be charged with anything, correct?
A Correct.
Q And at the Grand Jury proceedings, Chuckie, March 17,

A Correct.
Q Your mother is, of course, the sister of Uncle Chuckie, correct?
A Correct.
Q I'm showing you the transcription of that interview with Ms. Bucci on Pages 20 and 21. There's an entry voice. I never been to my brother's house until that day. And on the next page Ms. Bucci asked you, "Okay. So you don't know who the paperboy is or anything? " Voice: "I don't know anything. " Question: "It's all right, mom. You don't have do know" who's the voice?
A My mother wasn't there.
Q I'm sorry?
A My mother wasn't there when I went for that interview.
Q Do you know who the voice was?
A No.
Q You testified that you kept silent about Luis DeJesus because you didn't want to get him in trouble, correct?
A Correct.
Q And your desire not to get him in trouble was strong enough that you were willing to lie under oath at the bail--at the hearing in December of 1994?
A What.
Q You didn't want to get him in trouble that's also why you told me, why you told the lie under oath at the

hearing in December of 1994. Do you remember yesterday on cross-examination you admitted that when you answered under oath at that hearing that you didn't see a knife in his hand that was a lie, in Luis' hand. Do you remember that?
A Yes.
Q That was because you didn't want Luis to get in trouble, correct?
A Correct.
Q So you were willing to lie under oath in order to help not get Luis in trouble?
A Correct.
Q Is it fair to say you also didn't want to get your uncle in trouble?
A Correct.
Q And you and your uncle and your mother, his sister, were in touch with each other before you gave your statements to the police?
A Yes, so was Ponch too.
MR. ANDERSON: Nothing further.
THE COURT: Mr. Fahey.

RECROSS-EXAMINATION BY MR. FAHEY

Q Now this interview with Angela Bucci, is it fair to say that you were aware of the fact that it was being tape recorded?

A Uh-huh.
Q Anyone else?
A Timmy Gorman, Luis DeJesus and that's it.
Q Now on December 1st of 1994 were you with "Little Chuckie" in the later part of the afternoon?
A Yes, I was.
Q That was after school?
A Yes.
Q Where were you?
A We were at Charlie's Mini Mart.
Q Where is that?
A That's on School Street right by my house.
Q At some point did you go to Oliver Street?
A Yes, we did.
Q For what purpose?
A We went there to go get picked up.
Q Who was going to pick you up?
A Carlo, Uncle Chuck and that's all I knew of those two.
Q Who told you that you were going to get picked up by these two people?
A Everybody told everybody that was there.
Q Who's everybody?
A Chuckie, Luis, Rob, Jesse and Timmy.
Q Do you know why you were getting picked up?
A We were supposed to go beat somebody up.

Q Now, what time did you get picked up?
A We got picked up about five-thirty.
Q And what type of car did you get into?
A A van.
Q Whose van was it?
A Carlo's.
Q He was driving?
A Yes, he was.
Q Who else was in the van that you knew?
A Just Rene Gorman and Uncle Chuck and Uncle Chuck's little son, Tommy.
Q Was there a female in the van?
A Yes.
Q Did you know who that was?
A No, I didn't.
Q When you got into the van where did you sit?
A I sat in the way back.
Q When you got into the van do you remember hearing any conversation about going to beat someone up?
A Yes.
Q Did you hear any conversation about anyone getting stabbed?
A No.
Q Any conversation about a person getting killed?
A No.

Q It was just to go beat someone up?
A Yes, it was.
Q Do you know who that person was?
A No, I didn't.
Q Once you got into the van where did you go to?
A We went back to Woonsocket, to Uncle Chuck's house.
Q Did you make any stops along the way?
A No, we didn't.
Q Do you remember, did they stop at a liquor store?
A Yes they did.
Q Do you know who went into by liquor?
A Uncle Chuck did.
Q Now, once you got into Woonsocket whose house did you to go?
A Uncle Chuck's house.
Q Do you know where that house is?
A I don't know the name of the street.
Q Do you know how Uncle Chuck's house sits in relation to Carlo's house?
A Yes.
Q How would you describe it?
A I would say Uncle Chuck's house is on a hill and you go down the hill and then there's Carlo's house.
Q So the backyards face each other?
A Yes.

Q Had you been to Uncle Chuck's house before?
A No, I haven't.
Q That was the first time?
A Yes it was.
Q What about Carlo's house have you been to that house before?
A No, I haven't.
Q Do you remember what time you arrived at Uncle Chuck's house?
A About six okay.
Q What did you do once you got to Uncle Chuck's house?
A We went upstairs to check his messages and if he had his snakes and stuff.
Q How long did you stay at Uncle Chuck's house?
A We stayed there for about half an hour, forty-five minutes.
Q During that period of time did you do anything besides play with the snakes?
A No, we didn't.
Q Did you watch any movies?
A No.
Q And who was there with you?
A Me, "Little Chuckie", Uncle Chuck, Timmy, Luis, Rene, Jesse, Rob and his brother, Chuckie's brother, Mike.
Q At some point did you leave with "Little Chuckie" and

Luis to go somewhere?
A Yes, I did.
Q Where did you go?
A We went to Tara Francis' house.
Q Is that a friend of yours?
A Yes, it is.
Q How long did it take you to get to her house?
A It took us about maybe five or ten minutes.
Q How long did you stay there?
A We stayed there for about twenty minutes.
Q Do you know what time that was when you went there?
A No, I don't.
Q Do you know what time it was when you got back?
A It was about seven-thirty, quarter of eight.
Q When you returned did you go to Uncle Chuck's house or Carlo's house?
A I went to Carlo's house.
Q Who else went there with you?
A Chuckie and Luis.
Q And when you arrived at Carlo's house who was already in the house?
A Tracey, Rene, Jesse, Rob and Timmy and Mike.
Q What were they doing. Do you know what they where doing when you went in to Carlos house?
A They were sitting on the couch listening to radio.