A I can't remember about the car.
Q Do you know whatever happened to that check that you said that John Casserly received from his mother that night?
A It was put back into his pocket.
Q Who put it there?
A I'm not sure who put it there but I remember that they said, Carlo had said "Wipe the fingerprints off it" so I put in my shirt and wiped it off and someone had took it out with a glove and put it in his pocket.
Q Who had a glove?
A I'm not sure.
Q Did anyone threaten you about what happened?
A They hadn't threatened me, but they had said something to Chuckie.
Q Who said something to Chuckie?
A Carlo.
Q What did he say?
A He said this could happen to you too or something like that.
Q Did he say that to anyone else?
A He just said it towards Chuckie.
MS. SOCCIO: Nothing further.

CROSS-EXAMINATION BY MR. ANDERSON

Q Mr. Gorman, is it your understanding that you have been

sentenced to serve until you were twenty-one at the Training School and the remainder of the twenty year sentence will be suspended?
A Yes.
Q That was the deal that you and your lawyer negotiated, is that your understanding?
A Yes.
Q And you had several meetings, is it fair to say, with your lawyer before that was finalized?
A Yes.
Q And it was put in writing and you signed it on March 10th, correct?
A I believe it was March 10th, yes.
Q As you understand the agreement you made the assurance that the years after you turned twenty-one will be suspended is an essential part of that agreement, correct?
A Yes.
Q Did the Attorney General's Office promise you that's what would happen?
A Yes.
Q Your lawyer promised you that?
A Yes.
Q You believe that?
A Yes.

the Attorney General?
A By the Attorney General.
Q Did anyone tell you that for that to happen, that is after you turn twenty-one, there has to be a hearing at that time and that only at that hearing and only upon proof, by clear and convincing evidence that demonstrates that the person has made sufficient efforts at rehabilitation and that modification of the order of certification would not pose a threat to the safety of the public, the Court may suspend that, shall vacate the balance of the sentence. Did anyone explain that to you?
A I understand that I had a court date when I turn twenty-one but I didn't--
THE COURT: Let him finish his answer, please.
MR. ANDERSON: I'm sorry. Please finish your answer.
A I didn't understand that. I thought it was definite that it was being suspended.
Q Okay. No one told you that when you had your court appearance when you turn twenty-one that the judge can rule that, notwithstanding your cooperation, you must serve the remainder of those twenty years at the Adult Correctional Institutions?
A I was not aware of that.

you could be released from custody as early as your eighteenth birthday?
A Yes, I'm aware of that.
Q Which would be how long from now?
A A year and a half.
Q So that--so you do now understand that how much of the next twenty years of your life is going to be in custody is going to be dependent in large measure upon the recommendation of the Attorney General's Office?
A Yes.
Q You understand that the recommendation that they will make a year and a half from now when you turn eighteen, correct?
A Yes.
Q Yes. And if that doesn't work, several years from now when you turn twenty-one, correct?
A Yes.
Q When you were taken to the police station on Friday December 2nd of 1994, correct?
A Yes.
Q And you remember speaking with Sergeant bland and detective den as I will?
A I wasn't paying attention to names then.
Q You remember talking to a couple of detectives?
A Yes.

Q Do you remember them telling you that if you told them what happened they would do all they could to help you out when the matter went to court?
A Yes.
Q And that if you were afraid that then was the time to tell the truth?
A Yes.
Q You refused to talk at that time, correct?
A Yes.
Q You told them you wanted a lawyer?
A Yes.
Q You then took up to three months to--strike that. That was December 2nd, correct?
A Yes.
Q The statement you finally gave explaining in detail what you claim happened was given on March 4?
A I believe so, yes.
Q So you had three months to prepare for that statement, to think about what you were going to say?
A I wasn't thinking about saying anything.
Q Well, you were represented by counsel, correct?
A I don't understand.
Q You had a lawyer, right?
A Yes.
Q And you were, at least towards the end of this period of

