(STATE'S EXHIBIT 13 A, B, C MARKED FOR IDENTIFICATION)

Q Miss Fisher I'm handing you what's been marked as State's 13 A, B and C for identification. I ask you to look at the envelopes and what's contained in there and tell the Court whether or not you recognize what's in there.

A 13A is a stain I cut from the rug between the left wall and the tire in the back of the van. 13B is from the edge of the back cushion in the back of the van. And 13C is from the middle of the back section cushion in the back of the van.

Q Now what did you do with each of these cuttings?

A Each of these were packaged and returned to the laboratory.

Q Did you--you did testing on those?

A They were each screened for the presence of blood at the PD.

Q And what were the results?

A They were all positive.

THE COURT: Did you do the screening?

A Yes, I did.

Q Miss Fisher, after you were done with the cuttings and the swabs what did you do about them?

A They were all packaged and returned to the laboratory

and signed in as evidence.
Q And at some point did someone from the Woonsocket Police Department come to pick them up?
A Yes, they did.
Q Do you remember when that was?
A I believe it was January 23 of '95.

MS. SOCCIO: Your Honor I have just had these marked as State's 14 A through H.

(STATE'S EXHIBIT 14A THROUGH H MARKED FOR IDENTIFICATION)

Miss Fisher I'm handing you what's been marked as 14G and 14F for identification. I ask you to tell the Court if you recognize what's depicted in those photographs?
A Yes, I do.
Q How do you recognize that?
A This is the van I examined at the Framingham Police Department.
Q And I ask you to look at A, B, C, D, E and F, the remaining photographs. See if you recognize what's contained in those photographs?
A Yes, I do.
Q How do you recognize them?
A They're of the interior of the van I examined.
Q Any of those photographs, in particular, do they show the area that you took the cuttings from?

A Yes, they do.
Q Which ones?
A 14F, and 14C. There are also areas showing that are not as obvious on other shots.
Q What do you mean?
A Well, 14B I know the stain was right here.
Q On 14B?
A There was a stain.
THE COURT: They aren't exhibits yet.
Q If you could explain.
A There was a stain on the bumper, just to the left of the middle, in that area. The bumper is visible in 14B.
Q And what were the results of that test?
A The screening test was positive.
Q Do any of the other photographs depict any portion of the van that you examined?
A Yes.
Q Which ones?
A 14D and 14E.
Q What does 14D show?
A The back cushions.
Q And 14E, I believe you said.
A The inside of the left rear door.
MS. SOCCIO: No further questions, Judge.
MR. ANDERSON: I have no questions.

you seize five head hair samples from Adrian Bustamante?
A Yes, I did, sir.
Q And that was pursuant to a warrant?
A Yes, sir.
Q And those head hairs were later submitted to the FBI for analysis?
A Yes, sir, I believe they were.
Q And did you seize head hairs, five samples again from Rene Gorman?
A Yes, sir.
Q And that also was pursuant to a warrant?
A Yes, sir.
Q And those hairs were also sent to the FBI?
A Yes, sir, I believe they were.
Q Did you seize--did you seize any head hairs from Carlo Belloli?
A I believe so, yes, your Honor, sir, I'm sorry.
Q And those were also sent to the FBI?
A I believe they were sent, yes.
Q Did you or anyone else seize any head hairs from Charles Roy?
A Lieutenant Ducharme, I believe, responded to a facility and seized hair. I don't know who he seized it from.
Q You didn't--
THE COURT: You can't hear him?

Q You didn't seize any head hairs from Charles Roy?

THE COURT: If no one wants to hear him, I don't care at this point.

Q You did not?

THE COURT: Decide the case on what you hear.

Q You, yourself, did not seize any head hairs from Charles Roy?

A No, sir, I did not.

Q Do you know whether a warrant was procured by other members of your department authorizing the seizure of Charles Roy's head hairs?

A I have no knowledge of that, sir.

MR. ANDERSON: No further questions.

