Wounds O and P were two stab wounds of the upper midportion of the back of the chest. In other words, in this region here. Each of these wounds measured three quarters of an inch in width and they lay in oblique planes adjacent to one another. The wound on the left passed toward the midline into the tissue underneath the skin for a depth of two and a quarter inches and the right wound passed downward into the tissue underneath the skin for a depth of two and a quarter inches. Neither of these wounds entered the chest cavity.

Wound Q was a stab wound of the lumbar region of the back. It measured seven-eighths of an inch in width and lay one inch to the left of the midline, the lower part of the back in this region.

Wound T was a stab wound measuring one and one-quarter inches in width at the upper margin of the left buttocks. In orders words, in this region here. This wound passed downward into the tissue underneath the skin for a depth of three and a half inches.

Wound U was a stab wound measuring five-eighths of an inch in width at the lower margin of the left buttocks. In other words, the underportion of the left buttocks. Probing of this wound show it's course to be toward the front for a depth of three inches.

Wound V was a stab wound of the lower back part of

with a depth of three quarters of an inch over the side portion of the middle of the left side of the chest, in this region here. This wound passed toward the back and upward into the tissue underneath the skin. It did not enter the chest cavity. And there was a one inch incised wound with a three-quarter inch depth into the tissue underneath the skin over the left side of the chest one inch below the above-noted, previously mentioned, incised wound. This wound also did not enter the pleural cavity.

There were numerous abrasions. Abrasion being a scrape or an injury caused by contact with a rough surface. There was a one half by one inch abrasion just above the outer portion of the right eyebrow, in this region here. There was a one-sixteenth by one inch abrasion above that on the right side of the forehead. There was a one half by one half inch abrated area over the left front part of the forehead, in this region here and there were scattered abrasions over the lower lid of the right eye and the right cheekbone measuring up to five-eighths of an inch in maximum dimension. There was a three-eighths by three-eights of an inch abrasion below the outer portion of the left eye, in this region here, and there was a three-sixteenths by three-sixteenths inch abrasion and one-eighth by

one-eighth abrasion to the left of that.

There were scattered abrasions over the left side of the face. There was a one and a half inch interrupted linear abrasion. A linear abrasion being a scratch mark caused by a sharp object, for example, the tip of a knife blade, and that was in the front part of the neck. And there was also a one and one-quarter inch interrupted linear abrasion on the right side of the front of the neck. There was an one-quarter inch linear abrasion or scratch mark over the left front upper portion of the chest, in this region here. A linear abrasion or scratch mark measuring one and one-eighth inch over the left front of the chest just over the left of the midline and one inch to the right of the above-noted linear abrasion. There was a two and a half inch interrupted linear transverse abrasion immediately to the right of the midline in the midfront portion of the chest in this region here. An interrupted three and three-quarter inch linear abrasion lay just below the left nipple, in this region.

There was a four by two inch brush/burn abrasion. In other words, an abrasion caused by a scrape, a scraping motion over the left scapular. That's the left shoulder blade region of the back. And there was also a one by two and three quarters inch similar abrasion over

the right scapular region or right shoulder blade region of the back.

Q Doctor is that injury consistent with being dragged, the body being dragged?

A Yes.

Q There with multiple abrasions over the midlumbar region of the back. In other words, the lower portion of the back had multiple abrasions. There were multiple linear abrasions measuring up to one inch over the back part of the left side of the chest, in this region here. And there was a five-eighths by one half inch abrasion over the lower portion of the right side of the chest, in this region here. There were scattered abrasions with contusions. A contusion, being a bruise, over the lower portion of the right side of the chest and the right flank region, in this region in this area here.

There was a three inch linear abrasion along the long access of the left arm between stab wounds Y and Z. In other words, in this area. There were two linear abrasions in the transverse plane, one measuring one inch and the other one one and a half inches over the upper portion of the palm side of the left forearm. In other words, in this region here. Four linear abrasions each one measured three-sixteenths of an inch in the vertical plane. They are parallel to one another also,

however, the upper portion of the left forearm on the palm side.

