A Yes, he did.
Q Did you have anything to do with that?
A Yes. I packed them for him.
Q What did you pack, if you recall?
A Three pairs of jeans, three tee shirts, two turtlenecks, three pairs of socks, three pairs of underwear.
Q Do you know what kind of jeans Mr. Bustamante wears?
A Yes, I do. He wears size 30, 32 Levis.
Q All of those jeans Levis that you packed?
A Yes, they are.
Q When did you expect him to return to Vermont?
A He wasn't sure if he was going to return on Saturday or Sunday.
Q On Friday, the next day, did you learn that he was coming home?
A Yes, I did.
Q How did you learn that?
A He call my parents' home and my mother called me.
Q And did he arrive home on Friday?
A Yes, he did.
Q Approximately what time?
A Between 7:30 and 8:00 at night.
Q Was there anyone with him?
A Yes, there was.
Q Did you know anyone else was coming back?

A No, I did not.
Q Do you know the name of that person?
A Charles Roy.
Q Had you known Charles Roy or had you ever met him before?
A Yes, I have met him that summer.
Q Did you know him?
A No, I did not.
Q Had he ever, that is, Charles Roy, ever been to your parents' house before?
A No, he had not.
Q Do you have any memory of him ever visiting you and Mr. Bustamante during the time you lived in East Bedford?
A No.

MS. SOCCIO: Objection. Relevancy.

THE COURT: What's the relevancy of that?

MR. ANDERSON: Just to establish how long she does or does not know the man that appeared with Mr. Bustamante in Vermont.

THE COURT: How is that relevant?

MR. ANDERSON: I will move on, your Honor.

Q When Mr. Bustamante appeared at your home in Norwich on Friday evening how did he look?
A He looked really scared and upset.
Q How did he act?

A He was really, really worried and scared.
Q What was he then wearing when you saw him Friday evening around 7:30 or 8:00?
A The same clothes he wore Thursday.
Q And that included what pants?
A A pair of blue jeans and tee shirt.
Q The bag that you had packed for him did he return with that bag?
A Yes, he did.
Q Did you look at that bag after he returned with it?
A Yes, I did.
Q What did you see?
A It was the same as when I packed it the day before.
Q And had he changed at all?
A No, he had not.
MR. ANDERSON: A pair of pants for identification.
MS. CLERK: Defendant's M.
(DEFENDANT'S EXHIBIT M MARKED FOR IDENTIFICATION)
Q Miss Welch I'm showing you what's marked Defendant's M. You recognize those?
A Yes, I do.
Q What are they?
A They are the jeans he was wearing Thursday when he left and on Friday when he returned.
Q How do you know that?

A I don't know. I don't own very many pairs of jeans. I just--

THE COURT: Are those are your jeans?

A We share jeans. We wear the same size.

Q Now could you describe better the living arrangements, the house that your family lived in in Vermont and where you and this Mr. Bustamante lived?

A I'm living in a trailer and that's where we were both staying at the time. It's a small camper next to my parents' home.

Q There's a phone in that trailer?

A No, there's not. Well, there is now but there was not at the time.

Q Was there a phone in your parents house?

A Yes, there is.

Q Now did Charles Roy stay at Norwich, Vermont Friday and Saturday?

A Yes, he did.

Q Did you happen to notice if he used the phone?

A Yes, he did use the phone.

Q Did you or your parents have any objection to him using the phone?

A They didn't object. They didn't appreciate it, but they didn't object. He used a calling card.

Q He used a calling card?

A Uh-huh.
Q So you wouldn't be billed there for it. At some point did you and Mr. Bustamante take Charles Roy to a bus station?
A On Saturday morning we drove to Manchester, New Hampshire to check bus schedules for Boston.
Q And did Mr. Roy leave on Saturday?
A No, he did not.
Q Did you go down to the bus station again?
A Yes, on Sunday. He took the 12:00 bus back to Boston.
Q After Mr. Roy left, you and Mr. Bustamante were alone together again?
A Yes, we were.
Q Driving back to your parents' house in Norwich?
A Yes.
Q How did you and he feel at that time?
MS. SOCCIO: Objection.
THE COURT: Sustained.
Q That was you said around what time on Sunday?
A He took the 12:00 bus.
Q So you remember about what time you got back to Norwich?
A About 2:00.
Q Were you with Mr. Bustamante when he was arrested?
A Yes, I was.
Q Can you tell the jury how that happened?

