**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ADRIAN BUSTAMANTE** | : | |
| **Petitioner** | : | |
| | : | |
| **v.** | : | **C.A. 2006-07-T** |
| | : | |
| **A.T. WALL, DIRECTOR OF** | : | |
| **DEPARTMENT OF CORRECTIONS,** | : | |
| **Respondent** | : | |

**SUPPLEMENTAL MEMORANDUM IN RESPONSE TO TO PETITIONER'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

The State submits this supplemental memorandum in response to petitioner's Amended Petition for Writ of Habeas Corpus [hereinafter *Amended Petition*], and memorandum in support thereof. As the State has already provided the Court with extensive briefing responding to the legal and factual allegations of the original habeas petition, *see State's Response to Petitioner's Petition For Writ of Habeas Corpus, filed Feb. 14, 2006* [hereinafter *2/14/06 Response*], in this supplemental memorandum the State will limit itself to addressing the additional allegations and claims petitioner makes in the *Amended Petition* and supporting memorandum. However, the State also incorporates by reference all of the arguments already presented in its *2/14/06 Response*, particularly since it is not at all clear from petitioner's *Amended Petition* or memorandum that he is abandoning the claims for relief set forth in the original petition.

**Factual Allegations**

In his memorandum in support of his amended petition, petitioner presents his version of the facts of the case, in which he plays up conflicts in the record and minimizes his own participation in, and culpability for, the victim's murder. *See Petitioner's Memorandum filed 11/6/06*, pp. 1-20 [hereinafter *11/6/06 Memorandum*"]. But under the deferential standards of review applicable in habeas cases, absent clear and convincing evidence to the contrary (which petitioner has failed to present), it is the state court's version of the facts that must control this Court's determination of the legal issues petitioner has raised. Sanna v. DiPaolo, 265 F.3d 1, 7, 10-11 (1st Cir. 2001); Slaughter v. Parker, 450 F.3d 224, 232 (6th Cir. 2006). This is particularly true with respect to the state court's assessments concerning witness credibility. Sanna, 265 F.3d at 10-11.

As the State noted in its *2/14/06 Response*, the facts of this case are set forth in detail in State v. Bustamante, 756 A.2d 758 (R.I. 2000)[hereinafter Bustamante I], a copy of which was submitted along with the *2/14/06 Response. See State's Appendix to 2/14/06 Response, Tab 10*. For the Court's convenience, the State has reproduced an abbreviated statement of facts from Bustamante I below:

> On December 2, 1994, the police in Bellingham, Massachusetts, responded to a call from a passing motorist that resulted in the discovery of a body in a ditch near the side of the road in the area of Lake and Cross Streets. Thus, the events leading up to a gruesome murder began to unfold. The body later was identified as twenty-four-year-old John Casserly (Casserly) of Woonsocket, Rhode Island, who died as the result of multiple stab wounds after a severe beating. With the body, police recovered three pairs of blue jeans, a blue blanket, a sleeping bag, and other items of clothing.
>
> The circumstances leading up to the savage murder of Casserly stemmed from his ill-advised and random contact with an unsavory band of delinquents. The individuals who comprised this self-described gang . . . mainly were teenagers, although the ringleader of this crew was

apparently Charles Roy, known to the group as "Uncle Chuck," a man in his mid-thirties. The trial testimony revealed that on December 1, 1994, this confederacy of hoodlums ultimately would be responsible for Casserly's brutal murder. At trial, testimony established that on the afternoon of December 1, 1994, Uncle Chuck called his nephew, Charles Roy, Jr., known also as "Little Chuckie," age sixteen, and requested that he assemble his cohorts in Milford, Massachusetts, because Uncle Chuck wanted to "beat up some guy." Apparently, Uncle Chuck wanted Little Chuckie and his friends to assault or, according to some accounts, to stab a man who allegedly had "ratted" on neighbors of Uncle Chuck's, Carlo Belloli (Belloli) and his girlfriend Nora Solomon (Nora), causing Nora to land in jail. Little Chuckie complied with the request and gathered his soldiers to accomplish Uncle Chuck's vindictive objective. Composed of juveniles, the group included Rob Pointer (Pointer), Jesse Kegley (Kegley), Danny Dunbar (Dunbar), Little Chuckie's brother Michael Roy (Mikey), Luis DeJesus (Luis), and Timmy Gorman (Timmy), a twelve-year old. Uncle Chuck, accompanied by Belloli and fifteen-year-old Rene "Buzzy" Gorman (Buzzy), arrived in Milford in a van and transported the gang, first to a liquor store, then to Uncle Chuck's house at 706-08 Bernon Street in Woonsocket. Little Chuckie, Buzzy, Dunbar and Timmy all testified at trial, and although their testimony was at variance at some points, the witnesses were fairly consistent in their accounts of the events of that evening.

Uncle Chuck's house on Bernon Street shared a backyard with Belloli's house at 181 Paradis Avenue, Woonsocket, the scene of the murder. In addition to a common backyard, Belloli's and Uncle Chuck's homes were connected with an intercom system that allowed the occupants of one home to "buzz" the neighbors to communicate with one another. At some point, the plan to beat up the intended victim was aborted, and the group proceeded to consume the alcohol, and some of them consumed cocaine. Evidently, according to the testimony of Buzzy, Uncle Chuck had made arrangements for his guests to be tattooed that evening and had invited a tattoo artist, Bustamante, who was from Vermont and known simply as "Ponch," to Rhode Island to execute the tattoos.