time, you were actively negotiating your agreement with the Attorney General's Office?
A Yes.
Q And you had access to written materials about this case, did you not?
A Yes.
Q Do you remember when you were interviewed you were interviewed on March 4 at the Training School, correct?
A Yes.
Q That interview was tape-recorded and later transcribed and you later signed it, right?
A Yes.
Q Do you remember making reference in that interview--
A Remember making up?
MR. ANDERSON: I haven't finished my question.
Q Do you remember making reference in that interview to quote, "What I have remembered"?
A What I have remembered?
Q Let me show you what I'm referring to. Do you remember saying, "What I remembered. Based on what I remembered"?
A I believe that was with my cousin Timmy. That's the question of my cousin and I didn't know nothing about it.
Q Let me show you what I'm referring to. On Page 2, just

flashlight?
A Yes.
Q More than once?
A They had people said I hit him.
Q When everytime he tried to get up they were saying?
A Yes.
Q You knew, of course, that you and Carlo and Luis DeJesus had disposed of the body of John Casserly?
A Yes.
Q That you had helped clean-up the apartment?
A Yes.
Q That you had washed the knives?
A Yes.
Q And you knew, well knew, by then that you were facing prosecution for First Degree Murder?
A Yes.
Q And you knew that in Rhode Island First Degree Murder carries a mandatory penalty of life in prison?
A Yes.
Q And that the state could, in this case, ask for a penalty of life without parole?
A Yes.
Q They tell you the state was going to ask for such a penalty?
A Yes, my lawyer.

THE COURT: Let me tell you, ladies and gentlemen. It doesn't matter what the Attorney General asks. It's up to a judge to decide whether someone gets life without parole. It's not the Attorney General's job.

MR. ANDERSON: A judge can only give it if the Attorney General asks for it, correct?

THE COURT: Is that a question to me?

MR. ANDERSON: I'm sorry.

THE COURT: I would hope so.

Q Your lawyer told you that, explained the procedure to you as to how life without parole works?

A Yes.

Q Now, drawing your attention again to the night you were arrested. Do you remember when you--

THE COURT: Excuse me. You want to step back? Ladies and gentlemen, it's absolutely of no concern of yours what the sentence might be in this case. If there's a guilty verdict that's solely my function and that's where our functions part. You decide the facts of the case. I must decide the law and you are not to even consider what a sentence might or might not be.

Q You know what your sentence will be. You have already been sentenced, correct?

A Yes.

Q Now, when you were first questioned by the police that

night, do you remember when you were first questioned denying that you were even present?
A Yes.
Q And do you remember then, before you stopped answering questions, you remember then saying that you walked into Carlo's apartment and saw Carlo standing over a bloody body?
A I'm not sure. I'm not sure what I said.
THE COURT: This is December 2nd?
MR. ANDERSON: Yes, yes.
Q Before you stopped answering questions first you denied you were present, correct?
A Yes.
Q Do you remember then saying that you did see Carlo standing over a bloody body? You don't remember that?
A I might have said it. I'm not sure. I can't remember, really.
Q Do you then remember later breaking down and blurting out, "I punched him before anything else happened and Carlo started stabbing the guy. Carlo told me to help him take the body out of the kitchen. We put it in Carlo's van and brought it to Bellingham, Massachusetts." You did say that, correct?
A Yes.
Q So before you stopped answering questions you had

made--you admitted you were the first one to assault John Casserly?

A Yes.

Q You admitted that you saw Carlos (sic) with a bloody knife?

A Yes.

Q You admitted that you helped dispose of the body?

A Yes.

Q But you hadn't said anything about Ponch?

A No.

Q You didn't know Ponch? You had never met him before that night, correct?

A No.

Q You knew "Little Chuckie", correct?

A Who?

Q Charles Roy "Little Chuckie"?

A Yes.

Q Of course you knew Timothy, he's your cousin, correct?

A Yes.

Q You were, in your words, good friends were Luis DeJesus, correct?

A Yes.

Q You had known him for several years?

A Yes.

Q By the time you and these others from Milford, including

"Little Chuckie" and Luis DeJesus by the time you were all in that van coming back to Woonsocket you knew that Carlo and Uncle Chuck wanted you to help him--strike that. You knew that you were planning to stab a man, correct?

A I wasn't planning to stab him, I planned to beat him up.