MS. SOCCIO: No questions.

MR. FAHEY: No questions.

THE COURT: You may step down. Thank you. Next witness, please.

MS. SOCCIO: Lieutenant George Ducharme

GEORGE DUCHARME

SWORN

DIRECT EXAMINATION BY MS. SOCCIO

Q Lieutenant Ducharme you're employed by the Woonsocket Police Department, is that correct?

A Yes, I am.

Q And what capacity are you employed there?

visualized some stains which they believed may have been blood and also broken glass and they were not sure it wasn't involved. They were being cordoned off so the area would not be contaminated.
Q Where were the alleged blood stains located?
A The blood stains they saw were right outside the rear entrance door on a cement walkway.
Q Now, the backyard of 181 Paradis Avenue does it share that backyard with another house?
A Yes, 706-708 Bernon Street. It's a common backyard for both.
Q At the time that you were there, were you aware of who resided in either of those houses?
A No, I was not.
Q Did you observe a dumpster on the property?
A Near 708 Bernon Street in the paved area of the yard.
Q Did you have an opportunity to speak to the owner of both those properties?
A I did not speak to him. Commander William Mack, Commander of Detectives, spoke to him and he advised me.
THE COURT: No, not what he advised you.
Q After your conversation with him did you thereafter search the dumpster?
A Yes, I did.
Q And in searching the dumpster did you have any

assistance at that time?
A At the time I had called in Detective Sevigny. He arrived to assist me doing the photographs and I was also assisted by uniform Patrolman Daniel Turgeon and Omar Brochu. They were both assigned to assist.
Q Can you describe for the Court what it is--it was that you found in the dumpster?
A I found several articles in the dumpster. While going through it I found a Budweiser box and in the Budweiser box there was a blue and pink colored blanket.
MR. FAHEY: May the record reflect he's reading from the report?
THE COURT: Everybody can see it.
Q Okay. There was a blue and pink colored blanket and inside the blanket there was a black right hand glove which was a cloth glove, a stained white tee shirt and a stained green towel.
Q What did you do with these items?
A I separated the items on paper. I took photographs of them and properly packaged them as evidence.
Q Did you find a paper bag in the dumpster?
A Yes, I did.
Q Did you seize that paper bag?
A I seized the paper bag and the contents that were in it.

Q What was in the paper bag?
A There was one brown work boot. There was a baby scrap with little teddy bears on it. There was a MacDonald's Happy Meal box.
Q How would you describe the boot that was in that paper bag?
A It had stains on it which appeared to be blood.
Q What did you do with these items?
A I again photographed them and separated them and sealed them all as evidence.
MS. SOCCIO: Can I have these marked for identification, Judge?
THE COURT: What are they? How many are there?
MS. SOCCIO: There are three. If they could be marked as A, B and C. I think it's--
THE COURT: State's 16 A, B, C.
(STATE'S EXHIBIT 16, A, B, C MARKED FOR IDENTIFICATION)
MS. SOCCIO: Thank you.
THE COURT: What are they photos of?
MS. SOCCIO: Photos of 181 Paradis Avenue, 708 Bernon Street and the hallway of 181 of Paradis Avenue.
Q Lieutenant Ducharme I'm handing you what's been marked as State's 16 A, B and C for identification and ask you to look at those photographs and state whether or not

dumpster containing the brown work boot with the stain on it which I believed to be blood. And 17B is a close-up of the same articles, being the boot and the paper bag that were found in the dumpster.

Q Did you take those photographs?

A Yes, at the time I took them.

Q At some point later in your investigation did you find the other or another boot the same size as this one?

A Yes, I did.

Q Where did you find that boot?

A At the autopsy in Boston.

Q I'm handing you 17C for identification. Do you recognize what's in that photograph?

A Yes, I do. That's the brown boot which I found to be similar to the one I found in the dumpster which was on the body of John Casserly at the autopsy.

Q And you took that photograph?

A Yes, I did.

Q And you compared the two boots?