Q Doctor are those consistent with defensive wounds?

A These are consistent with defensive type wounds meaning a wound sustained by a victim trying to protect himself from his assailant.

There was a three-quarter of an inch linear abrasion over the lower palm side of the left forearm, in this region here. And there was a three-eighths by three-sixteenths inch abrasion, on the top of the thumb side of the left wrist. In other words, in this region here.

There was a one by one inch contusion or bruise over the upper half of the nose and there was a four by three inch area of contusions involving the lids of the left eye and the skin about the eye including the left cheek region. In other words, he had a black eye. Both lids of the left eye were swollen. The entire upper lid was contused as was the left side of the lower lid and most of the left ear was contused. The entire portion of the top of the right hand appeared contused, this region here. And a contusion measuring three-quarters by three-quarters inch was found over the top portion of the junction of the phalanges of the right fourth finger. In other words, in this region here.

Q Is that wound consistent with striking an object or punching something or someone?
A Yes. The top of the left second and third metacarpal regions and the top portion of the left thumb appeared contused. In other words, the top portion of the left hand, in this region was contused. Over the right front portion of the chin there was a one-eighth by five-eighths inch laceration or a tear of a depth of one-eighth inch.
Q You also performed--you went further and did an internal exam, correct?
A Yes.
MS. SOCCIO: Your Honor, at this time I'd like the Doctor to use the overhead projector to show-- he has with him some transparencies of where these injuries are located.
MR. ANDERSON: I don't know if we have seen those. Can we approach, briefly?
THE COURT: Certainly.
(BENCH CONFERENCE)
Q Doctor, without the assistance of the overhead projector and transparency could you continue to describe or begin to describe the internal examination that you performed?
A Yes.
THE COURT: Excuse me, Doctor. Would you need the

transparencies to describe? Is it necessary?

A I don't know, your Honor.

THE COURT: Well, can you describe it without the transparency?

THE WITNESS: I can. It would be helpful to have them, but it's up to the Court.

THE COURT: All right, go ahead.

A Occipital internal examination of the head there was hemorrhage associated with all these or bleeding associated with all these various lacerations that I described in the scalp. And there was also hemorrhage or bleeding in the neck associated with these incised wounds that I described on the left of the neck.

An examination of the chest showed bleeding in the tissue underneath the skin about the various stab wounds that I described. There was marked hemorrhage in the left pectoralis. Those are the muscles on the upper portion of the chest that connect with the arm and in the left armpit as well and association with the stab Wound Y.

The left pleural cavity, the space surrounding the left lung, contained two hundred milliliters of blood. That's a little less of--a little less of seven ounces of blood. Stab Wound A, which was the stab wound in the front part of the left side of the chest, in the region

of the fifth intercostal space, passed toward the right, slightly downward and toward the back. After perforating the intercostal space it entered the mediastinum. The mediastinum is the midstructure the midportion of the inside of the chest.

The stab Wound C, which is also in the left front part of the chest, perforated the cartilage at the left costal margin. Cartilage is hard tissue. Another name for it is gristle, and at the area of the margin of the ribs it's made up of cartilage. That was perforated.

And also the left side of the sternum or the breast bone was also perforated by stab Wound C which passed toward the right and toward the back. Both stab Wounds A and C terminated in the mediastinum region or the midportion of the chest. I couldn't tell one wound from the other because they were so close together. Internally one of them perforated the right ventricle which is one of the chambers of the heart. And the wound terminated within the cavity of the right ventricle. The other wound terminated in the mediastinum. The depth of the wound that terminated in the right ventricle measured approximately five inches and the depth of the other wound measured four inches.

Stab Wound B, which also entered on the left front part of the chest, perforated the left sixth intercostal

space. That's the space between the sixth and the seventh ribs. It passed downward and slightly toward the back without penetrating the lung and it terminated in a perforation of the diaphragm. The diaphragm being the muscle separating the chest organ from the abdominal organ. The depth of this wound measured four inches.