A The police department called our home at 12:00 at night and asked him to come to the police station.
Q And did you and he leave your home?
A Yes, I drove him down there.
Q What was Mr. Bustamante wearing then?
A A pair of gray sweatpants and an sweatshirt and a jacket.
Q Were you interviewed by the police in Vermont?
A Yes, I was.
Q And after you were interviewed by the police in Vermont did you have a chance to see Mr. Bustamante again?
A Yes, I did.
Q Where was that?
A At the police department.
Q For how long a period of time?
A Ten or fifteen minutes.
Q How was he acting then?
A He was really scared. He was crying. He didn't want to return to Rhode Island. He was afraid that something bad would happen to him.
MS. SOCCIO: Objection. Move to strike.
THE COURT: It may be stricken. The only thing that may stand "he was scared and crying".
Q The next day did you see Mr. Bustamante in the local court up in Vermont?

A Yes, I did.
Q And did you make any efforts to get him more clothes then?
A Yes. His Public Defender told me I could bring him more things.
Q And what did you do?
A I went home and I got two pairs of jeans, two pairs of socks, two pairs of underwear and two tee shirts for him.
Q And after you got these items of clothing what did you do with them?
A I brought them to the Woodstock Correctional Facility.
Q Miss Welch, I'm going to show you what has been earlier marked Defendant's K for identification, which has been identified in this Court as an inventory of the contents of a bag that accompanied Mr. Bustamante when he returned to Rhode Island. Looking at that inventory, starting from the articles of clothing, starting at the top, the first three articles being one blue jean jacket, one gray sweatshirt, one gray sweatpants. Do you know what those were?
A Those are the items he was wearing when they arrested him.
Q The next two items one black jean pants, one black tee shirt. Do you know what those are?

A Yes, I do. They are a set of clothes that I packed for him to go to Woodstock.

Q The ones--they are two of the items that you just mentioned of the clothes that you brought to him at the correctional facility in Woodstock?

A Yes.

Q How about the next five items? What are they?

A They are also items I packed for Woodstock.

Q What are they again?

A Two pairs of underwear, two pairs of socks, a red toothbrush, two black shoelaces.

THE COURT: What exhibit is that, please?

MR. ANDERSON: I'm sorry?

THE COURT: What exhibit is that?

MR. ANDERSON: Defendant's K for identification. I believe it was marked when Lieutenant Ducharme was on the stand.

THE COURT: I got it, okay.

Q The last two items on the list, what are they?

A One silver necklace and one silver cross with a chain.

Q And are those items that you packed?

A No, he was wearing them.

Q Wearing them when he was arrested?

A Yes.

Q By the way, have you seen that inventory before?

A You showed it to me this morning.
Q The pair of jeans that's listed in that inventory, can you recall what kind they were? Can you describe them?
A They are Silver Tabs, black jeans size 29, 32.
Q When you say "Silver Tab" was that also Levis?
A Yes, they are Levis.
Q It's like a brand?
A Yes, a brand.
Q Now, do you know what Mr. Bustamante was wearing when he was brought down to Rhode Island in the custody of the Woonsocket Police?
A He was wearing a pair of blue jeans and black tee shirt I had packed for him in Woodstock.
Q How do you know? Did you see him?
A Yes, I saw it on the news clip on our local television.
THE COURT: You want to keep your voice up? I don't think the jury can hear you either.
A I saw it on a news clip from a local station.
Q The clothes that Mr. Bustamante had been wearing to court did you supply those to him at the Adult Correctional Institutions?
A Yes, I did.
Q And when you did that did they give you some of his clothes in exchange?
A Yes. They gave me back the blue jeans and black tee

shirt.

MS. CLERK: Exhibit will be marked Defendant's N for identification.