Meanwhile, Casserly, a stranger to this brotherhood, had spent the evening at a pub in Woonsocket with his friend, Scott Deering (Deering). Deering testified that at around six or seven p.m., they left the pub, purchased cocaine off the street, and walked to Deering's house, where he and Casserly smoked the cocaine and drank beer. Deering said that after consuming the cocaine, he and Casserly left at approximately 11 p.m. to purchase more cocaine. Because neither had a car, Casserly and Deering walked to the vicinity of the place they previously had acquired cocaine and encountered two men "going to the bathroom outside their van." Deering testified that he and Casserly approached the two individuals and

struck up a conversation with them, at which point the two asked Deering whether he could secure some cocaine. Deering agreed. According to Deering, he and Casserly entered the van, they bought more cocaine and returned to Deering's house to consume it. Deering testified that the four men drank beer and partied, but that he "didn't like the way they were acting, so [he] did the drugs fast and * * * wanted them to leave." Deering testified that he cautioned Casserly against leaving with the men, and advised him that "we have to work in the morning," and that "[i]t's late[,] I think we [have] had enough." However, Casserly disregarded his friend's advice and departed with the men at 1 or 1:30 a.m. Deering never saw Casserly again. He testified that he was subsequently contacted by the Woonsocket police about the events of that evening. He provided a witness statement and identified Charles Roy (Uncle Chuck) as the passenger in the van from a photographic array, but was unable to positively identify Belloli as the driver or the person with whom he had smoked cocaine on that fateful night.

Crew member Buzzy testified that he was back and forth between Uncle Chuck's house and Belloli's house, and that at some point Uncle Chuck, Belloli, defendant and Casserly were at Belloli's house drinking. He said that with the exception of defendant, everyone used cocaine, including Buzzy. Later that night, Buzzy, defendant and Casserly left in Belloli's van to purchase more cocaine. It was the events of this buying trip that led to the carnage. Buzzy testified that Belloli gave defendant $100 to purchase cocaine, and that defendant gave the money to Casserly. The trio, with defendant at the wheel, proceeded first to Casserly's house, where Casserly obtained a check for $20 from his mother. This testimony was substantiated by Casserly's mother, who testified that between 1:30 a.m. and 3 a.m., she was roused from sleep by her son, who asked her for money. After giving him a check for $20, she watched her son leave; she never saw him again.

Buzzy further testified that the group then proceeded to Front Street in Woonsocket, at which point defendant and Casserly exited the vehicle, leaving Buzzy behind. About one-half hour later, the men returned to the van and Casserly informed Buzzy that they had been "ripped off," a sentiment reiterated by defendant. Buzzy testified that at that point he and defendant forced Casserly into the back of the van. The trio returned to Belloli's house without the cocaine, all the while shouting back and forth, with Buzzy and defendant questioning Casserly on the whereabouts of the money, and Casserly responding that he was "ripped off." Casserly was escorted into Belloli's house, where Uncle Chuck and Belloli were waiting for the cocaine. Buzzy told them that there was no cocaine, and defendant declared that Casserly had "ripped them off." It was at that point, according to Buzzy, that the onslaught began.

Buzzy testified that he, defendant, Luis, Belloli and Uncle Chuck all were present and accounted for during the early stages of the vicious attack upon Casserly. Buzzy described the sequence of events and admitted that he was the first to strike Casserly, followed by Belloli, who violently propelled Casserly to the floor, at which point the group kicked him until he appeared to be unconscious. At that point, according to Buzzy, defendant repeatedly struck Casserly with first a beer bottle and then with a flashlight, all the while screaming about the money. Casserly apparently regained consciousness, because he replied that he did not steal the money. Buzzy also admitted that he struck Casserly with the flashlight "once or twice." At some point Buzzy was called on the intercom system (either once or twice) and directed to report next door to tell Uncle Chuck what was happening. Significantly, Buzzy . . . testified that although Uncle Chuck was present at the end of the attack, when the group prepared Casserly's body for disposal, he was not there in the interim, when the weapons were being used. According to Buzzy, Uncle Chuck was conveniently next door.

Buzzy testified that when he returned, he observed Casserly get up from the floor and wrestle with Belloli, who in the interim had obtained a weapon from the back room, described as a small survival knife. According to Buzzy, Belloli stabbed Casserly at least ten times. During his testimony, Buzzy described Casserly as begging both Belloli and defendant to stop the attack, stating "[s]top[,] I can't breathe." Buzzy recalled seeing three knives during the attack: the survival knife, a steak knife, and a chrome knife with a black handle. In addition, Buzzy stated that defendant joined in the attack and stabbed Casserly in the back of his legs under his buttocks. Buzzy also implicated Luis, testifying that he grabbed a knife and stabbed Casserly three times. At some point, Belloli retrieved a blanket and threw it down next to Casserly, and told him to "[b]leed on the blanket[,] not on the rug."

Little Chuckie also testified about his involvement in this heinous murder. He said that he and Timmy were asleep at Uncle Chuck's when Buzzy and Luis arrived and awakened them. He went to Belloli's house and watched defendant, Buzzy and Luis viciously attack the victim. Little Chuckie added that at one point during the assault, defendant handed twelve-year-old Timmy a pocket knife and told him to stab the body "if it makes you feel good." According to Little Chuckie, Timmy complied. Little Chuckie also testified that Uncle Chuck was not present during the attack, but was home in bed with his young son.