THE COURT: Do you know who you were planning to beat up?

A No.

THE COURT: Do you know why you were supposed to beat up someone?

A Because he was the reason that Carlo's wife had gotten arrested that same day.

Q Showing you Page 61, your Grand Jury testimony.

THE COURT: Do you have it, Miss Soccio?

MS. SOCCIO: Yes, your Honor.

Q Did you tell the Grand Jury, "Question: Did you know why you were going to Woonsocket? Answer: Yes, I found out they wanted to stab John McKenna."

A Yes.

Q That was the question and the answer?

A Yes, but that wasn't talked about in the van,

Q That was your testimony at the Grand Jury, though, was it not?

A Not in the van. That's when we got back and found out.

Q Is this not the question that was asked of you in the Grand Jury and the answer you gave at the Grand Jury?
A It's not the same question you asked me though.
Q Look at the next question. Were you asked, "Okay, this John McKenna, when did you find out about him? Answer: I found out in the van".
A Yes, I found out about him in the van that we was going to beat him up.
Q The answer you gave before the Grand Jury here, "I found out they wanted to stab" don't you see that on Page 61?
A I see that.
Q You gave another statement on March 10 at the Training School, correct?
A Yes.
Q Page 1. "Question: Did Uncle Chuck and the other individuals discuss stabbing John McKenna in your presence? Answer: When I heard them talking about it they just said John. There were some things said about stabbing someone. They never said his name McKenna." Is that fair and accurate?
A About what?
Q Well, first of all did--were you asked that question and did you give that answer?
A Yes.
Q So that putting aside the question of whether you knew

the name John McKenna, you knew the plan was not just to beat him up it was to stab him?
A The plan at first was to beat him up and then later on it came in.
Q Later on the plan evolved into not just beating him up but stabbing him, is that your testimony?
A Yes.
Q And the reason, as you put it, when you talked to the police on March 4th. I'm showing you the March 4th statement, Page 7. Do you see the third answer? "I guess the whole thing of everybody going to Woonsocket I know they wanted Chuckie and all of them to stab some guy that had snitched on Carlo or Carlo's girl." You gave that answer, correct?
A Yes.
Q So that you were willing--well, you were--you were part of--you were willing to help stab someone because that--because you had been told that person was a snitch, correct?
A Yes.
Q These plans were made before these discussions beginning when you first went up to Milford, correct?
A What about?
Q The talk about this plan to beat up or stab someone began when you were first in the van on the way back

Q And then you went to, at some point you were at Carlo's house when Tracey was there, correct?
A Yes.
Q Tracey was present and Uncle Chuck was present?
A Yes.
Q "Little Chuckie" was present?
A Yes.
Q Rob Pointer was present?
A Yes.
Q You were concerned about Rob Pointer, weren't you?
A I wasn't that concerned about him.
Q Well, you knew that--it's fair to say that you knew that something criminal might happen that night involving this beating up or stabbing somebody, correct?
A Yes.
Q Something violent?
A Yes.
Q Something that could be reported to the police?
A Yes.
Q You knew you weren't going to report it to the police, correct?
A Huh?
Q You knew you weren't going to turn a snitch?
A Yes.
Q You knew "Little Chuckie" wouldn't?

A Yes.
Q But you were concerned about Rob Pointer, weren't you?
A Yes.
Q You told "Little Chuckie" that you didn't think Pointer could be trusted?
A Yes.
Q You said, "Well, I don't trust Rob Pointer because he's a snitch"?
A Yes.
Q Is it your testimony that during--strike that. When weapons were being used against John Casserly, be it the flashlight or the knife, is it your testimony that the uncle was never there during that time?
A Uncle Chuck?
Q Yes.
A I don't think he was there, no.
Q Your answer is-- what was your answer again?
A I believe he wasn't there.
Q You're not sure?
A I don't think he was there.
Q But he was there in the beginning, was he not?
A Yes.
Q That's when the argument and disagreement started is in the beginning he was there, right?
A Yes.