A Yes, I did.

Q What size were those boots, if you know?

A They were twelve inches in length. The exact size was not marked on the boot.

Q How long were you working in the dumpster area?

A I was in the dumpster area approximately two hours.

A It's a hooded sweatshirt, being brown and blue colored stripe.
Q And I believe you mentioned Friday that you seized one black right-handed cloth glove from the dumpster of 181 Paradis Avenue?
THE COURT: When did he say that Friday? What exhibit is it?
MR. ANDERSON: It's not marked as an exhibit but I believe he testified to it.
A Yes, a right handed cloth glove.
Q That was from the dumpster that you described, correct?
A Correct.
Q And did you also--did you also seize one black left-handed cloth glove from the master bedroom at 181 Paradis Avenue?
A Yes, I did.
Q Those gloves were not sent to any laboratory for any blood, hair or fiber analysis, correct?
A Correct.
MR. ANDERSON: One 1 page document, your Honor.
MS. CLERK: Defendant's K for identification.
(DEFENDANT BUSTAMANTE'S EXHIBIT K FOR IDENTIFICATION)
Q Were you present at the Woonsocket Police station on December 6, 1994 when my client, Adrien Bustamante,

Q And who retrieved those articles of clothing?
A Trooper Robert Ferraro who's also assigned to Worcester CPAC who works with me was responsible for securing all evidentiary items at the scene.
Q State's 35C depicts--
THE COURT: 35 what, C?
MS. SOCCIO: 35C depicts where the body was laying.
THE COURT: Just yes or no.
A Yes.
Q How close is that to where the street is? You can't see the street in that particular photograph?
THE COURT: The photographs aren't in evidence yet.
MS. SOCCIO: Excuse me?
THE COURT: The photo is not in evidence as yet.
MS. SOCCIO: That's correct.
THE COURT: It's only for identification.
Q You had an opportunity to observe where the body was located in reference to the street?
A Yes, ma'am.
Q Were you able to make a determination how close or how far away the body was from the street area?
A Yes, ma'am.
Q How far away was it?
A It was very close, perhaps ten feet.

packaging and what's contained in the packaging?
A Yes, ma'am, I do.
Q How is it that you recognize it?
A These are jeans that were taken from Cross Street in Bellingham.
Q And are there some markings or cuttings in those jeans at the present time?
A I beg your pardon?
Q Markings or cutting out of the jeans that you see?
A I see there are markings on the inside of the waist and also cuttings--
Q Okay. Now those markings and the cutting was that the way the--strike that. The markings and the cutting of that particular pair of jeans was that there on December 2nd when you saw those jeans?
A No, ma'am.
Q Other than that, are those jeans substantially in the same condition that you last saw them?
A Yes, ma'am.
MS. SOCCIO: Your Honor I'd ask that this be made a full exhibit.
THE COURT: 29 may be full.
(STATE'S EXHIBIT 29 MARKED AS A FULL EXHIBIT)
Q I'm handing what's marked as State's 27 for identification. I ask you to look at that, the

identification. I ask you to look at that, the packaging, and what's in it and tell the Court whether or not you recognize it.
A Yes, ma'am, I recognize this.
Q How do you recognize it?
A This is a blue towel that was also secured from the Cross Street scene.
Q And that was retrieved by you or Trooper Ferraro?
A Trooper Ferraro, yep.
Q And were you given all the evidence that was retrieved from Cross Street?
A Yes, I was.
Q And what did you do with it after you received it?
A I subsequently turned it over to Woonsocket detectives.
Q But prior to that was it stored in your evidence room?
A Yes, ma'am.
Q And that's located in Worcester?
A It's located in the Worcester CPAC office located in Auburn, Massachusetts.
MS. SOCCIO: Your Honor I'd ask that State's 27 be made a full exhibit.
THE COURT: Is that towel in the same condition, relatively the same condition as when you saw it that day
THE WITNESS: Yes, Judge.

THE COURT: It may be marked full.