Stab Wound Y, which is the wound that entered in the back part of the left shoulder, passed downward, slightly toward the front and toward the midline. It perforated the left second intercostal space. That's the space between the second and third ribs and entered the left pleural cavity, which is the space surrounding the left lung. Then there were two thrusts with penetration of the upper lobe of the left lung. In other words, the one wound was inflicted, the knife was withdrawn in the same wound and again thrust into the lung. The total depth of the stab Wound Y measured approximately seven and a half inches.

Q Doctor does the size of the wound conform to the size of the knife? In other words, if you had a five inch knife would the wound necessarily be five inches?

A Not necessarily, no.

Q In other words, the wound can be much deeper even with a smaller knife?

A Yes. As a consequence of the elasticity of the tissue

any chemicals in the body?
A Yes, blood fluids were submitted to the Massachusetts Police Chemistry Laboratory and I received a report from them.
Q And was there any alcohol in the victim's system?
A Yes.
Q How much?
A Point seventeen grams percent.
Q What about any drugs, intoxication?
A Yes.
Q How much?
A Blood cocaine was present; less than fifteen microgram percent and metabolites of cocaine were present. Benzoylecgonine was ninety-eight micrograms percent. Benzoylecgonine is a metabolite of cocaine. When cocaine enters the body is rapidly metabolized to several substances including Benzoylecgonine. In other words, it's broken down to form that compound. Also blood ecgonine methyl ester that was thirty-one micrograms percent. That's another metabolite of cocaine and also present was blood cocaethylene that was the detected and it was less than fifteen micrograms percent. Cocaethylene is a combination of cocaine and alcohol.
Q Is that a large amount? You said less than fifteen

micrograms?
A No, it's not a large amount.
Q Do you have an opinion as to whether or not the cocaine or alcohol contributed to this person's death?
A No.
Q Did you arrive at a conclusion?
THE COURT: Excuse me. You don't have an opinion or it didn't contribute?
A I don't have an opinion, your Honor.
THE COURT: Thank you.
Q Do you have an opinion based upon a reasonable degree of medical certainty as to the cause of death of John Casserly?
A Yes.
Q And what is that?
A Multiple stab wounds.
MS. SOCCIO: I'd like to have these marked for identification, Judge.
THE COURT: They may be marked. How many are there?
MS. SOCCIO: Thirteen.
MS. CLERK: State's 36 through 49.
THE COURT: Pardon?
MS. CLERK: State's 36 through 49.
THE COURT: Okay.

(STATE'S EXHIBITS 36 THROUGH 49 MARKED FOR IDENTIFICATION)

Q While those are being marked, Doctor. Did you make any reference in your report to any rigor mortis or can you describe what rigor mortis is?

A Yes.

Q Could you describe what you found and what it means?

A Rigor mortis was well-developed.

Q What does that mean?

A After death the muscles begin to stiffen and this is called rigor mortis and this begins at about, under average circumstances, about four hours after death and it reaches a peak in intensity approximately thirteen to fifteen hours later, after death that is, and then gradually subsides so that over a period of over twenty-four hours under average circumstances it usually disappears.

Q Is that process slowed down by the cold weather or warm weather?

A It's slowed down by a cold environment and accelerated by a warm environment.

Q Now, the injuries that you have described to the head and to the eye area, are those injuries consistent with being hit with a blunt object?

A Yes.