(DEFENDANT BUSTAMANTE'S EXHIBIT N MARKED FOR IDENTIFICATION)

THE COURT: These are the jeans he was wearing when he came back from Vermont.

MR. ANDERSON: When he was extradited from Vermont to Rhode Island.

Q Showing you Defendant's N for identification. Do you recognize those?

A Yes. They are a pair of jeans I packed for him to go--when I went and took them to Woodstock.

Q To clarify again, when he was arrested he was not wearing jeans? He was wearing sweatpants?

A Yes, he was wearing sweatpants.

Q You packed two pairs of jeans among other things and saw to it that those were given to him at the Woodstock Correctional Facility?

A Yes.

Q One of them you claim he wore to Rhode Island and you saw him briefly on t.v. when he was on his way to Rhode Island?

MS. SOCCIO: Objection.

THE COURT: Sustained.

Q When you brought him the clothes to wear to court at the Adult Correctional Institutions are you saying the defendant's--the pants in front of you are the ones that they gave you in exchange?
A Yes, they are.
MS. SOCCIO: Objection.
THE COURT: Sustained. Disregard that answer, please. Explain the relevance to me. I don't know the relevance as to the jeans he wore back.
Q Are those--were those also one of three pairs of jeans that you had packed for him when he went to Rhode Island?
A Yes, they are.
Q That remained packed, is that right?
A Yes.
Q In other words, one of the three pairs that you packed for Rhode Island ended up in the Woodstock Correctional Facility?
A Yes, they did.
THE COURT: But you packed them when he left to go to Rhode Island and when he came back they were still packed?
A Yes, they were.
MS. CLERK: The next exhibit will be marked Defendant's O for identification.

(DEFENDANT BUSTAMANTE'S EXHIBIT O MARKED FOR IDENTIFICATION)

Q Showing you Defendant's O for identification. Do you recognize those pants?

A Yes, I do. They are one of three pairs that I packed for him when he left for Rhode Island.

Q What size are they?

A 29, 32.

Q And what brand are they?

A They are Silver Tabs, Levis.

THE COURT: And once again you packed those when he went to Rhode Island and you unpacked them when he came back from Rhode Island?

A Yes.

THE COURT: They were not used?

A They were not used.

Q And they were not among the pants that you packed for him when he was in the Woodstock Correctional Facility?

MS. SOCCIO: Objection, leading.

THE COURT: I will allow it just once more. Don't lead, please.

Q Were they among the ones that you packed?

A No, they were not.

THE COURT: The rule of this Court is that once you ask a leading question you must go on to a completely

different area. I know that has not been done in this case but that's the rule of law.

Q How many pairs of pants did you pack for him to go to Rhode Island?

A Three.

Q And he was wearing a pair?

A Yes, he was.

Q The third pair of pants that you packed for him in Rhode Island, what happened to those?

A I wasn't sure until this morning.

Q Where were they when you last saw them?

A I took them to Woodstock.

Q And were they the pants that you recognize as being listed on Defendant's K?

A Yes.

Q Have you ever seen those pants again?

A No.

Q Could you describe them?

A They're black Silver Tabs size 29, 32.

THE COURT: What color?

A Black.

MR. ANDERSON: No further questions at this time.

CROSS-EXAMINATION BY MS. SOCCIO

Q Do you have a pair of jeans in front of you?

A Yes, I do.

Q You testified, Miss Welch, that you packed some clothes for Adrian Bustamante on Thursday, correct?
A Yes.
Q And he returned on Friday about 7:30, 8:00?
A Yes, he did.
Q And what was he wearing?
A A pair of blue jeans and black tee shirt.
Q Which pair of blue jeans was he wearing?
A One 30 by 32's.
Q And you remember that?
A Yes, I do.
Q Do you know how long he had been wearing them?
A Since noon on Thursday.
Q And he came home Friday, you say, at 7:30?
A Yes.
Q Did you see him take these jeans off?
A No. Well, when he came home I did, yes.
Q And were the jeans laundered at all?
A Since then I have been wearing them.
Q You've been wearing these jeans?
A Yes, I have been.
Q And it is fair to say when he had these jeans on you washed them before he wore them again or did you?
A Yes.
Q You said that you share jeans, correct?