Twelve-year-old Timmy also testified. He said that after being awakened at Uncle Chuck's, he watched the fatal assault on Casserly. He confirmed that defendant handed him a knife at the end of the attack and stated, "[y]ou know what you have to do." Timmy testified that although he

tried, he could not stab Casserly. Both Timmy and Little Chuckie testified that Belloli threatened to kill them if they said anything to anyone concerning the events of that evening.

Uncle Chuck appeared on the scene at some point and ordered someone to bring a blanket to wrap up the body for disposal. The corpse was wrapped in a blanket, loaded into the van and transported by Belloli, Buzzy and Luis to Bellingham, Massachusetts, where, according to Buzzy, Belloli dumped Casserly's blanket-wrapped body and some blood-stained clothing into a ditch by the side of the road.

Socorro Caro (Caro), who lived in a third floor apartment at 181 Paradis Avenue, also testified. She said that while she was making breakfast, at approximately 6:15 a.m., she looked out the window and saw a van back up to the rear door of her building. She testified that she then saw Belloli and Uncle Chuck carrying what looked like a rolled-up carpet from the house to the van.

Ellen Keefe (Keefe) worked in the probation department of the Framingham District Court, and knew both Belloli and Nora. Keefe testified that on December 2, 1994, Belloli appeared at the courthouse concerning a matter involving Nora. Keefe testified that Belloli appeared disheveled and frantic and had a strong odor of alcohol on his breath. When she asked Belloli what was wrong, he displayed his blood-stained hands and disclosed that he had "stabbed someone to death." Keefe further testified that after directing Belloli to wait in a vacant courtroom, she informed her boss of the conversation, and that her boss called the Framingham Police Department. But by that time, Belloli had left the building.

Almost immediately after the discovery of Casserly's body in Bellingham, the police were informed that a possible suspect had been identified in Framingham. Belloli was thereafter taken into custody and charged with Casserly's murder. Arrest warrants also were issued for defendant, Uncle Chuck and Luis.

Leonard Atkins, M.D. (Dr. Atkins), the medical examiner in Suffolk County, Massachusetts, performed the autopsy on Casserly's body, and described the horrific injuries suffered by Casserly. The record discloses that Casserly had been stabbed a total of twenty-seven times, and that any one of six severe stab wounds perforated the aorta, causing massive bleeding and death. One stab wound perforated the heart, and numerous stab wounds perforated Casserly's intestines, kidneys and lungs. In particular, Dr. Atkins described one of the wounds as a double thrust wound, indicating that the assailant had stabbed Casserly, pulled out the knife, and then thrust it back in. Also noted were numerous abrasions and

> lacerations to Casserly's head, shoulder and eye area consistent with the heel of a shoe. Further, Dr. Atkins identified other injuries consistent with Casserly's body being kicked and dragged, and he noted the presence of defensive wounds on his forearm. Doctor Atkins testified that a post-mortem blood test revealed the presence of cocaine and alcohol in Casserly's blood.

Bustamante I, 756 A.2d at 760-63 (footnotes omitted).

## Discussion

In responding to the grounds raised in petitioner's *Amended Petition* and *11/6/06 Memorandum*, the State is somewhat at a loss as to how organize its arguments, since there is no one-to-one correspondence between the grounds petitioner has set forth in the *Amended Petition*, and the arguments he has made in the *11/6/06 Memorandum*. The State has therefore decided to address the *Amended Petition*'s grounds first, tying in the *11/6/06 Memorandum*'s arguments as much as possible, and thereafter address the remaining arguments petitioner makes in the *11/6/06 Memorandum*.

### A. Ground One: Ineffective Assistance of Counsel

In the *Amended Petition*, petitioner first claims as follows:

> *Counsel was ineffective starting from pre-trial motions, to trial errors, to post-trial motions and arguments. Trial counsel failed to object to a flawed indictment due to improper vouching and failed to conduct a proper voir dire. Trial counsel failed to introduce exculpatory evidence, namely a "Biker" Jacket. Appellate counsel also failed to raise legitimate issues that petitioner requested.*

*Amended Petition*, p. 6.

Ground One of the *Amended Petition* is substantially identical to Ground One of petitioner's original habeas petition. The State therefore incorporates by reference its original response to the allegations in Ground One, and asks that this claim be dismissed as being without merit. *See 2/14/06 Response*, pp. 4-10.

**B. Ground Two: Denial of Due Process Rights**

In Ground Two, petitioner claims that he was "denied a fair trial, to wit, violation of due process rights due to improper jury instruction," in support of which he maintains that the "[t]rial justice erred in his instructions to the jury on life without parole." *Amended Petition*, p. 8. Without further guidance from petitioner about how the trial justice erred, the State will assume that Ground Two essentially restates Ground Three from his original petition. Pursuant to the original Ground Three, petitioner alleged that the trial justice erred in instructing the jury "as to the aggravated circumstances that would trigger a sentence of life without parole." The State hereby incorporates its previous response to this Ground, s*ee 2/14/06 Response*, pp. 15-16, and asks that Ground Two of the *Amended Petition* be dismissed with prejudice.