Q Do you have your Grand Jury testimony up there?
A Yes.
Q Would you look at the bottom of Page 71 and just read to yourself, if you would, through to about halfway through Page 73?
A Read to where?
Q All of 72 and about half of 73. You earlier described to this jury how John Casserly came after you and you hit him, correct?
A Yes.
Q That was in the very beginning of this, correct?
A Yes.
Q And he went to the ground, people starting kicking him, correct?
A Yes.
Q And is it fair to say that when you describe that event to the Grand Jury those early events occurred while Uncle Chuckie was still present?
A Yes.
Q There was some kind of an intercom system between Uncle Chuckie's house and Carlo's house, correct?
A Yes.
Q And if someone at one house wanted to call to someone on the other house they could use this system?
A Yes.

Q And while you were at Carlo's house and while this fight was going on with John Casserly, were you ever called over through this intercom system?
A Yes.
Q Who called you over?
A Uncle Chuck.
Q Do you remember--do you remember telling the Grand Jury that when he called you over you went--you went over to Uncle Chuck's house, correct?
A Yes.
Q And you told him they had a guy on the floor. They wasn't stabbing him at this time?
A Yes.
Q Well, you told them that even though he'd already been there when the guy was on the floor after you hit him, is that what you're saying?
A I was telling them what happened after he left. That's why he called me over.
Q To tell him there was a guy on the floor?
A He called me over to tell him what was going on right there.
Q In fact, you have claimed that you were twice interrupted by getting beeped by Uncle Chuckie, correct?
A I said I went over there twice but I don't think he beeped me the second time.

Q But from the time the altercation first began from the time you hit John Casserly you went over to brief--to report to Uncle Chuckie twice?

A Yes.

Q The second time you went over there, the second time you went over there you reported that Casserly was getting stabbed?

A The second time I went over.

Q The second time after the fight started that you went over?

A I'm not sure if I told him that right then. I'm not sure he was getting stabbed then.

Q Well, do you remember--you remember telling the police on March 4th in your statement, Page 5 "Uncle Chuck called on the pager and said he wanted to talk to me." Mr. Gorman listen and see if you remember then you can look for it, okay? Do you remember telling them "Uncle Chuck called me on the pager and said he wanted to talk to me. I went to Uncle Chuck's house and was freaking out. I said they're stabbing him. They're stabbing him. He said, calm down." Do you remember making that statement?

A Yes.

Q And it is your claim that after you went and reported this stabbing, not just a beating but a stabbing and you

Q That he was there at the beginning when you first punched John Casserly, correct?
A Yes.
Q That he was there at the end when the time came to prepare his body for disposal, correct?
A Yes.
Q But he wasn't there when any of the weapons were being used against Mr. Casserly?
A No.
Q That's your testimony yesterday. You have told us that earlier in the evening sometime after you arrived but before Mr. Casserly was there--strike that. Miss Soccio was asking you questions about what happened after you came down from Woonsocket and whether there was any drug use and you testified that later in the evening Uncle Chuckie, Casserly, you and Luis were doing cocaine. Do you remember that?
A Yes.
Q And you said that Uncle Chuck had gotten that cocaine, correct?
A Yes.
Q Is it fair to say that Uncle Chuck knew how to get cocaine in Woonsocket?
A Yes.
Q You were questioned several times about the knives that

Q And "Little Chuckie"?
A Yes.
Q And Carlo?
A Yes.
Q And Charles Roy, Uncle Chuck?
A Yes.
Q You remember when you were testifying in the Grand Jury you remember being asked about that when you were testifying before the Grand Jury?
A Yes.
Q And you were asked if that ever happened, if you ever did go beat up that man. Did you remember being asked that?
A Yes.
Q And you said no. Do you remember?
A Yes.
Q And then you were asked "What happened? " And you answered "We ended up murdering John Casserly. " Do you remember giving that answer?
A No, I don't remember giving it like that.
Q The bottom of Page 61. "This John McKenna, when did you find out about--Answer: I found out in the van, in the van on the way back. I heard talking. Did that ever happen? No. What happened? We ended up murdering John Casserly."