(STATE'S EXHIBIT 27 MARKED AS A FULL EXHIBIT)

THE COURT: We will take our midmorning recess. You may step down.

THE WITNESS: Thank you, Judge.

THE COURT: We will be about ten or fifteen minutes. If you want, you can send one or two of your number down to get some refreshments. Once again, please do not discuss the case among yourselves.

(JURY LEFT THE COURTROOM)

RECESS

(JURY ENTERED THE COURTROOM)

TROOPER FRANCIS LEAHY RESUMED THE STAND

MS. CLERK: May I remind you, sir, you are still under oath.

THE WITNESS: Yes, ma'am.

MS. CLERK: Thank you.

<u>CONTINUED DIRECT EXAMINATION BY MS. SOCCIO</u>

Q Trooper Leahy I'm handing you what's been marked as State's 28 for identification and ask you to look at that packaging and tell the Court whether or not you recognize the packaging and what's contained in it?

A Yes, ma'am, I do.

Q And how is it that you recognize what's in there?

A These are black jeans that were also recovered from the

Q Now, if you could briefly just take a look at those jeans to see if they are in substantially the same condition as when you last saw them on December 2nd?
A No, ma'am.
Q What is different about them?
A These jeans have a number of markings and arrows. They have an evidence tag which obviously wasn't on it. There's writing on the inside waist.
Q Other than those markings, are those jeans in substantially the same condition as when you last saw them?
A Yes, ma'am.
MS. SOCCIO: Your Honor, I ask this be made a full exhibit, State's 28.
THE COURT: It may be marked full.
(STATE'S EXHIBIT 28 MARKED AS A FULL EXHIBIT)
Q State's 31 for identification. I ask you to look at that and tell the Court whether or not you recognize the packaging and what's contained in there?
A Yes ma'am, I do.
Q And how is it that you recognize that?
A Again, these are a pair of trousers that were recovered from the Cross Street scene.
Q And are those jeans in substantially the same condition as the last time that you saw them?

A Yes, other than the fact that there are markings on them. There's a cutting taken from them, from the jeans.

MS. SOCCIO: Thank you. Your Honor I ask this be made as a full exhibit.

THE COURT: That's 31, right?

MS. SOCCIO: 31.

THE COURT: 31 may be full.

(STATE'S EXHIBIT 31 MARKED AS A FULL EXHIBIT)

Q Trooper Leahy, this is State's 30 for identification. I ask you to take a look at it and tell the Court whether or not you recognize that exhibit.

A Yes, ma'am. This is the plaid shirt that was recovered from the Cross Street scene.

Q And Trooper Leahy is it in substantially the same condition as the last time you saw it on the December 2nd of 1994?

A No. Again, there are notations that have been made on it and patches that have been cut from it.

Q Other than the notations and the cuttings is it in substantially the same condition?

A Yes, ma'am.

MS. SOCCIO: Thank you. Your Honor, I ask this be made a full exhibit.

THE COURT: 30, right?

THE COURT: 30, right?

MS. SOCCIO: 30.

THE COURT: It may be marked full.

(STATE'S EXHIBIT 30 MARKED AS A FULL EXHIBIT)

(STATE'S EXHIBIT 32 MARKED FOR IDENTIFICATION)

Q State's 32 for identification. I ask you to take a look at that to see if you recognize it.

A Yes, ma'am, I do.

Q And how is it that you recognize it?

A This is the Simpson Family sleeping bag that was recovered from the Cross Street scene.

Q And is that in substantially the same condition as the last time that you saw it?

A Yes, ma'am.

MS. SOCCIO: I ask that this be made a full exhibit, your Honor.

THE COURT: It may be marked full.

MS. CLERK: State's 32 may be marked in full.

(STATE'S EXHIBIT 32 MARKED AS A FULL EXHIBIT)

Q Trooper Leahy did you also have an opportunity to observe the vehicle that was in question --

A Yes, I did.