Q You described some the linear abrasions on the forehead of John Casserly. Did you describe any linear marks?
A No.
Q What, if anything, did you find on the forehead, what type of marking?
A Well, there was a pattern of blood and parallel lines one-eighth inch apart and also some abrasions of the forehead.
Q Those linear lines, were those in your opinion consistent with the heel of a shoe or a sneaker?
A Yes.
Q And you described the interrupted linear abrasion, what does that mean?
A That means scratch marks that was interrupted. In other words, it wasn't a solid mark. It was partially present and then absent and then again present again.
THE COURT: Doctor, you examined the body. What was the state of rigor mortis at that time?
A It was well-developed, your Honor.
THE COURT: And what time did you do your autopsy, approximately?
A The autopsy started at 7:54 a.m. December 3, 1994.
THE COURT: Thank you.
Q Doctor, I'm handing you what's been marked as State's--
THE COURT: You want to show that to counsel?

Q Does that fairly and accurately depict the wound to John Casserly in the back of the neck, at the top of the back?

A Well, it's below the neck. It's in the upper portion of the back in this region here.

Q And you recognize that as being the one that you saw --

A Yes.

Q -- when did you the autopsy.

MS. SOCCIO: Your Honor I would move these all in as full exhibits and I would like to have them published to the jury.

THE COURT: We will defer on that until a recess. Let's move on so we don't keep the Doctor waiting.

MS. SOCCIO: I don't have any further questions.

THE COURT: Yes, go ahead.

CROSS-EXAMINATION BY MR. ANDERSON

Q Doctor, as a result of your examination of this body is it fair to say that statement--you can say there was no evidence of cigarette burns?

A I didn't recognize any cigarette burns.

MR. ANDERSON: Thank you.

CROSS-EXAMINATION BY MR. FAHEY

Q Doctor, pursuant to your autopsy and your investigation in this matter you prepared a death certificate, is that correct?

A Yes, I have that information in a police report, a copy of a police report.
Q Would you mind looking at it, Doctor?
A According to this report 9:08 a.m. the police responded to the scene.
Q That was on what date?
A December 2nd, 1994.
Q And it is fair to say that the autopsy was performed on December 3 some twenty-two hours later?
A Yes.
Q And in your diagnosis, Doctor, of the victim, besides the presence of drugs that you noted before in your testimony did you also make a determination of acute alcoholism?
A Yes.
Q And by that did you make that determination by studying the inside of the body, the liver?
A No.
Q How was that made?
A By the alcohol level of point seventeen grams percent in the blood.
MR. FAHEY: Thank you. No further questions.
MS. SOCCIO: Nothing further.
THE COURT: You may step down, Doctor. Thank you.
THE WITNESS: Am I excused your Honor?

following exhibits, all the remaining photos may be introduced as full exhibits.

MS. CLERK: Judge we had said that we were going to mark up to 49 but it only went to 48.

THE COURT: Do you rest now?

MS. SOCCIO: Yes, Judge.

THE COURT: You will rest again in front of the jury?

MS. SOCCIO: Yes.

MR. ANDERSON: Your Honor I believe there are two other matters that have yet to be ruled on. Maybe it should be addressed before the motion for judgment of acquittal. One was my written motion to strike the testimony of Timothy Gorman filed on Friday of last week.

THE COURT: Wait a minute. What do you say about his motion as to Timothy Gorman?

MS. SOCCIO: I'd object to the motion to strike Judge because in discovery Timothy Gorman does make reference to the flashlight. Furthermore, Judge, Mr. Anderson--

THE COURT: How does he make reference? Does he say the defendant struck him with a flashlight?

MS. SOCCIO: Yes, Judge.

THE COURT: Wait a minute. Is that true? You're

alleging in your motion it isn't.

MR. ANDERSON: I would also--this is Timothy Gorman's statement. "I would also like to correct something on Page 2 of my statement I gave on 3 December'94. Ponch picked up the flashlight first, not Buzz and when Buzz did get the flashlight he did hit the guy on the head, not the stomach and ribs." That does not say Ponch hit the guy with a flashlight.

MS. SOCCIO: He's making reference to his statement, Judge and in his other statement it says Buzz so he's saying instead of Buzz it's Ponch picked up the flashlight.

THE COURT: What's it say? Not what you interpret, what does it say?