A Yes, we do.
Q Do you know which jeans these are?
A They are a pair I packed for him to go to Woodstock and also that he had with him.
Q Do you know what size these are?
A They are 30, 31's.
Q Do you know what size these Levi Strauss Silver Tabs are?
A They are 29, 32.
Q And you came to court today with these three pairs of jeans?
A Yes, I did.
Q And that K-Mart bag?
A Yes.
Q And you have held on to those jeans since December 26, 1994?
A Yes, I have.
Q Have you worn those jeans?
A Yes, I have.
Q And washed all three pairs?
A Yes.
Q And I take it that at that time you thought perhaps the clothes were significant or the jeans were significant so you held on to them?
A Yes.

A Yes, I do.
Q From the Vermont police?
A Yes, he's a State Trooper.
Q And that was on December 4th '94?
A Yes, it was.
Q And when Adrian Bustamante came home from Rhode Island he told you that Carlo Belloli had dumped the body, correct?
A Yes, he did.
MR. FAHEY: Objection, your Honor.
THE COURT: What are you objecting to? Overruled. Even if you have one, it's overruled.
A Yes, he did.
Q And he told you that?
THE COURT: I'm sorry. Do you have an objection? Overruled.
MR. FAHEY: Thank you, your Honor.
Q And he had told you about an event that took place at Carlo Belloli's house, correct?
A He didn't actually tell me about it, no.
Q He told you that something bad happened at Carlo Belloli's house?
A Yes, he did.
Q He didn't tell you any details about what happened, did he?

A No, he did not.
Q You didn't want to hear really what happened at Carlo Belloli's house, did you?
A No, I did not.
MS. SOCCIO: Nothing further.
MR. ANDERSON: May I have a moment, your Honor?
THE COURT: Do you have a motion to strike that portion of what Mr. Belloli did?
MR. FAHEY: Yes, your Honor.
THE COURT: It may be stricken. Disregard that part of the testimony that Carlo did something about the body. It's hearsay.
MS. SOCCIO: May I be heard at side bar, your Honor?
(THE FOLLOWING TOOK PLACE AT THE SIDE BAR)
MS. SOCCIO: Your Honor this witness testified to what Adrian Bustamante had said to her about the events that happened at Carlo Belloli's house.
THE COURT: Uh-huh, but she can't say specifically what he said, that's hearsay, isn't it?
MS. SOCCIO: It's not hearsay with regard to Adrian Bustamante, Judge.
THE COURT: No, but it's hearsay as to Carlo Belloli dumping the body. If Adrian Bustamante said he helped dump the body or helped with the body that

and the one he was wearing back. So that I believe was Defendant's--that's Defendant's M that would be admitted.

THE COURT: That's the first one?

MR. ANDERSON: Yes.

THE COURT: Defendant's M. Of course Defendant's M may come in full and not N and O. Defendant's M may be admitted in evidence as full but defendant's N and O are not admitted into evidence.

(DEFENDANT BUSTAMANTE'S EXHIBIT M MARKED AS A FULL EXHIBIT)

(END OF SIDE BAR CONFERENCE)

Q The pants that are now full, Defendant's M, the first pair of pants I showed you this morning, what are they again?

A These are the jeans he was wearing on Thursday when he went to Rhode Island.

THE COURT: You got to keep your voice up. I can't hear you. I don't know how the jury can hear.

A They are the jeans that he was wearing when he went to Rhode Island.

THE COURT: The jeans he was wearing to Rhode Island?

A When he went to Rhode Island on Thursday.

Q And when he came back, the same jeans?

A Yes.
Q When he came back were those jeans--was there any blood on them?
A No, there was not.
Q You've washed those and other jeans before?
A Yes, I have.
Q Have you ever washed jeans that had blood on them?
A Yes, I have.
Q What happens?
A It leaves a yellow stain.

MR. ANDERSON: Nothing further.