**C. Ground Three: Insufficient Evidence to Support Conspiracy Charge**

One of the most basic tenets of habeas corpus jurisprudence is that, before a federal court may consider a state petitioner's claim, the petitioner must demonstrate that he has "fairly presented" the federal constitutional question at every level of the state court proceeding. Picard v. Connor, 404 U.S. 270, 275-76, 92 S.Ct. 509, 512-13 (1971); O'Sullivan v. Boerckel, 526 U.S. 838, 842-45, 119 S.Ct. 1728, 1731-33 (1999); Cristin v. Brennan, 281 F.3d 404, 410 (3d Cir. 2002). This also means that petitioner has to present the same legal theory ***and*** the same factual basis for the claim to both the state and federal courts. ***See, e.g.,*** Thomas v. Gibson, 218 F.3d 1213, 1221 n.6 (10th Cir. 2000); Martens v. Shannon, 836 F.2d 715, 717 (1st Cir. 1988); Adelson v. DiPaolo, 131 F.3d 259, 262-63 (1st Cir. 1997). If, however, petitioner has exhausted his state court remedies without fairly presenting his federal claims to the state courts, he is procedurally

barred from pursuing those claims in a federal habeas proceeding. Gray v. Netherland, 518 U.S. 152, 161-62, 116 S.Ct. 2074, 2080-81 (1996); Coleman v. Thompson, 501 U.S. 722, 730-32, 111 S.Ct. 2546, 2554-55 (1991); Cristin v. Brennan, 281 F.3d at 409-10.[1]

In the case at bar, petitioner claims that "[t]here was insufficient evidence presented at trial that petitioner engaged in a murder conspiracy." In the state court, petitioner failed to frame this claim as a federal constitutional question, but instead dealt with it purely as a state law issue. ***See, e.g., Defendant's Appellate Brief, pp.*** 50-58.[2] Because petitioner failed to characterize his sufficiency-of-evidence argument as a federal question while in state court, he correspondingly failed to fairly present the federal question at every level of the state court system. Accordingly petitioner failed to exhaust his state court remedies on this issue. ***See, e.g.,*** Hivala v. Wood, 195 F.3d 1098, 1106-07 (9th Cir. 1999)(claim that evidence was insufficient to prove elements of first-degree murder did not amount to characterization of the sufficiency-of-evidence issue as a federal question in state court); Adelson, 131 F.3d at 263 (use of constitutional "buzz words" such as "proof beyond a reasonable doubt" does not conjure up a federal question in state court when the phrase is unaccompanied by federal constitutional analysis).

[1] An exception to this rule exists if petitioner can demonstrate cause for his procedural default and actual prejudice resulting from the federal constitutional violation. Cristin, 281 F.3d at 412. To show cause and prejudice, petitioner must establish some objective factor external to the defense that prevented him from complying with the state's procedural requirements. Coleman, 501 U.S. at 752-54, 111 S.Ct. at 2566-67. Petitioner in this case has failed to overcome the cause-and-prejudice hurdle with respect to any of his procedurally barred claims.

[2] For a copy of *Defendant's Appellate Brief*, see *State's Appendix to 2/14/06 Response, Tab 2*.

But because petitioner has already completed his post-conviction relief process in the Rhode Island court system, he has no right to further pursue the sufficiency-of-evidence issue in state court by framing it as a federal question. *See* R.I. Gen. Laws § 10-9.1-8. Accordingly, petitioner's sufficiency-of-evidence claim is procedurally barred in the habeas context and should be denied with prejudice. *See, e.g.,* Coleman, 501 U.S. at 735 n.1, 111 S.Ct. at 2557 n.1; O'Sullivan, 526 U.S. at 847-48, 119 S.Ct. at 1734.

Even assuming this Court decides to reach the merits of Ground Three, that Ground is completely frivolous, as the Rhode Island Supreme Court's decision on the merits makes clear:

> At the close of the state's case, defendant's motion for judgment of acquittal for the crime of conspiracy was denied by the trial justice on the ground that, although this was not the "strongest conspiracy case [he had] ever heard," a jury reasonably could find the defendants guilty of conspiracy to murder Casserly. Before this Court, defendant argued that the evidence presented at trial was legally insufficient to establish that an agreement to murder Casserly was ever formed, much less that defendant was a member of the conspiracy. Specifically, defendant contended that a conspiracy to murder cannot exist when the agreement to kill was formed contemporaneously with the murder itself. Based upon the facts of this case, we disagree.
>
> It is undisputed that the murder of John Casserly took place over a protracted period, during which the assailants inflicted increasingly serious blows to Casserly's body, eventually causing his death by stabbing. Standing alone, this evidence indicates more than a momentary resolve to bring about the death of John Casserly on the part of all the assailants. Also, we note that at least one of the three knives used in the murder was retrieved from another room in the apartment and was used by more than one person. From these facts, a jury could find there was an implied agreement among his assailants to kill Casserly. Accordingly, we are satisfied that the state presented sufficient evidence to establish beyond a reasonable doubt that a conspiracy to kill Casserly existed, and therefore the trial justice properly denied defendant's motion for judgment of acquittal.

Bustamante I, 756 A.2d at 766-67. For additional discussion of the evidence supporting the conspiracy verdict, see the *State's Appellate Brief*, pp. 53-60 (copy found in *State's Appendix to 2/14/06 Response, Tab 8*).