Q So it would be fair to say that everybody was there was drinking?
A Yes.
Q And there was no one there was excepted from that?
A Yes.
Q And what was the length of time from when you last used the crack cocaine to the time that you struck John Casserly with the flashlight?
A An hour and a half, maybe two hours.
Q And you had used the drugs at Carlo's house, is that correct?
A Yes.
Q And Uncle Chuckie had supplied the drugs?
A Yes.
Q And at the time were you a member of a gang?
A It wasn't a gang.
Q Did you ever hear of the Kool-Aid Gang?
A The Kool-Aid Gang, no.
Q How about the Dog Pound?
A Huh.
Q You have heard of that gang?
A Yes.
Q Were you a member of that?
A It wasn't a gang, though.
Q What was it, an association of friends?

Q On Oliver Street?
A Yes.
Q And this was a common hanging point, is that correct?
A Yes.
Q And how frequently did you hang out with your friends on Oliver Street?
A Every day.
Q And how far is it from Woonsocket to Milford in terms of distance or time?
A Maybe about half an hour, forty-five minute drive, I guess.
Q How far is it from Woonsocket to the Massachusetts border, if you know, in terms of time?
A Two minutes. Depends on where you are.
Q And had you done illegal things for Uncle Chuckie before?
MS. SOCCIO: Objection.
THE COURT: Sustained. Don't answer that.
Q Now you were asked before about who was the last one to have contact with the victim, John Casserly, and you said Luis DeJesus, is that correct?
A Yes.
Q And by "contact" you mean he was the last one to stab?
A Yes.
Q Now, when the victim was placed into the van you didn't

A They wasn't saying any of their names. They already had stuff on some people.

Q Why didn't you say anything about Ponch is my question.

MR. ANDERSON: Objection. Asked and answered.

THE COURT: I will allow it. I can't hear you, first of all.

MR. ANDERSON: Asked and answered, I say.

THE COURT: Overruled.

Q Why didn't you say anything about what Ponch did on December 2nd?

A Because he wasn't being brought up. His name wasn't in it. There was nothing about his name in there. HAD READ STATEMENTS

Q On December 2nd were you aware of what Ponch did, if anything?

A Yes.

Q But you didn't say anything on December 2nd?

A Right. Just like I didn't say nothing with Luis because his name wasn't in it either.

Q What made you say something about Ponch on December 4th--on March 4th when you gave a statement?

A Because they were starting to give me life and I didn't want it and so many people were against me.

Q I don't understand what you're saying, Mr. Gorman.

A Because I was trying to get a deal.

Q So your testimony is you wanted to cooperate with the

Department of Attorney General?
A Yes.
Q Originally you were charged with murder, is that correct?
A Yes.
Q And then as a result of your agreement it was reduced to Assault With a Dangerous Weapon, correct?
A Yes.
Q Whose idea was it to cooperate with the Attorney General's Office?
A I had talked to my lawyer.
Q And at the time were you talking about what you hadn't said to the police on December 2nd?
A Yes.
Q And it was after your conversation with your lawyer that you decided to make a statement?
A Yes.
Q And that statement on March 4th included what you told the jury today, is that right?
A Yes.
Q And that was about Ponch?
A Yes.
Q And also about what Luis did?
A Yes.
Q Do you recall, Mr. Gorman, whether or not the victim,

John Casserly, when he was on the floor he said anything about his ability to breathe?
A Yes. He said he couldn't breathe.
Q At what point was that?
A After he had fell and somebody stopped stabbing him.
Q What did he say?
A He said, "Stop. I can't breathe".
Q Who was he talking to?
A Carlos (sic) and Ponch.
Q When you picked up the body that was wrapped in the blanket you testified to before, you hit your shoulder against the bar?
A Yes.
Q Was John Casserly dead at that point?
A I believe so.
Q Was he breathing?
A Not at that--
Q Was he moving?
A No.
Q Was he making any noises at all?
A No.

MS. SOCCIO: Nothing further.

MR. ANDERSON: Nothing further, your Honor

RECROSS-EXAMINATION BY MR. FAHEY

Q Sir, it's fair to say you're not a doctor or medical

AFTERNOON SESSION

(JURY ENTERED THE COURTROOM)

THE COURT: Counsel waive the polling of the jury?