Q -- with regards to this homicide?

A Yes, I did.

Q And what vehicle did you observe?

that's the black Levi pants, those were on a comforter directly on top of the body, were they not, depicted in 35B?

A Yes, sir.

Q Those are State's 28 full, correct?

A Yes, sir.

Q Those are black?

A Yes, sir.

Q Could you check the brand name and the size of those?

A Levi Strauss and Co.. The waist 32, length 32.

MR. ANDERSON: Thank you, Trooper. No further questions.

CROSS-EXAMINATION BY MR. FAHEY

Q Trooper Leahy this was a Massachusetts investigation starting out, is that correct?

A Yes, sir.

Q Because the body was found in Bellingham?

A Yes, sir.

Q And I believe you testified that the Bellingham Police were the first ones on the scene?

A Yes, sir.

Q And then the State Police was called?

A Yes.

Q And were you the first state police officer there?

A Yes, sir.

Q Now, did you have anything to do with the autopsy? Were you present at it?
A Yes.
Q And you are familiar with the autopsy report that the death certificate--?
A I haven't seen it.
Q Well, from your investigation was the time of death determined to your knowledge?
A I'm not qualified to even answer that question. I didn't see the autopsy report.
Q But were you at the autopsy?
A I beg your pardon?
Q Were you at the autopsy?
A Yes, sir.
Q And at some point is it fair to say there was discussion in the Worcester District Attorney's Office about this case?
A Certainly, sir.
Q And there was discussions about jurisdiction, wasn't there?
A Yes, sir.
Q Because the body was found in Massachusetts?
A Yes, sir.
Q And did you participate in those discussions?
A Yes, sir.

Q And you are familiar with the name of the victim in this ! Case?

A Yes.

Q And that's Casserly?

A Yes.

Q And was there a k number assigned to a known sample of his blood?

A Yes, there was. By protocol we usually assign K-1 to the victim. In this case after running the first set of films when they were developed it was apparent that this particular sample was either degraded or there was insufficient DNA because no profile was obtained. After the second submission items that were on his person at the time of his death they were bloodied cuttings from his underpants were taken and used as a known sample for Mr. Casserly.

Q And what designation was that given?

A We gave that, it was q'd in as Q-47. We also called that within our computer K-12 and the reason for giving it two designations is because the computer has to have a k designation to be able to compare it to a q.

Q And as a result of the procedures followed by the FBI were you able to find a match for Q-47, the underwear from John Casserly, with any of the items that were submitted, q'd items or q items, and if so, could you

MS. SOCCIO: We don't know that, Judge. They have to judge the credibility of those witnesses. This is scientific evidence.

THE COURT: You think they understand? There's only one person on this jury that understands; that's Doctor Davis. You look at that jury when they listen to you.

(RECESS)

(JURY ENTERED THE COURTROOM)

DEBORAH HOBSON RESUMED THE STAND

MS. CLERK: May I remind you, Miss Hobson you're still under oath.

THE WITNESS: Yes.

CONTINUED DIRECT EXAMINATION BY MR. PRIOR

Q Miss Hobson beside the matches that you made with the sleeping bag, the rug, the blanket, the shoe matching Mr. Casserly, were you able to reach--find any other matches with blood evidence that was submitted?

A We received a band-aid into our lab we designated--

THE COURT: I'm sorry. You have to keep your voice up. I can't hear a word you're saying.

A We received a band-aid into the lab. We designated that item Q-21. There was human blood on the band-aid and we performed DNA analysis. That item came from Mr. Belloli's van. It was found there and it had

blood--excuse me, DNA profile that matched Mr. Belloli's.

Q In all six probes?

A Yes.

MR. PRIOR: Thank you. I have no further questions.

CROSS-EXAMINATION BY MR. ANDERSON

Q Miss Hobson is it fair to say that when a police officer or a lay person sees a stain on an article of clothing that might be blood, if it looks like blood that they can't tell whether it's blood until it's been tested in the laboratory?