MS. SOCCIO: He's correcting his first statement and his first statement says "Buzz picked up the black metal flashlight like the police have and as the guy was trying to get up hit him over the head with it and the guy fell back onto the floor." What he's doing in the supplement, Judge, is saying that it was Ponch who picked up the flashlight.

THE COURT: Read it to me.

MS. SOCCIO: "I'd like to correct something on Page 2 of my statement. Ponch picked up the flashlight first, not Buzz. When Buzz did get the flashlight and

hit the guy on the head--"

THE COURT: Where does it say that the Defendant Bustamante hit him with a flashlight?

MS. SOCCIO: Judge, you have to read both statements together. Timothy Gorman was correcting his statement that he gave.

THE COURT: On who picked up the flashlight?

MS. SOCCIO: Excuse me?

THE COURT: Motion to strike is granted as to--.

MS. SOCCIO: Judge, Mr. Anderson also had the chance and did cross-examine Timothy Gorman on all this information and was allowed to say on the record, Judge--

THE COURT: The testimony, excuse me, you want to interrupt me, go ahead.

MS. SOCCIO: I'm saying for the Court that he didn't make a motion to strike at that time saying that it wasn't provided in discovery.

THE COURT: Yes, he did. He made this motion to strike was on 2/23/69 before Mr. Gorman, Timothy Gorman, took the stand.

MS. SOCCIO: No, he did not file this motion.

THE COURT: You want--don't tell me I can't read, please. Come and look at it. It's clerk marked filed at 2/23.

MS. SOCCIO: Judge, this did not come up when Timothy Gorman was on the stand. It was after the fact, and if you recall the conversation that we had in chambers--

THE COURT: I said I have heard enough. Number One may be granted, motion to strike. How about Number Two?

MR. ANDERSON: By Number One you mean even more clearly, your Honor? There's nothing in Timothy Gorman's statement that he saw the defendant Ponch stab Casserly.

THE COURT: What do you say about that?

MS. SOCCIO: He testified to that, Judge and Mr. Anderson cross-examined him on that fact.

THE COURT: Is there anything in discovery that said Timothy Gorman saw Defendant Bustamante stab him, yes or no?

MS. SOCCIO: Not in the supplemental statement of June 8.

THE COURT: How about his original statement?

MS. SOCCIO: In his original statement he makes reference to Carlo, to Carlo Belloli.

THE COURT: There's nothing that Bustamante stabbed him in his statement, in Gorman's statement?

MS. SOCCIO: That's correct, Judge, and I would

argue--

THE COURT: That's also stricken. Now on Number two.

MR. ANDERSON: Your Honor there was provided in the supplemental statement his claim that my client suggested or handed me a knife and quote, "Do what you got to do" and then he said he bent over and essentially pretended to stab the victim. When that came up in testimony, "Do what you got to do or I will kill you", there was a specific testimony given by this--by Timothy Gorman that my client threatened to kill him. That was not in the witness' statement.

MS. SOCCIO: Judge, again, this state's obligation is to provide a summary. I'm not obligated to give word-for-word what the witness is going to testify to because I don't know that. Timothy Gorman elaborated on what he meant by when Ponch, the defendant, Bustamante gave him the knife and said, "Do what you got to do".

THE COURT: Do you mean that he, Bustamante's, going to kill him?

MS. SOCCIO: That was a threat, Judge, handing the twelve year old a knife, "Do what you got to do" and Timothy Gorman testified that that was part of the threat and again, this--he testified to that and Dale Anderson cross-examined on that and now we're going

through this days after the fact that he's testified.

THE COURT: Number Two is granted.

MR. ANDERSON: Your Honor, the others are housekeeping sort of motions. I believe it was mentioned earlier in the trial, I would formally move to strike State's 18 as a full exhibit. 18 was the videotape. What I'm anticipating is a possible request by the jury to view that videotape. The problem with such a request Number One there's no way for them to limit themselves on the portion of the tape that was shown to them. Number Two, it does have a soundtrack which was not played for the jury and Number Three--

THE COURT: Let's take the soundtrack. If they can't play it, they can't hear the stuff; that's all.