RECROSS-EXAMINATION BY MS. SOCCIO

Q Miss Welch, had there been blood on it you certainly would have washed it, correct?
A Yes, I would have.
Q If they had been soiled you would have washed them?
A Yes, I would have.

MS. SOCCIO: Nothing further.

THE COURT: You may step down. The next witness, please.

MR. ANDERSON: George Ducharme.

GEORGE DUCHARME

SWORN

DIRECT EXAMINATION BY MR. ANDERSON

Q Lieutenant Ducharme you recall testifying earlier in

this case?
A Yes, I was.
Q And you recall being asked questions concerning a bag of clothes that you saw had come down to Rhode Island with Mr. Bustamante?
A Upon his arrival at the police station, yes.
Q And you made an inventory of those clothes which is marked Defendant's K?
A Yes, I did.
Q And do you recall me asking you if you knew what happened to those clothes after you had made the inventory?
A Yes, I do.
Q And and you were unable to say for sure whether or not the Woonsocket Police Department still had those clothes?
A Correct.
Q And I asked you to check, correct?
A Correct.
Q Have you checked?
A Yes, I have.
Q Did you find them?
A Yes, I have.
Q The bag of clothes, the same bag of clothes as we're talking about in Defendant's K?

A Yes.
Q Did you bring them to court?
A Yes, I did, in the white box.
THE COURT: These are the clothes that the defendant appeared in the Woonsocket Police Station after being extradited from Vermont?
A Correct, your Honor.
MR. ANDERSON: Your Honor, I'm only going to ask that one item of clothing be marked for identification. Can we approach the Bench?
THE COURT: Sure.
(BENCH CONFERENCE)
Q Lieutenant Ducharme when you found--when did you find this bag?
A This morning.
Q When you found it did you check to see if it was the same bag with the same items in it that you saw back on December 6, 1994?
A The items matched the inventory.
Q And one of the items--it's marked for identification?
MS. CLERK: Defendant's P for identification
(DEFENDANT'S EXHIBIT P MARKED FOR IDENTIFICATION)
Q One of items is Defendant's P for identification, one of items?
A Yes, that was in the bag.

Q Can you describe what Defendant's P for identification is?
A A black pair of Levi Strauss Silver Tab black jeans.
Q And can you find a tag that indicates the size?
A Waist 29 length, 32 student.
THE COURT: I think it's just the opposite, isn't it?
THE WITNESS: Waist 29 length 32, your Honor.
MR. ANDERSON: No further questions.

CROSS-EXAMINATION BY MS. SOCCIO

Q Lieutenant Ducharme, where were those items kept?
A They were kept in the evidence room of the Woonsocket Police Department.
Q Why did you hold on to them until today?
A The evidence was holding on for someone to come and retrieve them, to sign for the items.
Q Was someone notified that there was some belongings that belonged to Adrian Bustamante?
A I have no idea but he came in with the clothes, so--
Q And he turned the clothes over to you?
A Yes. Upon his arrival the clothes were inventoried and kept in our property room.
Q And that's the customary practice of the Woonsocket Police Department to hold on to items that an arrestee comes in with?

WALTER WAROT

SWORN

DIRECT EXAMINATION BY MR. ANDERSON

Q Sergeant Warot you work for the Woonsocket Police Department?

A Yes, sir, I do.

Q And on December 6 of 1994 did you go to Vermont?

A Yes, I did.

Q And for what purpose?

A I went there to take possession of a prisoner that was arrested there, a Mr. Bustamante.

Q And bring him back to Rhode Island?

A That's correct.

Q Did he have--were you aware of him having a bag of clothes with him?

A Yes. When I took custody of him at the correctional facility he did have a bag of clothing that was labeled as his possessions.

Q Since I have notified you you might be a witness in this case have you reviewed your statement in this case?

A Yes, briefly just before coming in here in the courtroom.

Q Could you describe for the jury the demeanor of Mr. Bustamante as he was being transported in your vehicle from Vermont back to Rhode Island?