### D. Ground Four: Insufficient Evidence to Establish First-Degree Murder

In support of Ground Four, petitioner contends that "[t]he evidence presented at trial was insufficient to prove that petitioner was guilty of premeditation." *Amended Petition*, p. 12. This is a ground that petitioner raised on his direct appeal in a pro-se filing. *See State's Appendix to 2/14/06 Response, Tab 3.* The problem with petitioner's argument is that at trial he ***conceded*** that there was enough evidence to support petitioner's intent to kill. (Tr. III, 671-72).[3] Under Rhode Island law, the issue was therefore waived at the trial level. *See, e.g.,* State v. Mohapatra, 880 A.2d 802, 810 (R.I. 2005). For habeas purposes, petitioner failed to exhaust the premeditation issue because he neglected to raise it at every stage of the state court proceedings. *See* cases cited *supra* pp. 8-9.

In any case, the record provides ample evidence to establish the elements of intent and premeditation beyond a reasonable doubt. As the State contended to the Rhode Island Supreme Court:

> . . . Bustamante's argument on this score runs afoul of black letter law regarding the way in which all degrees of murder, and first-degree murder in particular, are proved. *See, e.g.,* State v. Diaz, 654 A.2d 1195, 1201-03 (R.I. 1995). It is simply beyond dispute that premeditation and intent to

[3] Citations to the record are contained in the transcript appendix that the State submitted to the Rhode Island Supreme Court along with its appellate brief during direct appeal. Pursuant to this Court's Administrative Procedures for Electronic Case Filing, the State has submitted and served a copy of that transcript appendix in hard copy (rather than a PDF file) to the Court and opposing counsel contemporaneously with the electronic filing of this Supplemental Memorandum. *See* AP 4(b)(1)(C).

> kill can be inferred from a murder that takes two hours to commit and results from 27 stab wounds, and which even Bustamante concedes must have been "painful." Pro Se Br. at 13. *See* State v. Brown, No. 97-52-C.A., slip op. at 11-12 [744 A.2d 831, 838-39] (R.I. Jan. 21, 2000) (affirming trial justice's refusal to allow second-degree murder instruction in case in which victim was viciously beaten with gravestone "in a manner that demonstrated more than momentary resolve"). And, as Bustamante could be found guilty even without himself "pull[ing] the trigger," Diaz, 654 A.2d at 1201, the State is not required to prove that Bustamante personally inflicted any particular stab wound. *See* [Defendant's ] Pro Se. Br. at 4.

*State's Appellate Brief*, pp. 79-80 (*State's Appendix to 2/14/06 Response, Tab 8*).

**E. Ground Five: Preclusion of Cross-Examination of Timothy Gorman**

With respect to Ground Five of the *Amended Petition*, petitioner complains that he was denied the "opportunity to inquire into the possible bias of the alleged eye witness stemming from his expectation of favorable treatment from law enforcement authorities which seriously impacted petitioner's right to a fair trial." He further states that, as a result, he was deprived of his right to confront this witness. *Amended Petition*, p. 14. In his *11/6/06 Memorandum*, petitioner supports his argument by contending that even though the Rhode Island Supreme Court agreed that the trial court erred in precluding cross-examination of Timothy Gorman, the state supreme court violated petitioner's rights when it concluded that the error was harmless beyond a reasonable doubt. *11/6/06 Memorandum*, pp. 21-27. *See also* Bustamante I, 756 A.2d at 765-66. Accordingly, petitioner concludes, by rejecting his claim the Rhode Island Supreme Court "unreasonably applied" the harmless-error test of Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431 (1986).

In the first place, petitioner invokes the wrong legal test for reviewing this kind of trial error. Unlike on direct appeal, in the habeas context a federal court does not assess a

state court's application of the harmless-beyond-a-reasonable-doubt standard by applying that standard all over again. Instead, the federal court applies the less exacting standard of Brecht v. Abrahamson, 507 U.S. 619, 623, 637, 113 S.Ct. 1710, 1714, 1721-22 (1993). *See also, e.g.,* Medina v. Matesanz, 298 F.3d 98, 101 (1st Cir. 2002); Fortini v. Murphy, 257 F.3d 39, 48 (1st Cir. 2001); Sanna v. DiPaolo, 265 F.3d at 14. Under the Brecht standard, a trial error is considered harmless unless the error had a substantial and injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at 623, 113 S.Ct. at 1714; Medina, 298 F.3d at 101. And it must be remembered that, in applying the Brecht harmless-error standard, this Court should not adopt petitioner's view of the credibility of the prosecution's witnesses simply because petitioner deems those witnesses untrustworthy. *See 11/6/06 Memorandum*, p. 27. Petitioner's view of the witnesses' credibility was rejected by the Rhode Island Supreme Court, and the state court's finding of fact in that regard is presumptively binding upon this Court. Sanna v. DiPaolo, 265 F.3d at 10-11.