MS. SOCCIO: Yes, your Honor.

MR. ANDERSON: Yes, your Honor

MR. FAHEY: Yes, your Honor.

THE COURT: Next witness please.

MS. SOCCIO: Mrs. Donna Casserly.

DONNA CASSERLY

SWORN

DIRECT EXAMINATION BY MS. SOCCIO

MS. SOCCIO: Good afternoon, Mrs. Casserly.

THE WITNESS: Good afternoon.

Q Where do you live?
A 55 Oakland Road, Woonsocket, Rhode Island.
Q Who do you live there with?
A My family.
Q Your husband and your children?
A My husband and my children.
Q How many children do you have?
A I have six children.
Q Your son was John Casserly?
A Yes, he was.
Q How old was he as of December 2nd, 1994?

A Twenty-four.
Q You were aware that your son John had a drug problem, is that correct?
A Yes.
Q On December 1st of 1994, which is a Thursday night into the wee hours of Friday morning, December 2nd, did you see John?
A Yes, I did.
Q And that evening do you recall what you were doing at approximately midnight, 1:00?
A Between midnight and 1:00 I was watching Northern Exposure on television.
Q In what room of the house were you in?
A It's--we call it a sun room.
Q Were you the only one awake at that time?
A Yes, I was.
Q There was no one else in the room with you?
A No.
Q Did John live with you at that time?
A Yes, he did.
Q What time did you go to sleep?
A I think I went to sleep anywhere between, I'm sorry, 1:30 and 3:00.
Q Now, did something awaken you or someone awaken you at some point?

A Yes, my son did.
Q John?
A Yes.
Q And you were still in the sun room?
A Yes, I was.
Q That's where you were sleeping?
A Uh-huh.
Q Did John come into the room alone or with someone?
A Alone.
Q Did you have a conversation with him?
A Yes, I did.
Q And what was it about?
A John wanted to borrow some money because he said he was going out of town the next day and over the weekend for a job.
Q He worked at the time?
A Yes, he did. He used to work.
Q Who did he work with?
A Brian Deering.
Q That's Scott Deering's brother?
A Yes, it is.
Q Is that some kind of construction work or carpenter?
A Yes, it was construction work.
Q Did John tell you how much he wanted to borrow?
A No, he didn't. He didn't ask me for a specific amount.

Police Department?

A I was to test someone's hands for the presence of blood and to examine a vehicle.

Q And who was that individual whose hands you had to test?

A Carlo Belloli.

Q And could you explain to the Court what did you once you got to the Framingham Police Department?

A When I observed Mr. Belloli's hands I observed whether there were visible cuts and whether there were stains visible. I then used a piece of filter paper, wiped the filter paper on the particular area of the hand and then applied chemicals to the filter paper. A particular color is indicative of the presence of blood.

Q And what did your observations reveal?

A I obtained a positive result in a number of areas on both of his hands.

Q Miss Fisher I'm handing you what's been marked as State's 4E 4C and 4D for identification. I ask you to look at those photographs and tell me if you recognize what's depicted in those photographs?

A Yes, I do.

Q How do you recognize 4E?

A The person? Which one is 4E?

Q That's 4E.

A The person whose hands I examined at the Framingham

Q Do you recognize the packaging?
A Yes, I do.
Q Did you package what's contained in there?
A Yes, I did.
Q And what is in each of the exhibits, if you could refer to them by number and how you recognize them.
A Number 10 is a swabbing from the driver's armrest. Number 11 is a swabbing from the inside of the left back door. And Number 12 is the stain from the top of the back bumper, just left to the--just left of the middle.
Q Did you do the analysis right at the Framingham Police Department?
A I did the screening test at the department, yes.
Q And the results from those swabs were what?
A All of them were positive for the presence of blood.
Q You testified you also took cuttings from inside the van?
A That's correct.
Q Where did you take these cuttings from?
A From the back cushion area of the van.

MS. SOCCIO: Your Honor, may I have these marked for identification, three envelopes if we could label them A, B and C State's 13 A, B, C.

THE COURT: All right. State's 13, A, B and C for identification only.