A That's correct.

Q And in this case were you asked to examine five different pants to determine whether any stains on there were blood, and if so, human blood?

A We were asked to look at a number of different pairs of jeans which I haven't counted them up.

Q Any particular item that you are examining you give a q number to, correct?

A That's correct.

Q For example, showing you what's marked State's 29 full can you tell us what the q number is on that article of clothing?

A This has been designated Q-40 by our lab and it's been

A That's correct.
Q So those where you found blood, namely Q-40 and Q-42 did you do grouping tests?
A Yes, grouping tests was performed on both of those items.
Q And did you do grouping tests on the known blood submitted to you from the victim, John Casserly, from the suspects Adrian Bustamante and Rene Gorman, Charles Roy and Carlo Belloli?
A Yes.
Q Is it fair to say that the blood that you found on those two pairs of pants could have come from the victim, John Casserly?
A Yes, they could have.
Q Based on your grouping tests?
A Yes.
Q Is it also fair to say that the blood you found on those two pairs of pants could not have come, based on the grouping tests, from the suspect Adrian Bustamante?
A That's correct.
Q And you also examined a plaid shirt which you designated Q-41?
A Yes.
Q Showing you State's 30. Does that indicate a q number?
A Yes. This was designated Q-41.

fiber from a questioned source from the color of the known source.

Finally, another instrument is used to confirm the fiber type and the fiber's then viewed finally in the fluorescent light microscope which looks at the fluorescence of the questioned fiber and compared it to the fluorescence of the known fiber. If the fibers look the same after going through all this analysis then the fibers are said to have the same microscopic characteristics and optical properties.

Q Mr. DiZinno you have an occasion to receive any pieces of evidence with regard to a homicide investigation from the Woonsocket Police?

A Yes, I did.

Q And when, approximately, did you receive these items for your analysis?

A I received this evidence on two different occasions, on March 3rd and April 7, 1995.

Q And what exactly did you receive, what items? No, strike that. I will question you into certain items. It's fair to say you received a number of items?

A Yes, I received numerous items relating to this case.

Q And was one of those items a pair of sneakers or tennis shoes?

A Yes, I received a tennis shoe that was indicated to me

as being a tennis shoe from Carlo Belloli.
Q And did you have an opportunity to conduct the examination that you just described to the jurors on that particular piece of evidence?
A Yes, I did.
Q And what did you do?
A On that--with all these items of evidence that I will talk about, all the examinations that I just mentioned were conducted. In regard to that tennis shoe I found a green synthetic carpet type fiber which had the same microscopic characteristics and optical properties as the green synthetic carpet fiber composing a carpet sample from a residence at 181 Paradis Avenue. Numerous other green carpet type fibers of this type were found on a sponge and sleeping bag from that Paradis Avenue residence, a towel, three pairs of jeans and a shirt from Cross Street and also the jeans, jogging pants, underwear, socks and tee shirt from John Casserly. All of these items contained fibers that were consistent with having come from the carpet at 181 Paradis Avenue.
Q Did you also analyze a band-aid?
A Yes, I did.
Q And did you analyze that band-aid with relation to any carpet fibers?
A Yes, this band-aid was a band-aid that was indicated to

Q And did you find any hair sample for comparison on any of those jeans?

A I will go through each one of them if that's okay? On the Q34 blue jeans there was a Caucasian head hair that was suitable for comparison that did not have the same microscopic characteristics as either John Casserly, Carlo Belloli, a Mr. Gorman and a Mr. Bustamante.

On Q40 which is another pair of blue jeans there was a Caucasian head hair that was the same as the hairs from the victim John Casserly.

And on Q42 there with several head hairs that had the same microscopic characteristics as hairs from John Casserly.

Q Was there submitted--strike that. When you say you compared these hairs to hairs of Carlo Belloli, Rene Gorman, Adrian Bustamante and John Casserly I assume that samples of their head hairs were submitted to you, correct?

A That's correct.