MR. ANDERSON: They will be instructed not to push the button?

THE COURT: Yes.

MR. ANDERSON: There still could be no way for them to remember which portions they saw and which portions they didn't see, and, finally, I think that they are required to rely on their memory of what happened in the courtroom as it applies to the witnesses and it should also apply to the videotape. That's like replaying a witness live. There's some cases I know where cameras were tested with video cameras videotaping the witnesses

MR. FAHEY: Yes, your Honor.

THE COURT: I didn't hear you.

MS. SOCCIO: Yes, your Honor.

THE COURT: Ladies and gentlemen the testimony of Timothy Gorman, now that's not confused with Rene Gorman, Timothy Gorman where he said that he saw the defendant Ponch or his real name Bustamante stab the victim and hit him with a flashlight is stricken from the record. Disregard that please, only that testimony not anyone else's testimony. And also the testimony that the Defendant Bustamante threatened to kill Timothy Gorman, strike that from the record too. You have an objection to that.

MS. SOCCIO: Thank you, your Honor.

MR. ANDERSON: Thank you, your Honor.

THE COURT: Mr. Anderson please.

MR. ANDERSON: At this time Adrian Bustamante calls Lisa Welch.

LISA WELCH

SWORN

DIRECT EXAMINATION BY MR. ANDERSON

Q Miss Welch, where do you live?

A Norwich, Vermont.

Q And who do you live with?

A My parents.

Q Is your father present in the courtroom?
A Yes, he is.
Q Point him out.
A He's right there.
Q Where do you work?
A Kilglen Farms (phonetic spelling).
Q And what is that?
A It's a vegetable farm in Norwich.
Q Do you work with any family members?
A Yes, my father works with me.
Q How long have you worked there?
A Eight years.
Q Do you know the defendant, Adrian Bustamante?
A Yes, I do. He's my fiancee.
Q How long have you known him?
A Almost three years.
Q And do you remember when it was that you first met him?
A July of '93.
Q You said you were his fiancee; that means you were engaged?
A Yes, we are engaged.
Q And when did you become engaged?
A January of '95 or '94. I'm not sure.
Q When you first met Mr. Bustamante in the Summer of 1993 what was he doing? What kind of work?

A He was working at a carnival.
Q What kind of work would he do for the carnival?
A He ran a ride, a carnival ride.
Q And does he have another occupation?
A Yes. He does tattoos.
Q And you're familiar with his tattoo work?
A Yes, I am.
Q And can you describe, does he have, can you describe the tattoo business?
A He was trying to establish a business. We were trying to open a shop.
THE COURT: Keep your voice up.
A I'm sorry. He was trying to establish a business in Claremont, New Hampshire, trying to open a shop so he can do tattoos legally. We registered with a trade name and purchased equipment to enable him to open his own place.
Q Does he have--does he own tattoo equipment?
A Yes, he does.
Q And whereabouts would he do tattoos?
A We worked in people's homes. We made appointments. People would call him and make appointments and then he would either travel to their home or they would travel to ours.
Q Now, during this period from--during, you say, the

year--from 1993 until shortly before this incident, where were you living?
A East Bedford, Vermont.
Q And how far is that from your family home in Norwich, Vermont?
A About five miles.
Q So during that year and a half did Mr. Bustamante get to know your parents?
A Yes, he did.
Q At some point did you move?
A Yes.
Q And where did you move to?
A Back to my parents' home.
Q And when was that?
A The end of November of '94.
Q Just about a week before Mr. Bustamante was arrested?
A Yes.
Q Now drawing your attention to that week, specifically on Thursday, did you learn that Mr. Bustamante was going to Rhode Island?
A I learned on Wednesday night that he was going to Rhode Island.
Q And did he leave Wednesday or Thursday?
A He left on Thursday.
Q Before he left did he bring any clothes with him?