A He was upset. He was combative, violent.
Q And you wrote that statement, right?
A Yes, I did.
Q You described him as agitated and frantic in your statement?
A I believe I did.
Q Would you describe him as scared, fearful?
MS. SOCCIO: Objection. Leading.
THE COURT: Sustained.
Q Did you describe him as combative in your statement?
MS. SOCCIO: Objection.
THE COURT: I will allow it for what it's worth.
A Yes, at one point.
Q If I show you your statement could you find that for me?
A Sure.
Q If you find it could you just point it out to me?
A Okay. At the end, the bottom of the first page.
Q Do you recall how you described him?
A Combative and upset.
Q And you recall what how else he appeared to you other than combative and upset as you reported?
THE COURT: If you recall.
A He was very upset. He didn't want to go back to the State.
Q Do you recall him repeatedly saying that they were going

to kill him?

MS. SOCCIO: Objection. Leading.

THE COURT: Sustained. Sustained.

MR. ANDERSON: I'd like to be heard on the leading aspect of this at the side bar.

(THE FOLLOWING TOOK PLACE AT THE SIDE BAR)

MS. SOCCIO: Judge, I object, not only because it's leading, he's trying to elicit statements that his client made and I will not have the opportunity--

THE COURT: I know. I sustained the objection.

MR. ANDERSON: Your Honor, first off, this witness is clearly a person who is allied with an opposing party to which I can put leading questions. I think it's Rule 6-11 Subsection C. The last sentence in that Rule I claim this is a witness, in the words of the Rule, "A witness identified as an adverse party interrogation may be made by leading questions."

THE COURT: You're leading him, but you can't lead him as to what your client said.

MR. ANDERSON: Secondly, even apart from that Rule I contend--I should have an extra copy, it's marked for identification--is hostile in the sense that the theme of this is not, underline not, that Mr. Bustamante was hostile and combative. There's no suggesting that Mr. Bustamante offered any violence to any person.

To get to the merits of Ms. Soccio's objection, what I'm offering here is testimony, competent evidence of Mr. Bustamante's state of mind. It's 803 Subsection 3.

THE COURT: What? After the fact?

MR. ANDERSON: State of mind of fear of returning to Rhode Island.

THE COURT: What are you citing here? Sheriff, take the jury into the jury room, please. Don't discuss the case among yourselves. You may send one or two of your number down to get refreshments. We will be a little while.

(JURY LEFT THE COURTROOM)

THE COURT: What's the cite? What's the cite?

MR. ANDERSON: The Hearsay Rule 803 Subsection 3, I believe.

(END OF SIDE BAR CONFERENCE)

ON THE RECORD IN OPEN COURT

THE COURT: You say 803 says you can?

MR. ANDERSON: 803 permits as an exception to the Hearsay Rule a statement of the declarant's then existing state of mind, emotion.

THE COURT: If it's relevant. It's not relevant, the state of mind when he came back to Rhode Island.

MR. ANDERSON: Well, first may I be heard on that?

The state of mind that I intend to show through this witness is as indicated in the statement that he was scared to go back, according to Mr. Bustamante, "because they are going to kill me."

THE COURT: That's not admissible.

MR. ANDERSON: Let me just--there's an offer of proof that would indicate--

THE COURT: Put it on the record.

MR. ANDERSON: As they were driving he kept saying "they were going to kill him. We reassured him that no one was going to kill him."

THE COURT: Is that what you are going to prove with this witness?

MR. ANDERSON: Can I continue with my offer?

THE COURT: Is that what you are going to prove?

MR. ANDERSON: That's part of what I want to prove. He kept insisting that they were going to kill him. They told him he would be in protective custody. He insisted that he was going to get killed and pleaded with us in a chant-like repetitive, "Please, don't let them kill me. Please don't let them kill me. " His attitude then changed to a suicidal attitude saying, pleading he wanted to kill himself. He kept saying that they were going to kill him because he saw too much.

THE COURT: Isn't that hearsay?

MR. ANDERSON: Well, to the extent that it's reflective of a fear and a fear of being killed. It's clearly--before we get to relevancy, it's clearly not hearsay because that's precisely what 803.3 refers to as his then exiting state of mind.