On the merits, during the direct appeal in the Rhode Island Supreme Court the State discussed at great length the facts in the record that supported the conclusion that any error was harmless beyond a reasonable doubt. *See State's Appellate Brief*, pp. 48-52 (*State's Appendix to 2/14/06 Response, Tab 8*). The state supreme court agreed with the State's contentions, concluding:

> [I]n view of the extensive record of inculpatory evidence presented in this case, we are satisfied that this error was harmless beyond a reasonable doubt. In State v. Texter, 594 A.2d 376 (R.I. 1991), this Court adopted the analysis enunciated by the United States Supreme Court in applying the harmless-error test to cases in which a defendant's constitutional rights have been violated. *Id.* at 378 (citing Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). This harmless-error analysis has been applied to situations in which there has been an

> impermissible restriction on the right of cross-examination. [State] v. Wiley, 676 A.2d [321], at 324 [(R.I. 1996)]. In determining whether error is harmless, we examine various factors, including the relative degree of importance of the witness testimony to the prosecution's case, "whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and * * * the overall strength of the prosecution's case." Texter, 594 A.2d at 378 (quoting Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438, 89 L.Ed.2d at 686-87).
>
> In light of these factors and the extensive eyewitness testimony, we are satisfied that although error, the restriction placed upon defendant's cross-examination of Timmy was harmless beyond a reasonable doubt. As noted, there were multiple eyewitnesses who implicated defendant as one of the principal assailants in this massacre, including a detailed description of his participation in the crime. Thus, we conclude that Timmy's testimony was cumulative to the testimony of the other participants and eyewitnesses. Moreover, during his closing argument defendant emphasized to the jury that it was not Timmy but rather two other eyewitnesses on whose testimony the state rested its case, arguing that "[i]f you are to find Adri[a]n Bustamante guilty, you must [concern] yourself with two witnesses; Rene Buzz Gorman and Charles Roy, Jr., Little Chuckie. You ***must*** endorse ***their*** testimony. There is no other way." (Emphases added.) Clearly, in the eyes of both defendant and this Court, Timmy's testimony was cumulative in light of the overwhelming eyewitness testimony presented by the state. Accordingly, we conclude that the error of the trial justice restricting defendant's cross-examination was harmless beyond a reasonable doubt.

Bustamante I, 756 A.2d at 766. Petitioner does not convincingly explain why the state supreme court's analysis fails to satisfy the Van Arsdall harmless-error standard, let alone the more lenient standard of Brecht v. Abrahamson that must be applied in the instant context.

Even if this Court disagreed with the Rhode Island Supreme Court's analysis, that alone wouldn't demonstrate the objective unreasonbleness of the state court's holding required to grant habeas relief. Evenstad v. Carlson , ___ F.3d ___, ___, 2006 WL 3436142, *3 (8th Cir. Nov. 30, 2006); Sanna v. DiPaolo, 265 F.3d at 13. Petitioner's

claim regarding the prejudicial impact of the limitation on cross-examination of Timothy Gorman should be rejected.

**F. Ground Six: Error In Imposing Life-Without-Parole Sentence**

Petitioner argues concerning Ground Six that the "evidence did not warrant a sentence of life without parole." *Amended Petition*, p. 16. He notes that he raised this ground in state court in the context of his motion for sentence reduction, which the state supreme court denied in State v. Bustamante, 793 A.2d 1038 (R.I. 2002)[hereinafter Bustamante II]. *Amended Petition*, p. 16. In the state court proceeding, this issue was litigated entirely under R.I. Super. Ct. R. Crim. P. 35, involving a plea for leniency from the sentencing court rather than any federal constitutional question. *See* Bustamante II, 793 A.2d at 1040-41. And indeed, unless petitioner has alleged that his sentence falls outside the parameters of the applicable state statute—which he has not done—no federal question is presented by a claim that a particular sentence is not warranted. *See* Townsend v. Burke, 334 U.S. 736, 740, 68 S.Ct. 1252 1255 (1948); Foster v. Withrow, 159 F. Supp. 2d 629, 645 (E.D. Mich. 2001), *aff'd*, 42 Fed. Appx. 701 (6th Cir. 2002); Stephanski v. Superintendent of Upstate Correctional Facility, 433 F. Supp. 2d 273, 284 (W.D.N.Y. 2006).

In any event, a sentence of life-without-parole imposed for commission of a brutal first-degree murder doesn't violate the federal Constitution's prohibition against cruel and unusual punishment at all. United States v. Saccoccia, 58 F.3d 754, 756-59 (1st Cir. 1995); United States v. DeLuca, 137 F.3d 24, 40 n.19 (1st Cir. 1998); Foster, 159 F. Supp. 2d at 645-46. Ground Six of the *Amended Petition* should be denied and dismissed with prejudice.

**G. <u>Ground Seven: Failure to State on Record Reasons for Imposing Life-Without-Parole Sentence</u>**

As to Ground Seven of the *Amended Petition*, petitioner alleges that the trial justice failed to state on the record why he imposed a life-without-parole sentence, and that this failure violated RI Gen. Laws § 12-19.2-4. *Amended Petition*, p. 18. Petitioner cites no federal constitutional right that is violated by this alleged error. In fact, when petitioner raised this issue in state court on direct appeal, the Rhode Island Supreme Court quoted the reasons given by the trial justice for imposing the life-without-parole sentence. <u>Bustamante I</u>, 756 A.2d at 768. After reviewing the record *de novo*, the state supreme court concluded that the trial court had complied with state law:

> Although the statement [of the trial justice] was not a model of detail and particularity, we conclude that the trial justice did satisfy, although with brevity, the requirements of § 12-19.2-4, and was not obligated to engage in a long oration about his rational for imposing this sentence. The trial justice considered the nature and circumstances of the offense, the statement by defendant and the fact that this crime included juveniles in its perpetration. Accordingly, we conclude that the trial justice did not fail to state his reasons for imposing a sentence of life without the possibility of parole. Moreover, in the exercise of our own independent judgment and discretion, we deem this sentence to be appropriate and just.