Q Were any samples of head hair submitted to you from an individual identified as Charles Roy?

A No.

MR. ANDERSON: Thank you.

MR. FAHEY: I have no questions, your Honor.

THE COURT: You may step down.

half inch laceration with abrated margin in the front to back plane over the left parietal ridges five-eighths of an inch. In back of the above-noted two inch laceration there was a two and a half inch laceration with abrated margins in the front to back plane.

Over the left parietal occipitalis, that's the back part of the scalp on the left, there was a two and three quarters inch laceration in the oblique plane with abrated margin over the right parietal region, that's the side of the top of the scalp. There was a two inch laceration in the front to back plane with abrated margin in the right temple region, that's in the temporal region of the scalp, this area.

There was transverse lacerations with abrated margin over the mid-occipital. That's the midportion of the back of the scalp in the this region here. There was a one and a half inch laceration with abrated margins in the occipital plane over the left side of the occipital region, the left side of the back of the scalp. And half an inch laceration in the transverse plane laying one half inch to the right of the lacerations I have just mentioned.

There with thirty-seven stab wounds. I have labeled these from A to Z and then Double A for identification purposes. That does not necessarily

imply a chronological sequence.

Stab wound A measured eighteen inches in length and lay in the transverse plane over the left front part of the chest at the level of the fifth intercostal space. The intercostal space is the space between the ribs, the ribs being numbered from top to bottom. So that the fifth intercostal space is between the fifth and sixth ribs, in this region here. That was two inches from the midline.

Q Doctor, is that a fatal wound?

A Yes.

Q And when you say "fatal" what do you mean?

A It would cause death.

Q Bleeding?

A Yes. Stab wound B measured one and three sixteenth inches in width and lay in the transversion plane over the left front part of the chest at the level of the sixth intercostal space, in this region here, three and a half inches from the midline.

Wound C was a stab wound measuring one and five-eighth inches in width and lay in the oblique plane over the left front part of the chest at the costal margin one half inch from the midline. The costal margin is the margin of the last rib, so it's the lower front part of the chest.

Wound D was an abdominal stab wound measuring three quarters of an inch in width and laying in the vertical plane one half inch above and immediately to the left of the plane of the umbilicus. In other words, in this region here.

Q Was that also a fatal wound, Doctor?
A It could be, yes.
Q As well as B and C?
A Yes. Wound E was a stab wound measuring three quarters of an inch in width over the lower portion of the right upper quadrant of the abdomen one and one-quarter inches from the midline. In other words, in this region here.

Wound F was an abdominal stab wound measuring one half inch in width, one-quarter inch to the right of the stab wound E that I just mentioned.

Wound G is a stab wound measuring one half inch in width over the left flank. The flank is the region between the last rib and the hip bone.

Wounds H, I and J were three stab wounds each measuring one half inch in width over the outer portion of the left lower quadrant of the abdomen. In other words, in this region here.

Wound K was a stab wound measuring one and three quarter inches in width in the pubic region immediately to the left of the midline. In other words, the lower

part of the abdomen near the groin area. Probing of this wound showed that it passed downward for a depth of two and a half inches without entering the scrotum.

Wound L was a stab wound to the lower part of the right side of the chest in this region here. It's width measured one inch and probing of this wound showed it had to pass toward the left and toward the back for a depth of four and a half inches into the tissue underneath the skin without entering the chest or abdominal cavities.

Q What is probing, Doctor?

A A probe is an instrument put into the wound to determine it's course and depth. Wound M was a stab wound of the right flank. Again, the flank being the space between the last rib and the hip bone. It's width measured three quarters of an inch. And it's course was toward the front for a depth of two and a half inches into the tissue underneath the skin without entering the abdominal cavity.

Wound N was a stab wound of the left lateral aspect of the chest. In other words, occipital, this side of the chest. It measured three quarters of an inch in width and three quarters of an inch in depth. It's course was toward the right into the tissue under the skin without entering the chest cavity.