Now, as to relevancy, your Honor--

THE COURT: That's my book.

MR. ANDERSON: Sorry. I contend his state of mind is circumstantial evidence of his innocence. It's inconsistent with the state's case against him. It tends to rebut what I'm sure the state will contend is his incriminating nature of flight. If his behavior and state of mind are inconsistent with the allegations against him, circumstantial evidence of innocence, 803.3 shows that it's not hearsay. The relevance is circumstantial evidence against--

THE COURT: Why is it circumstantial evidence of his innocence? I would say circumstantial evidence of his guilt. He doesn't want to come back to Rhode Island and face the music.

MR. ANDERSON: That's only one interpretation, your Honor.

THE COURT: All right. So it's not circumstantial evidence of his innocence, is it?

MR. ANDERSON: If it's interpreted as evidence that

violent, correct?
A Yes.
Q And, in fact, during the drive back from Vermont to Rhode Island he kicked out the back window in the police car, is that correct?
A Yes, he did.
Q And he was combative to the point where you had to put a cowl over him?
A Yes.
Q And you had to get local assistance from the local police department?
A Yes.
Q And did you change his seating position at that point?
A Yes, I did.
Q Did you change to a position where he was laying on his stomach in the back seat?
A Yes, I did.
Q Was that to avoid any further kicking of the window?
A That's correct.
Q The rest of ride there were no other combative or violent incidents?
A No.
MS. SOCCIO: No further questions.

REDIRECT EXAMINATION BY MR. ANDERSON

Q The way you have described it, was he was combative as

to himself? He wanted to kill himself?
MS. SOCCIO: Objection.
THE COURT: Sustained.
MR. ANDERSON: As to the Rule I cited, might I be heard again?
THE COURT: It wasn't brought up in cross-examination. That he was combative, fine, but the last part of your sentence was not.
Q His violence was self-directed?
A He wanted to get out of the car.
Q You did not indicate in describing his violence he wanted to kill himself?
MS. SOCCIO: Objection.
THE COURT: Sustained.
Q Did you hear him yelling that he wanted to kill himself?
MS. SOCCIO: Objection.
THE COURT: Sustained.
Q As he was acting in the manner you have described, was he trying to talk to you?
A He was yelling that he wanted to get out.
Q Was he yelling that he wanted to tell you what happened?
MS. SOCCIO: Objection.
THE COURT: I will allow that.

THE COURT: Any time a bunch of kids hang around together they are members of a gang, correct?
A No.
THE COURT: Well, what is it then?
A I don't get what you mean.
THE COURT: You understand the question?
A No.
THE COURT: You understand that a bunch of kids hanging around together you call it a gang?
A Yes.
THE COURT: You do. That's what you're saying under oath, you're saying this to me?
A Yes.
THE COURT: Okay.
Q Does the gang engage in illegal activities?
A Yes.
Q What type of illegal activities?
A Getting checks, stealing stuff, selling drugs.
Q And did you engage in those activities?
A Yes.
THE COURT: Has anyone warned you about your Constitutional rights?
A Yes.
THE COURT: So you're waiving that constitutional right? You're willing to incriminate yourself?

A It's in Rhode Island.

THE COURT: What city?

A I'm not sure. It might--I mean in Milford.

THE COURT: Pardon?

A I mean in Milford.

Q So it's Oliver Street in Milford, Massachusetts? Chuckie Roy's house is in Milford?

A Yes.

THE COURT: When is the last time you went there?

A Awhile ago in the summer.

THE COURT: This summer?

A Last summer.

THE COURT: '95? This is'96, '95?

A In '94.

THE COURT: You went to his house in Milford?

A Yes.

Q And were you ever in Chuckie Roy's house in Rhode Island, Woonsocket?

A No, I haven't.

Q And did you ever perform gang activities for Charles Roy Sr. with the Kool-Aid Gang?

A Yes, I have.

Q What type of gang activities was that?

A Selling drugs, stealing checks.

Q And you did this for Charles Roy Sr.?