<u>Bustamante I</u>, 756 A.2d at 768-69.

Thus, in the case at bar, petitioner has not challenged the constitutionality of Rhode Island's life-without parole scheme, but merely questioned whether the sentencing procedure was properly complied with in his particular situation. The state's highest court, interpreting and applying the concededly legitimate state law, concluded that the trial court had not so erred. Even if this Court disagrees with the Rhode Island Supreme Court's interpretation of state law, there is absolutely nothing about the sentencing scenario that implicates a federal constitutional question, and this Court therefore lacks

authority in the habeas context to review the state supreme court's decision any further. Evenstad, ___ F.3d at ___, 2006 WL 3436142, *3; Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996). *See also* Sanna, 265 F.3d at 11; Estelle v. McGuire, 502 U.S. 62, 71-72, 112 S.Ct. 475, 481-82 (1991).

**H. Remaining Arguments**

**(1) State of Mind Evidence Under R.I. R. Evid. 803**

In the *11/6/06 Memorandum*, but not in the *Amended Petition*, petitioner complains that the trial court violated his right of confrontation and his right to present a defense when it relied upon R.I. R. Evid. 803(3) to refuse to allow him to present his own self-serving testimony through a police witness. If allowed, the admission of the police officer's testimony would have effectively permitted petitioner to testify without having to take the stand and submit to cross-examination. *11/6/06 Memorandum*, pp. 27-32. *See* Bustamante I, 756 A.2d at 763-64.

There are two fatal flaws to petitioner's argument regarding R.I. R. Evid. 803(3). First, petitioner failed to fairly present his federal constitutional claims in state court because he did not raise them, as required for exhaustion, at ***every*** level of the state court system. *See supra* pp. 8-9 (citing cases). Although petitioner's appellate counsel did, in part, pose the question in terms of federal constitutional issues, *Defendant's Appellate Brief*, pp. 33-38 (*State's Appendix to 2/14/06 Response, Tab 2*), during trial defense counsel argued the issue solely in terms of the application of the Rhode Island Rules of Evidence. (Tr. III, 739-45).[4] Because defendant failed to raise the constitutional issue at

[4] This transcript excerpt is being submitted in the State's hard-copy appendix. *See supra* p. 11 n.3; AP 4(b)(1)(C).

trial, under the Rhode Island Supreme Court's long-standing raise-or-waive rule, the Supreme Court would not have considered the constitutional question on appeal regardless of the fact that appellate counsel brought the federal questions to the court's attention. *See, e.g.,* Cronan ex rel. State v. Cronan, 774 A.2d 866, 877-78 (R.I. 2001). As petitioner failed to properly exhaust his state court remedies, he is now precluded from pursuing these federal claims in the habeas context. *See, e.g.,* Gray v. Netherland, 518 U.S. at 161-62, 116 S.Ct. at 2080-81. *Accord*, Fortini v. Murphy, 257 F.3d 39, 45 (1st Cir. 2001)(although petitioner failed to raise constitutional claim in state trial court and was therefore potentially procedurally barred from pursuing claim in habeas setting, in federal habeas proceeding state did not argue lack of exhaustion, and thereby waived objection to habeas claim on basis that petitioner failed to raise it at trial).

In any case, even assuming this Court were to reach the merits of petitioner's argument, that argument must be rejected. To begin with, like every litigant, a defendant does not have an unfettered right to offer testimony that is otherwise inadmissible under standard rules of evidence. Jimenez v. Walker, 458 F.3d 130, 147 (2d Cir. 2006)(citing Taylor v. Illinois, 484 U.S. 400, 410, 108 S.Ct. 646, 653 (1988)), *petition for certiorari filed 10/30/06* (No. 06-7603). *See also* Evans v. Verdini, 466 F.3d 141, 148 (1st Cir. 2006). In the case at bar, as the State argued at length to the state supreme court, R.I. R. Evid. 803 is substantially identical to Fed. R. Evid. 803. Federal courts have consistently interpreted Fed. R. Evid. 803 to require exclusion of state-of-mind evidence in precisely the sort of circumstances that arose in the instant case. *See State's Appellate Brief*, pp. 26-36 (citing and discussing application of Rule 803 and federal case law)(*State's Appendix to 2/14/06 Response, Tab 8*). In the Rhode Island Supreme Court's decision on

direct appeal, the state court cited and discussed United States v. Cohen, 631 F.2d 1223 (5th Cir. 1980), a federal case interpreting Fed. R. Evid. 803 along the lines the State had proposed in its appellate brief. The Rhode Island Supreme Court held that R.I. R. Evid. 803 was consistent with Fed. R. Evid. 803 on this score. Bustamante I, 756 A.2d at 764.

Since Rhode Island's version of Rule 803 is consistent with the federal version of Rule 803, and since petitioner cites no support for the proposition that application of Fed. R. Evid. 803 in these circumstances has been held to violate the federal constitution, the State is hard-pressed to see how petitioner's constitutional rights were violated by application of R.I. R. Evid. 803 to exclude his self-serving statement from evidence at trial. This argument, too, must be rejected.