MURDER AND CONSPIRACY)

(JURY FOUND DEFENDANT BELLOLI GUILTY OF FIRST DEGREE MURDER AND CONSPIRACY)

THE COURT: Thank you. Gentlemen?

MR. ANDERSON: Request polling for Bustamante, your Honor.

MR. FAHEY: And for Belloli too, your Honor.

(JURY WAS POLLED)

(ALL JURORS RESPONDED GUILTY TO BOTH COUNTS AGAINST BOTH DEFENDANTS)

THE COURT: Ladies and gentlemen your work is not done yet. There are questions I must have you answer for me. I will send up Interrogatories with you and the Interrogatory reads as follows: "We the jury find that the state has proven beyond a reasonable doubt that the murder of John Casserly was committed in the manner involving torture or aggravated battery." I will give you some definitions of that.

Aggravated battery indicates that it constitutes a malicious causing of bodily harm to another by depriving him of a member of his body or rendering a member of his body useless or seriously disfiguring his body or a member thereof.

Torture is defined by our case law, torture requires evidence of serious physical abuse of the

victim before death.

I will ask you to retire to your jury room again and decide whether the state has proven either one of those or both, whichever it is. If it's not, obviously the answer is no, you don't have to do anything, but if it's yes, underline whether it's torture or aggravated battery or underline whether it's both. Good luck to you. You may retire.

(JURY LEFT THE COURTROOM)

(11:35 A.M.)

THE COURT: Mr. Fahey, I'm revoking bail at this time.

MR. FAHEY: Yes, your Honor.

THE COURT: Please take him downstairs and I will call him when he's needed.

MR. ANDERSON: Your Honor I have an objection or a request.

THE COURT: All right, sit down gentlemen.

MR. ANDERSON: Twofold your Honor. One that the Court instruct the jury that they are to make an independent determination as to the answer to that question to each defendant.

THE COURT: Bring the jury down.

MR. ANDERSON: And that the murder of John Casserly may fit the definition to one defendant and not the

her to be an extremely credible witness.

The sixth witness was Timothy Gorman. He said that he waited for the mysterious Uncle Chuckie to pick him up to beat up some guy. He was picked up by the Defendant Carlo, went with the defendant to his home in Woonsocket. He identified both defendants. When he went into the defendant's--at Carlo's house, he saw a guy on the floor bleeding. The man on the floor, according to this Timothy Gorman, was saying, "Stop it". He saw the Defendant Carlo stab the victim. He also saw the Defendant Bustamante stab the victim. He also said he saw the Defendant Bustamante burning the hand of the victim with a cigarette. He also told--he was told by Carlo that if he talked he'd kill him. Then he said he was given a knife and told him to stab him and apparently went home and driven home by Bustamante. I find his testimony to be credible.

I might add at this point the witnesses in this case, none of them would be classified as choirboys, but that notwithstanding, I found some of them to be extremely credible and some not to be.

The next witness was Mr. Caro. Mrs. Caro lived upstairs. She heard some yelling. She saw something being carried into the van. She really didn't add that much to the case but there was something wrapped in a

rug being moved out of the house into the van and that they seemed to be blue jeans.

The eighth witness was Rene Gorman also known as "Buzz". He went to Carlo's house. He was supposed to beat up some guy. This was, as the trial developed, this was suppose to be McKenna. It was not supposed to be Casserly at the time. He went to get coke with Bustamante and Casserly. When they came back Mr. Bustamante told those in attendance at the Woonsocket house that the other defendant, the co-defendant, that he had been ripped off. I find that, bearing in mind that Gorman was offered with a better deal than I have ever seen in this court, but he had the ring of truth to what he was saying. He obviously was not happy being a snitch or so-called snitch but he made an agreement with the state and the agreement was he tell the truth and he was a very candid, although reluctant witness.

The ninth witness was Mrs. Casserly. She testified that her son, her late son, stopped by which corroborates the testimony of others, stopped by to get some money and she didn't have cash and gave him a check for $20. He told his mother he would be back. He was going on a trip. He would be back Monday to go to work.