**(2) Errors In Sentencing Proceeding**

As for the remaining arguments in petitioner's *11/6/06 Memorandum*, he raises five alleged errors related to his sentencing proceeding. The State is not certain to which ground in petitioner's *Amended Petition* these five errors relate. Nevertheless, the State will attempt to respond to them.

Petitioner contends that (1) the trial justice failed to instruct the jury as to reasonable doubt during the sentencing proceeding (*11/6/06 Memorandum*, pp. 33-34); (2) the trial justice failed to instruct the jury that its determination of factual circumstances might support imposition of a life-without-parole sentence (*11/6/06 Memorandum*, pp. 34-35); (3) the trial justice impermissibly limited the jury's selection of special circumstances (*11/6/06 Memorandum*, p. 35); and (4) the trial justice failed to find the existence of one of the special circumstances (*11/6/06 Memorandum*, pp. 36-37).

Significantly, petitioner concedes that he did not raise any of the foregoing errors either during the sentencing proceeding or on appeal. *11/6/06 Memorandum*, p. 39.

Additionally, petitioner asserts that because his attorneys failed to raise any of the errors set forth in the preceding paragraph, he was denied the effective assistance of defense counsel both during sentencing and during appeal of the sentence. *11/6/06 Memorandum*, p. 39. Petitioner also admits, however, that although he pursued an ineffective-assistance-of-counsel claim in his state court post-conviction relief action, he did not raise any of these particular four sentencing errors as bases for an ineffectiveness claim. *11/6/06 Memorandum*, p. 38.

As to his four claims of sentencing error, petitioner never raised these issues in state court at all, despite having had ***three*** opportunities (direct appeal, motion to reduce sentence, and post-conviction relief action) to do so. The state supreme court made clear the last time it reviewed errors from petitioner's sentencing that petitioner's failure to raise sentencing errors during direct appeal and motion to reduce sentence precluded petitioner from pursuing those errors during his post-conviction relief action. The state supreme court held that further litigation of the issues petitioner had failed to raise up until that point was barred by the doctrine of res judicata. Bustamante v. Wall, 866 A.2d 516, 526 (R.I. 2005).

The Rhode Island Supreme Court's holding in Bustamante v. Wall would obviously also apply to bar the sentencing claims that petitioner never made until he reached this Court. These new claims, although technically unexhausted, can no longer be brought in state court due to the common law doctrine of res judicata. Bustamante v. Wall, 866 A.2d at 526. These new claims are therefore procedurally defaulted for

purposes of habeas review. *See* Williams v. Bagley, 380 F.3d 932, 966-67 (6th Cir. 2004)(habeas claims procedurally barred by res judicata); United States ex rel. Novak v. Grankey, 871 F. Supp. 1053, 1055 (N.D. Ill. 1995) (same). *See also* Cannon v. Gibson, 259 F.3d 1253, 1266 n.11 (10th Cir. 2001)(if state court would consider claim procedurally barred based on petitioner's failure to raise it in timely fashion, claim is procedurally defaulted for habeas purposes).

Petitioner's belated ineffective-assistance-of-counsel claims are similarly precluded by his failure to raise them in state court when he had the opportunity to do so. The law is clear that, to satisfy exhaustion requirements, petitioner must have presented ***both*** the factual basis ***and*** the legal theory underlying his ineffectiveness claims at each level of the state court proceeding before lodging those ineffectiveness claims with the federal courts in a habeas proceeding. *See, e.g.,* Castillo v. McFadden, 399 F.3d 993, 999 (9th Cir.), *cert. denied*, 126 S.Ct. 348 (2005); Matias v. Oshiro, 683 F.2d 318, 329-30 (9th Cir. 1982); Thomas v. Gibson, 218 F.3d 1213, 1221 n.6 (10th Cir. 2000); Williams v. Bagley, 380 F.3d at 969-70 & n.21; Martens v. Shannon, 836 F.2d 715, 717 (1st Cir. 1988).

Here, by his own admission, petitioner failed to present the state courts with either the factual underpinnings or the legal theories underlying the ineffectiveness argument he now makes concerning his sentencing proceeding. Hence, petitioner implicitly concedes that he has procedurally defaulted on the ineffectiveness argument and that it cannot be considered by this Court in the habeas context. *See, e.g.,* Gray v. Netherland, 518 U.S. at 161-62, 116 S.Ct. at 2080-81.

## CONCLUSION

For the reasons set forth above and in the State's *2/14/06 Response* to petitioner's original habeas petition, the State requests that petitioner's original and amended petitions for writ of habeas corpus be denied and dismissed with prejudice.

Respectfully submitted,

**STATE OF RHODE ISLAND**
By its attorneys,

**PATRICK C. LYNCH**
**ATTORNEY GENERAL**

/s/ Lauren S. Zurier
**Lauren S. Zurier # 4496**
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
(401) 222-2995 (fax)
lzurier@riag.ri.gov

Dated: December 28, 2006

## CERTIFICATION

I hereby certify that on the 28th day of December, 2006, I filed this document electronically and that it is available for viewing and downloading from the ECF system. I also certify that, on the same date, I electronically mailed the foregoing document to the attorney(s) of record listed below:

Joseph R. Palumbo, Jr., joseph@palumbolaw.net.

/s/ Lauren S. Zurier