**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ADRIAN BUSTAMANTE** | } | |
| | } | |
| **Plaintiff** | } | |
| | } | |
| **v.** | } | **C.A.: 06-07T** |
| | } | |
| **ASHBELL T. WALL** | } | |
| | } | |
| **Defendant** | } | |

**PETITIONER'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

On April 3, 2007, Magistrate Judge Almond filed a Report and Recommendation, in which the Magistrate Judge recommended to this Honorable Court that petitioner's amended petition for writ of habeas corpus be denied and dismissed. This Court granted petitioner an extension of time to file any objections to the Magistrate Judge's Report and Recommendation. Petitioner now submits his objections.

TRAVEL OF THE CASE

Indictment Number P1/95-1200A filed in the Superior Court of Providence County on April 14, 1995 charged the petitioner, Adrian Bustamante (hereafter "Bustamante" or 'Ponch"), with three offenses: the kidnapping of John Casserly; the murder of John Casserly; and conspiracy to murder John Casserly. Bustamante's co-defendant, Carlo Belloli, was charged with both the murder and conspiracy to murder.

Bustamante and Belloli were jointly tried by a jury, with the late Justice John Sheehan presiding, in a trial that lasted 11 days. Bustamante moved for a judgment of

acquittal on the kidnapping charge at the conclusion of the state's case, which was granted.

On March 1, 1996 Bustamante and Belloli were each found guilty by a jury of first degree murder and conspiracy to commit murder. After further deliberations, the jury found that the murder involved torture or aggravated battery.

Bustamante's motion for a new trial was heard on March 8, 1996. While denying Bustamante's motion, the trial justice did say that he found some of the state's witnesses to be "extremely credible, and some not to be." App. D, TR 812. On May 31, 1996, Judge Sheehan sentenced Bustamante and Belloli to life without parole on the murder and gave them each a 10 year concurrent sentence on the conspiracy charge.

Bustamante appealed his conviction to the Rhode Island Supreme Court. In an opinion issued on August 2, 2000 the Supreme Court affirmed Bustamante's conviction and sentence of life without possibility of parole. *State v. Bustamante*, 756 A.2d 758.

Bustamante later filed a motion to reduce his life without parole sentence, which was denied by the trial justice. The Supreme Court affirmed the trial judge's denial of the motion to reduce sentence. State v. Bustamante, 793 A.2d 1038 (R.I. 2002).

On February 28, 2001, Bustamante filed a *pro se* application for post-conviction relief in the Superior Court. The trial judge denied Bustmante's application, and Bustamante appealed, *pro se*, to the Rhode Island Supreme Court. The Supreme Court affirmed the denial of Bustamante's application for post-conviction relief. *Bustmante v. Wall*, 866 A.2d 516 (R.I. 2005).

Adrian Bustamante now seeks relief in this Honorable Court.

## STATEMENT OF FACTS

*a. The gang.*

This case involves a gang of teenage males, ranging from age twelve to seventeen. The leader of the group, dubbed the "The Kool-Aid Gang" (or alternatively, "The Dog Pound Gang," TR 216, 219, 311), did not arise out of the gang's youthful membership. Instead the bellwether was a full-grown man in his mid-thirties by the name of Charles Roy, known to all the pubescent hooligans who did his bidding as "Uncle Chuckie."

During the early morning hours of December 2, 1994, the Kool-Aid Gang's thieving, assaultive, drug-seeking aspirations expanded to include murderous ones. For on that date, an alcoholic, drug-addicted, twenty-four year old man by the name of John Casserly, TR 444, was beaten and killed by Uncle Chuckie's friend, neighbor and apparent compatriot in crime, Carlo Belloli, aided by various members of the Kool-Aid Gang, after Casserly lost $100 of Belloli's cash in a drug deal gone sour.

Some of the boys, though ever-protective of their Uncle Chuckie (who virtually got off scot-free in his criminal prosecution), later implicated a stranger who had the extreme misfortune of being in the employ of the evil assemblage that evening – namely, the petitioner, Adrian Bustamante.

*b. The gang's original plan*

On December 1, 1994, the day before the murder, Uncle Chuckie called his fifteen year old nephew, Charles Roy, Jr., also known as "Little Chuckie", and told him to round up his friends to go and "beat-up some guy in Woonsocket." TR 74, 75, 77, 128-129. Little Chuckie complied with Uncle Chuckie's request, gathering the boys he

hung around with each day – Rob Pointer, Jesse Kegley, Danny Dunbar, Michael Roy (Little Chuckie's brother), Luis DeJesus, and Timmy Gorman (who, at age twelve, was the youngest of the group). TR 131-32, 436.

Although three of the boys would not admit to gang membership, two of the three admitted that they hung around with the group each day and were called "The Kool-Aid Gang" or the "Dog Pound Gang" by other kids. TR 155, 310-311; TR II 434-36. Yet another boy said all of them, including the boys registering denials, did, in fact, comprise "The Kool-Aid Gang." TR 216. Timothy Zani, a member of the Kool-Aid Gang who was not present that day, testified for the defense that the Kool-Aid Gang members engaged in illegal activities for Uncle Chuckie, such as selling drugs, and stealing checks and other items. TR 764, 768.

As arranged, the boys were picked up that afternoon by Uncle Chuckie and his friend, Carlo Belloli, with Carlo at the wheel of his van. TR 77, 201-02. Already in the van with Uncle Chuckie and Carlo were Rene "Buzzy" Gorman (Timothy Gorman's fifteen year-old cousin), Tommy Roy (age seven, Uncle Chuckie's son), and Tracy Peloquin (a woman who lived upstairs form Carlo Belloli), TR 74, 75, 77, 176, 343-44. En route to Woonsocket, Uncle Chuckie and Carlo stopped at a liquor store to buy liquor for the younger gang members. TR 79, 203, 269.

The boys learned from Uncle Chuckie that the individual he wanted the boys to beat up that day was a man they did not know by the name of John McKenna, who had "ratted on" Carlo Belloli and his "girl" Nora, in a stolen check scheme, which had just landed Nora in jail. TR 129, 214. Eventually, some of the boys related, the plan to beat up the snitch, John McKenna, evolved into a scheme to stab him instead. TR 136-37,

403-05.

The boys were transported by Uncle Chuckie and Carlo Belloli to Woonsocket, as planned, where they divided their time between Carlo's and Uncle Chuckie's apartments. The two friends' respective tenements had adjoining backyards and were likewise connected by an intercom system, which Carlo, Uncle Chuckie, and the boys used to communicate with each other between the two houses. TR 98, 203, 409. Little Chuckie testified that he spent a considerable amount of time at Carlo Belloli's when he was staying with Uncle Chuckie, and that night was no different. TR 77. Clearly, everyone present at Carlo's and Uncle Chuckie's either were related to each other or had been good friends and confederates for a long time. TR 132, 215.

To reward the boys for the proposed attack upon John McKenna, Uncle Chuckie provided them with plenty of cigarettes, alcohol, and crack cocaine, which was made available to them throughout the night at Carlo's house. TR 84, 205, 271, 346, 351. At Uncle Chuckie's, the boys were treated with playtime with Uncle Chuckie's impressive collection of snakes and other reptilia. TR 79, 204. Pornographic moves were also shown at Uncle Chuckie's. TR 208.

The greatest reward for all the boys, however, was the promise of a tattoo. TR 81-82. While at least three of the boys already had tattoos (including Uncle Chuckie's seven year-old son, Tommy, who apparently was not excluded from the night's revelry), they were told that Uncle Chuckie had hired a tattoo artist by the name of "Ponch" to come and give them tattoos that night. TR 81, 82, 148, 174.

"Ponch" was the nickname of the petitioner, Adrian Bustamante. TR 348. Bustamante was a tattoo artist who lived in Norwich, Vermont, with his fiancée, Lisa

Welch and Ms. Welch's parents. TR 707-09. Ms. Welch testified that Mr. Bustamante's work as a tattoo artist brought him to various fairs and carnivals throughout Vermont and New Hampshire, where he had occasion to meet Uncle Chuckie, an occasional carnival worker. TR 709-10. It was Uncle Chuckie who invited Bustamante to Rhode Island to give tattoos to assorted members of the Kook-Aid Gang. When Bustamante arrived in Woonsocket sometime after 8:30 or 9:30 on the night of December 1, 1994, Chuckie and Carlo had to go get him since he did not know the way to Carlo's. TR 172, 206, 274, 348. Thus, by the time that Adrian "Ponch" Bustamante arrived with the tools of his trade later that night, the debaucherous party was well underway and the vengeful plot to attack (and, possibly, to stab) John McKenna was already formulated. TR 407.

But, Uncle Chuckie inexplicably decided to call off the attack on McKenna. TR 207. However, as one of the boys explained to the Grand Jury, instead of the boys committing an assault and battery on John McKenna, "We ended up murdering John Casserly." TR 423.

*c. Enter John Casserly*

John Casserly's friend, Scott Deering, who admitted to being a drug user for some twenty years, testified that he and Casserly each bought a couple bags of cocaine around 6 or 7 on the evening of December 1, 1994 and then went to Deering's house for a couple hours to drink and smoke crack. TR 62, 63, 72. At 11 p.m., Deering testified, they ran out of drugs and went out to buy more. TR 63. On the way, they met two men relieving themselves on the street outside their van. TR 64. The two they encountered asked Deering and Casserly if they could get them some drugs. TR 65. Deering and Casserly then got into the strangers' van, bought drugs for all of them, and then went to Deering's

house to use it. TR 65. Deering said the driver of the van was a dark, heavy, scruffy man he never identified. TR 65. The other man, Deering said, was acting completely "crazy", boasting that he had just been released from jail and that it wasn't any big deal. TR 69. Deering later identified the second man as Charles ("Uncle Chuckie") Roy. TR 68, 69. Deering said he was so uneasy about the way the individual was acting, that he did the drugs quickly. TR 65. Unlike Deering, John Casserly wanted to join the two men, and Deering tried, but failed to talk Casserly out of it. TR 65-66. Deering said that Casserly thus left with the scruffy and "crazy" duo around 1 or 1:30 a.m. on December 2nd and they wound up at Carlo Belloli's house.

Rene "Buzzy" Gorman testified that after Casserly had been at Carlo's for awhile, the group ran out of cocaine, so he, Ponch, and Casserly drove off in Carlo's van to buy some more. TR 352. Buzzy claimed that Carlo had given $100 in cash to Ponch, who, in turn, gave it to Casserly. TR 353. Buzzy said that they drove to Casserly's mother's house, both Ponch and Casserly went in for ten or fifteen minutes, and Casserly returned with a check for $20 from his mother. TR 354-55. (John Casserly's mother, Donna Casserly, testified that John came by to get money between 1 and 2 a.m. that night. TR 445-46). Then the threesome ventured over to Front Street to buy some cocaine. TR 356. Ponch and Casserly left the van and came back about a half hour later, at which point Casserly remarked that he had been "ripped off." TR 356-57. Buzzy testified that although Casserly began to walk away from the van, he and Ponch grabbed him and put him inside, TR 358, and they brought him back to Carlo's. TR 359.

Carlo was furious at Casserly over the loss of his money, and kept saying, "I want my money now." TR I 91; TR 374-75. **The accounts of the subsequent attack upon**

**John Casserly differed with each of the three young eyewitnesses to the grisly event**.

*d. Rene "Buzzy" Gorman's account*

Rene "Buzzy" Gorman, age fifteen at the time, testified that he was present at Carlo's before, throughout, and after the attack, and, by his own admission, actively participated in it. In fact, Buzzy testified that he was the very first to push and hit Casserly. TR 361. Soon after, Carlo hit Casserly and Casserly fell to the ground, at which point, according to Buzzy, everyone started to kick him. TR 361. Buzzy alleged that each time Casserly tried to get up, Ponch hit him with a flashlight, *until* Buzzy took the flashlight from Ponch and used it himself to strike Casserly. TR 363-64. When Casserly managed to get up he started wrestling with Carlo, who then began stabbing Casserly with a survival knife. TR 364. Buzzy said that Carlo stabbed Casserly "a lot"… "more than 10 times." TR 365. Buzzy also said that he saw Ponch stab Casserly under the buttocks and on the back of the leg. TR 360-67.

Buzzy said that at one point during the stabbing, Casserly cried out, "Stop. I can't breathe." TR 442. But, according to Buzzy, the stabbing persisted. Carlo threw a blanket next to Casserly and told him, "Bleed on the blanket, not on the rug." TR 370. Carlo also warned Little Chuckie, "This could happen to you too." TR 387. Buzzy further testified that he saw neither his friend, Little Chuckie, nor his cousin, Timmy, doing anything but standing there. TR 374.

Buzzy further related that while the fight was going on with Casserly, he was twice called over the intercom by Uncle Chuckie, who wanted to know what was going on. TR 410-11, 413. Though Uncle Chuckie was not there when the weapons were used, claimed Buzzy, he had been there when the argument started. TR 408. Once Casserly

started getting stabbed, Buzzy said he "was freaking out" and ran over to tell Uncle Chuckie, who told him to calm down. TR 411.

For three months after the incident, Buzzy Gorman denied he was present at the crime scene and refused to give a statement, while his lawyer attempted to negotiate a deal on his behalf. TR 396-97, 401. In the interim, he admitted, he had access to written materials about the case. TR 397.

Buzzy said he knew the strength of the evidence against him and knew that the state would charge him with first degree murder and would seek a sentence of life without parole. TR 399-400. In March of 1995, after giving a statement at last, Buzzy entered into a deal in which his first degree murder charge was reduced to assault with a deadly weapon, for which he was sentenced to twenty years, to be served at the Training School until age twenty-one, with the remainder suspended. TR 340, 388. He knew, too, that he could be released as early as his eighteenth birthday. TR 395. However, he admitted on cross-examination that he was not made aware that, notwithstanding his cooperation and the Attorney General's recommendation, at age twenty-one a judge could order him to serve the remainder of his twenty-year sentence at the A.C.I. TR 393, 399. Buzzy *did* know, however, that how much of his life would be spent behind bars depended on the recommendation of the Attorney General's Department. TR 395.

Upon his arrest on December 2, 1994, Buzzy testified, he did not say anything about Ponch because he didn't know Ponch. TR 402. Moreover, he said that he could hear Little Chuckie and his cousin Timmy in the next room and they didn't mention Ponch either. TR 439. He elaborated, "Because he wasn't being brought up. His name wasn't in it. There was nothing about his name [or Luis de Jesus' name] in there." TR

440. Buzzy explained his reasons for finally implicating Bustamante in the following exchange:

> Q. What made you say something about Ponch on March 4th when you gave a statement?
>
> A. Because they were starting to give me life and I didn't want it and so many people were against me.
>
> Q. I don't understand what you're saying, Mr. Gorman.
>
> A. Because I was trying to get a deal.

TR 440-41. During the hearing on the defendant's motion for a new trial, the trial justice remarked that Rene "Buzzy" Gorman was "offered a better deal than I had ever seen in this court." TR 813.

*e. Charles "Little Chuckie" Roy, Jr.'s account*

Little Chuckie Roy was another testifying witness who was present during the attack, though he was never charged with anything. TR 191. Little Chuckie gave four different statements as well as testimony to the Grand Jury, ***later admitting that he either lied or left things out of all of them.*** TR 145-154, 162, 177. In his first statement when arrested on December 2, 1994, Little Chuckie implicated only Carlo and Buzzy in the murder. TR 118-19. He said that both Ponch and his uncle were at Uncle Chuckie's during the attack, and did not say that Ponch so much as laid a finger on John Casserly. TR 117, 119.

When picked up by the police two days later for further questioning, Little Chuckie refused to talk with the police until he conferred with his Uncle Chuckie, even though he had spoken with him several times since December 2nd. TR 121. After being permitted to speak with his uncle on the phone, Little Chuckie claimed *for the first time*

that Ponch participated in the stabbing. TR 123. Yet, Little Chuckie admitted at trial that he left out or lied about at least four other salient facts at the time, such as Luis' and Timmy's involvement in the stabbing. TR 123.

On December 20, 1994, while testifying in court in a pre-trial hearing, Little Chuckie swore he had stopped lying and had finally "come clean". TR 124. Nonetheless, he testified that he never saw a knife in Luis DeJesus' hand – which in sworn testimony he later admitted was a lie. TR 125. He also admitted telling the same lie to prosecutor Angela Bucci six weeks later during an interview at the Training School. TR 126.

In a third written statement on March 15, 1995, for the first time Little Chuckie said, "I saw Luis stab the guy," because he knew then, for the first time, that the police were interested in Luis DeJesus. TR 126-27. And, as Little Chuckie testified before the Grand Jury, he changed his story because the police threatened to lock him up. TR 127. At trial, Little Chuckie explained that he lied, even under oath, because he was afraid of Ponch and because Luis was his friend and he didn't want to get him in trouble. TR 193-94. He likewise admitted that it is fair to say that he does not want to get his uncle in trouble either. TR 194.

At trial, in testimony which Little Chuckie claimed was, at long last, the whole truth, he implicated Carlo, Luis, Timmy, Buzzy and Ponch.

Little Chuckie testified at trial that he was sleeping over Uncle Chuckie's with Timmy, Danny, Jesse and Rob (having turned in at around midnight, TR 87), when he was awakened at about 3-4 a.m. by Buzzy and Luis, telling him that someone was getting beaten up at Carlo's TR 89, at which point he and Timmy went over to check it out, TR

90. They saw a guy on the ground bleeding from the head, with Carlo standing over him saying over and over, “I want my money now.” TR 90-91.

Little Chuckie further testified that Buzzy alone, not Ponch, repeatedly struck the victim with a flashlight, Carlo stepped on his head, Carlo stabbed him at least ten times, Ponch stabbed him in the buttocks and on the side of his back with a pocket knife, Timmy was told by Ponch to stab him “if it makes you feel good”, and Luis stabbed him after he was already dead. TR 91-96. Uncle Chuckie, he said, came over to Carlo’s too. TR 97.

Little Chuckie and Timmy eventually went back to bed at Uncle Chuckie’s, but not before Little Chuckie was warned by Carlo to “Keep you mouth shut or this will happen to you.” TR 96-97. When Uncle Chuckie later beeped Little Chuckie and told him to bring over a blanket, Little Chuckie said that Timmy brought over the blanket (which Timmy denied, TR 303), and then he and Timmy went back to sleep. TR 97, 99.

*f. Timothy Gorman's account*

Buzzy Gorman’s cousin, Timmy Gorman, age twelve at the time of the incident, was in a residential treatment facility by the time of trial after having been adjudged delinquent for indecent assault and battery on a minor, as well as assault and battery. TR 266, 293. Timmy testified that he, too, was awakened by Buzzy while asleep at Uncle Chuckie’s on the night in question. TR 275. Timmy said he went over to Carlo’s with Little Chuckie, only to see a man he didn’t recognize lying on the floor, bleeding from the head. TR 275. Timmy said that Carlo stabbed the guy and stomped on his head. TR 280-81. Carlo threatened to kill Timmy if he told anyone. TR 284. Timmy said that Luis stabbed the guy too. TR 284.

For the very first time at trial, Timmy made three extremely serious allegations against Ponch which he had never made in any prior statements, i.e., that he saw Ponch stab Casserly, hit him with a flashlight, and threaten to kill Timmy. TR 277, 279, 281, 284-85, 299-300, 319, 321. Because these allegations were never provided to the defense in discovery, that testimony was stricken from the record and the jury was told to disregard them, but of course the jury heard it anyway. See generally TR 661-666; 707. Also, though Timmy alleged that Ponch burned the victim with cigarettes, prompting him to cry out, "Ow" TR 281, the medical examiner found no evidence of cigarette burns (or any burns) on the body. TR 651.

*g. The aftermath*

Following the attack, the boys testified, Buzzy, Luis and Carlos wrapped the body in a blanket, and Carlo dragged it down the steps toward his van. TR 377. Buzzy, Luis and Carlo drove the body to an area near Silver Lake in Bellingham, where Carlo threw the body out into a ditch by the side of the road, with three pairs of pants and a blanket on and around it. TR 380-82.

Socorro Caro, who lived on the third floor of Carlo Belloli's apartment house, testified that she heard a lot of screaming and yelling coming from Belloli's first floor apartment around 4:30 a.m. TR 324, 325. At 5, when she woke her son to do his paper route, she still heard screaming. *Id.* At 5:45, however, when they returned from delivering papers, all was quiet in the house. *Id.* At 6:15, as she made breakfast, Socorro saw Carlo's van backing up to the steps with Carlo in it. TR 327. She then saw and heard Carlo carrying something toward the van which looked like a big carpet with blue jeans and two feet hanging from it. Carlo opened the van, threw the object in, kicked it,

slammed the door and said “Let’s go”. TR 328-30. Uncle Chuckie also was helping Carlo. TR 328, 330, 333-34. Someone seemed to be pulling from inside the van as well, she said. *Id.* In addition, Socorro testified that right after they put the object into the van, Uncle Chuckie went to the window to catch a black jacket, and then the van took off. TR 332-33. Similarly, Timmy Gorman testified that Uncle Chuckie called him from the yard to throw down Timmy’s Raiders jacket, and he did so. TR 286, 304, 306.

Back at Uncle Chuckie’s after Carlo, Buzzy, and Luis had left in Carlo’s van, the other boys watched T.V. a little and slept a little. TR 102. Uncle Chuckie and Ponch then came over. TR 102, 138. Ponch and Uncle Chuckie drove Mike, Timmy, Rob and Danny to school in Milford. Massachusetts. TR 102, 104, 288-89.

When Carlo returned from his gruesome journey around 7 a.m., he buzzed Little Chuckie and Buzzy to come over to help with the clean-up of his apartment, and they complied. TR 104-05, 107. When Carlo asked Little Chuckie to take a bag containing the bloody towel to an empty second floor apartment, he did so. TR 105, 113. Buzzy threw a blood-stained paper bag into a nearby dumpster. TR 209.

There was some testimony about various individuals wearing blood-stained clothing after the episode. Danny Dunbar saw blood on Luis DeJesus’ jacket, and Little Chuckie saw blood on Buzzy’s. TR 144, 215. Although Uncle Chuckie took a shower and changed all of his clothes, Ponch did not shower. TR 102, 138.

*h.* *Carlo confesses*

Carlo Belloli wasted no time in confessing to the murder. Ellen Keefe, an account clerk in the Probation Department of the Framingham District Court, has known Carlo Belloli and his partner, Nora Solomon, for fifteen years. Ellen testified that Carlo came to the courthouse around 10:15 that morning to see Nora, who had been incarcerated since the day before. TR 221, 223, 225, 228, 232, 238. As Ellen approached Carlo in the hallway of the courthouse, she could see that he was "disheveled", "frantic", and "upset". TR 224. He looked, she said, like he had been drinking for days and that he was still impaired by alcohol. TR 234.

When Ellen asked Carlo what was wrong, he said, "Oh, I really fucked up last night." TR 223. She, in turn, inquired, "Did you get into a fight?" *Id.* He answered, "No, I stabbed someone to death," and held out his hands, which still had dried blood all over them. TR 224, 231. When Ellen asked him why he would do such a thing, Carlo replied, "because he pissed me off." TR 224. Carlo <u>did</u> <u>not</u> tell her that other people were with him when this occurred. TR 227. Then Carlo volunteered that "I dumped him in Franklin." *Id.*

Soon after her conversation with Carlo, Ellen said, Carlo's and Nora's babysitter, Diane Travis, who was also a friend of Ellen's, came in with papers for Nora to sign so that Diane could continue to care for Nora and Carlo's children. TR 226, 235. Diane told Ellen that Carlo had confessed to her. TR 236. Ellen left Carlo in a courtroom as she went to look for her boss and to call her fiancée about Carlo. TR 224. She did not tell one of the court officers because she knew that Carlo could be violent and she was

afraid of what might happen. TR 236. Within minutes after leaving Carlo, Ellen could find neither him nor his van. TR 226. With her boss, Ellen summoned the Framingham police, telling them she feared that Carlo was on his way to Diane Travis' house to pick up his two children. TR 227.

Diane Travis was a neighbor and long time friend of both Nora and Carlo, who babsysat for their two toddlers. TR 242, 259. She confirmed that she was caring for their kids on December 1st and 2nd after Nora had been arrested. TR 242. At about 8:30 on the morning of December 2nd, Diane testified, Carlo came over, a six-pack in hand, with blood smeared all over his hands, and told her "he thought he might have killed somebody." TR 247, 251. When Diane, incredulous, asked him again, he repeated "he thought he stabbed someone to death * * * until he couldn't like move anymore * * * [until he was] just like flopping like a flounder." TR 248-49. Carlo said it had something to do with money. TR 248. He did not say anyone else was with him at the time. TR 250. He said his house was "a bloody mess" and he left the body behind "some like biker's place." TR 251. After about a half hour, said Diane, Carlo left for the courthouse to see Nora. TR 250-51. Diane said she herself then left for the courthouse to have Nora sign a paper allowing her to continue caring for her children. TR 251. She saw Carlo in his van in the courthouse parking lot, having a beer. TR 252. In the courthouse, she said Ellen Keefe asked her whether Carlo had told her anything, and she answered affirmatively. TR 51-52. By the time Diane had come out of the courthouse, Carlo was gone. TR 252. Upon her arrival home, however, Carlo was on her front porch, being arrested by the Framingham Police. TR 252-53.

*i. The physical evidence*

The Woonsocket homicide investigation led the police to Cross Street in Bellingham, Massachusetts, where the Massachusetts State Police found the body of a white male, later identified as John Casserly, about ten feet from the roadway, with a sleeping bag, a comforter, a blue towel, two shirts, and three pairs of jeans strewn on or around the body. See generally TR 528, 530-35, 541-42.

Not surprisingly, given Carlo's confession, each and every piece of inculpatory physical evidence was connected to none other than Carlo Belloli or to his home. Bloodstains were found on Carlo's hands, inside and outside his van and apartment, and on various items seized from a bag in a vacant upstairs apartment and a dumpster outdoors. See generally TR 452, 455-58, 467. Among other blood-stained items found in the dumpster outside of Carlo's and Uncle Chuckie's apartment houses, were a single, black glove which matched one found in Carlo's bedroom, and a single, blood-stained workout boot which matched one found on the decedent's body. See generally TR 468-69, 471, 507. The FBI Crime Laboratory found DNA matches between John Casserly's known blood sample and several blood-stained items which were seized: the sleeping bag found near the body; one of Carlo Belloli's tennis shoes; a cutting from the rug in Carlo's apartment; and a blanket from the dumpster near Carlo's house. TR 584. Blood on a band-aid found in the van matched Carlo Belloli. TR 591-92. Of the three pairs of jeans found near the body, two had blood stains. TR 600. Though only blood grouping tests – not DNA tests – were performed on those jeans, the FBI concluded that the *blood could not have come from Adrian Bustamante. Id.*

In addition, fibers from the carpet in Carlo's apartment were found on all the clothing and underwear of the victim, on the three pairs of jeans and tee shirt found near the body, on Carlo's tennis shoes, on the sleeping bag and towel found near the body, and on a sponge found in a plastic bag in the vacant, second floor apartment in Carlo's house. TR 615-16. *None of the hairs found anywhere matched Bustamante's*. TR 619. (Though police had warrants to seize Adrian Bustamante's, Carlo's, and Uncle Chuckie's head hairs, the warrant for Uncle Chuckie's was never executed. See generally TR 464-65.)

*j. Cause of death*

Leonard Atkins, M.D., the Medical Examiner for Suffolk County, Massachusetts, concluded that John Casserly's cause of death was multiple stab wounds, and the manner of death was homicide. TR 642. Dr. Atkins said that the subject received twenty-seven stab wounds (four of which were fatal), TR 624-28, multiple lacerations and contusions to the head and eye area consistent with being hit with a blunt object, linear abrasions on the forehead consistent with coming into contact with the heel of a shoe or sneaker, and numerous abrasions on the face and eyelids consistent with dragging on a rough surface. TR 632-28, 631-33, 635, 643-44. There was, however, no evidence of cigarette burns. TR 651. The Medical Examiner found both drugs and alcohol in John Casserly's system, and made a determination of acute alcoholism. TR 641, 654.

*k. No blood on Bustamante's clothes*

Lisa Welch, Mr. Bustamante's fiancée, testified that Ponch lived with her and her parents in Norwich, Vermont. TR 708. Bustamante, Lisa said, was a tattoo artist who plied his trade either in his customers' homes or in his home, or at New England

carnivals. TR 709. When Bustamante left for Rhode Island for a job on Thursday, December 1st, expecting to remain there until Saturday or Sunday, Lisa said she packed him a bag with three pairs of jeans and other clothing items. TR 711, 722-23.

Lisa also testified that when Bustamante returned home earlier than expected on Friday evening, he was still wearing the very same clothing he had worn when he departed – a pair of size 30 waist, 32 length blue jeans and a black tee shirt. TR 713, 722, 724-25, 233-34. Upon his return, no blood evidence was on his clothing. TR 733-34. His overnight bag was unopened and the contents untouched. *Id.*

Lisa further testified that, upon Bustamante's return to Vermont, he looked worried, scared and upset, and reluctantly had Charles "Uncle Chuckie" Roy in his company as an unexpected houseguest. TR 711-13. Uncle Chuckie stayed until Sunday, when they drove him to the Boston bus. TR 715. Bustamante told Lisa that "something" had happened at Carlo's and that Carlo had dumped the body. TR 727. But he did not provide any details. TR 727-28.

When the local police called the Bustamante/Welch home at midnight on Sunday and asked Bustamante to come to the station, he did so, though he was scared and crying at the time. TR 716. He was wearing a sweatshirt and sweatpants when he reported to the police station. TR 717.

Lisa identified the contents of the bag which accompanied Bustamante to Rhode Island: the sweatclothes that he wore when he reported to the Norwich police station; the clothes she packed for him upon his arrival in Vermont – one pair of black jeans (size 29 waist, 31 length) and one black tee shirt; one pair of blue jeans (size 30 waist, 31 length)

and a tee shirt; and other assorted items. TR 717-19, 721-22. A Woonsocket Police Detective corroborated that Bustamante had brought a bag to the Woonsocket station upon his arrival in Rhode Island, which contained black Silver Tab Levi jeans, size 29 waist, 32 length. TR 735-37. He was wearing the other pair of jeans – the blue ones – when he arrived at the Woonsocket police station. TR 719.Lisa said she recognized all of Bustamante’s blue jeans and knew their sizes 29 or 30 waist, and 31 or 32 length – since she wore the same size and they shared jeans. TR 714.

*l.* *Adrian Bustamante's return to Rhode Island*

In support of his defense, Bustamante called Sergeant Walter Warot of the Woonsocket Police Department, who traveled to Vermont to transport Bustamante to Rhode Island after he waived extradition. TR 739. Although the trial justice allowed in *part of* Sgt. Warot’s testimony – that Mr. Bustamante was very upset, violent, agitated and frantic and did not want to go back to Rhode Island, TR 740 – he precluded critical circumstantial evidence of Bustamante’s innocence. TR 740-43. Defense counsel offered to prove, as set forth in Sgt. Warot’s report, that what Bustamante was scared and fearful about was that “they” were going to kill him “because he saw too much.” TR 740-43. He kept saying, over-and-over in a repetitive chant, “Please don’t let them kill me.” TR 743.

Other facts from the record will be discussed within this memorandum where relevant to the issues raised.

## JURISDICTION AND STANDARD OF REVIEW

The Court's jurisdiction over the instant petition for writ of habeas corpus is under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.

Under the AEDPA, this Court may grant habeas relief if the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523 (2000).

## ARGUMENT

**1. The Magistrate Judge erred in finding that the Rhode Island Supreme Court's finding that the trial judge's Sixth Amendment violation was harmless beyond doubt was a reasonable application of federal law.**

There was no physical evidence connecting Adrian Bustamante to the murder. The only evidence linking him to the murder was the testimony of three young hoodlums—all members of the Kool-Aid Gang, who claimed to be eyewitnesses to the killing. As described above, each gave varying accounts of what happened and each had a motive to lie. Buzzy Gorman, for example, who for three months after the incident denied being present at the crime scene, testified at trial that his reason for finally implicating Bustamante was "because they were starting to give me life" and he "was trying to get a deal." TR 440-41; 813. Similarly, Little Chuckie Roy, who admitted to lying several times to the police, because of his fear of going to jail.

The third alleged eyewitness was Timothy "Timmy" Gorman, who was only twelve years old at the time of the incident and fourteen years old at the time of trial. TR 266.

In cross-examining Timmy, the defendant elicited that Timmy, despite his young age, had already been adjudicated delinquent on serious charges, was in a detention facility at the time of trial, and still had pending juvenile charges in Massachusetts awaiting disposition. TR 293-94. Timmy admitted that the Massachusetts authorities

were aware of his cooperation as a witness in a Rhode Island murder case. TR 294. However, the trial judge prevented defense counsel from inquiring as to Timmy's *expectation* of favorable treatment on the pending Massachusetts charges:

> Q. Are you doing what you can to help yourself out with the authorities in Massachusetts?
>
> A. Yes.
>
> Q. And do you not believe that your cooperation in this case will help you out in that regard?
>
> A. Yes.
>
> MS. SOCCIO: Ojbection.
>
> THE COURT: Sustained.
>
> MR. ANDERSON: Your Honor he answered yes.
>
> MS. SOCCIO: Move to strike.
>
> THE COURT: Granted. Disregard that answer, please.
>
> Q. Do you hope that your cooperation here in Rhode Island will help you out in that regard?
>
> MS. SOCCIO: Objection.
>
> THE COURT: Sustained. You can ask him if he's been promised anything.
>
> MR. ANDERSON: I'm sorry.
>
> THE COURT: You can ask him if he's been promised anything but his hopes and desires have no bearing on this case.

> MR. ANDERSON: Please note my exception to that ruling.
>
> THE COURT: You have it. Unless you can tie in his testimony with some hope or desire.

TR 296-97.

The Sixth Amendment to the United States Constitution guarantees "[I]n all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him…" Included within the right of confrontation is the right to cross-examine one's accusers. See, e.g., *Davis v. Alaska*, 415 U.S. 308 (1974). The Supreme Court has characterized cross-examination as "one of the safeguards essential to a fair trial, " *Alford v. United States*, 282 U.S. 687, 692 (1931), *accord In re Oliver*, 333 U.S. 257 (1948), as it is "the principal means by which the believability of a witness and the truth of his [or her] testimony are tested." *Davis v. Alaska*, *supra*.

Cross-examination's "denial or significant diminution calls into question the ultimate 'integrity of the fact-finding process.'" *Chambers v. Mississippi*, 410 U.S. 284 (1973), quoting *Berger v. California*, 393 U.S. 314 (1969). Although the scope of cross-examination is subject to the exercise of the trial justice's sound discretion, a trial justice's discretionary authority to limit cross-examination comes into play only once the requirements of the Sixth Amendment have been satisfied.

The courts have particularly been protective of the right of cross examination to search for bias or motive. As the United Supreme Court has said:

> The introduction of evidence of a prior crime is… a general attack on the credibility of a witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible

> biases, prejudices, or ulterior motives of the witness *as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony."* We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionality protected right of cross examination…

*Davis. v. Alaska, supra.,* 415 U.S. at 417 (citations omitted) (emphasis supplied).

In particular, a witness' subjective expectation or hope for immunity or leniency is an entirely appropriate subject of inquiry on cross-examination. Indeed, it constitutes reversible error to preclude cross-examination as to the hope of immunity or favorable treatment, even though such hope or expectation was not based on promises, direct or implied, from the prosecution, and even thought it may have been "only a faint glimmer of hope" or an erroneous expectation. Annot., Preventing or Limiting Cross-Examination of Prosecution's Witness As To His Motive For Testifying, 62 A.L.R. 2d 610, 615 (1958). That the witness is testifying in the mere hope of receiving a lighter punishment is always relevant to his possible bias. WHARTON'S CRMIINAL EVIDENCE §9:14 AT 624-25 (B. Bergman & N. Hollander, eds. 15th ed. 1998).

In *Whitton v. State*, 479 P.3d 302 (Alaska 1970), while cross examining a key witness for the prosecution, defense counsel was permitted to ask the witness, Daniel, if he had been promised immunity from the prosecution as to any offenses he may have committed. However, defense counsel was forbidden to ask Daniel whether he *expected* such immunity. Because the court found the undue restriction of cross-examination to be prejudicial to the defense, it reversed the appellant's conviction. The court reasoned that even if a witness unreasonably or mistakenly believes that he will garner favorable

treatment, the defense should be allowed to elicit that fact:

> "The witness' belief that his testimony, if favorable to the prosecution, will result in leniency or favorable treatment in connection with the crime committed by him is evidence of motive despite the fact that the witness' belief is mistaken, unreasonable or, indeed, is not based on any words or conduct of the prosecution. The test is the witness' expectation or hope of a reward, not the actuality of a promise by the State."

*Id.*, at 317, citing *Arizona v. Little*, 350 P.2d 756, 760 (Ariz. 1960). "What we are speaking of," the court explained, "is bias – the slanting effect upon human testimony of the emotions or feelings of the witness…or the self-interest of the witness in the outcome of the case." *Id.* at 316-17. By showing the witness' expectation or hope to curry favor, said the court, the defense would be able to argue that the witness was predisposed to shade his testimony in favor of the prosecution and against the accused in order to further his own self-interest.

In *State v. Vale*, 666 So.2d 1070 (La. 1996), the state confessed error where the trial judge ruled that, in the absence of an explicit deal or promise on a pending charge, the witness' subjective expectations were irrelevant for purposes of cross-examination into bias and interest in testifying for the state. The court held that to the extent that exposure of a witness' motivation is a proper and important function of the constitutionally protected right of cross-examination, the witness' hope that he will receive leniency is "highly relevant" to establishing his bias or interest as a witness for the state. *Id.* at 1073.

In Bustamante's direct appeal of his conviction, the Rhode Island Supreme Court

(RISC) did indeed find that his constitutional guarantees under the Sixth Amendment and article 1, section 10 of the Rhode Island Constitution were violated by the trial judge's preclusion of cross examination of Timmy on his expectation of favorable treatment. 756 A.2d 758, 765 (R.I. 2000). The RISC, however, found the error to be harmless error beyond a reasonable doubt, reasoning that two other eyewitnesses implicated petitioner in the crime and therefore Timmy's testimony was merely cumulative. *Id*. The RISC employed the harmless-error analysis set out in *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed. 2d 674 (1986).

The Magistrate Judge embraced the RISC's holding that the trial judge's violation of Bustamante's Sixth Amendment rights was "harmless because Gorman's testimony was duplicative and cumulative." (Report & Recommendation, pp. 13-15).

While acknowledging that Confrontation Clause error does not require automatic reversal, in *Van Arsdall* the United States Supreme Court said that "[t]he focus of the prejudice inquiry…must be on the particular witness, not on the outcome of the entire trial." 106 S.Ct. at 1436. "It would be a contradiction in terms to conclude that a defendant denied any opportunity to cross-examine the witness against him nonetheless had been afforded his right to "confrontation" because use of that right would not have affected the jury's verdict." *Id.*

The Supreme Court went on to state in *Van Arsdall* that "[w]hether…an error is harmless in a particular case depends on a host of factors...[which] include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradicting testimony of

the witness on material points, the extent of cross examination otherwise permitted, and, of course, the overall strength of the prosecution's case. 475 U.S at 687-88.

Unlike the case against Carlo Belloli, there was a complete absence of any physical evidence linking Adrian Bustamante to the murder---no DNA, no blood, no hair, and no fiber evidence. The case against Bustamante was built entirely on the eyewitness testimony of young Timmy Gorman and two of his confederates who were admitted liars with a clear motive to finger Bustamante to save their own hides. The finding that Timmy Gorman's testimony was "duplicative" of the eyewitness testimony of the other two scumbags and therefore "cumulative" has no support whatsoever in the record. Timmy's testimony was, necessarily, a critical part of the state's case against Bustamante: Besides the witness of the three young hoodlums, there was no other evidence linking him to the crime.

When a trial judge commits constitutional error, appellate courts must be convinced *beyond reasonable doubt* that the errors did not contribute to the guilty verdict; otherwise the defendant is entitled to a retrial. *United States v. Lynn*, 856 F.2d 430, 437 (1st Cir. 1988), citing *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988).

For all anyone knows, the jury chose to disbelieve the testimony of Little Chuckie and Buzzy Gorman and placed great credence in young Timmy's testimony. The point is that because the state's evidence against Bustamante consisted entirely of the testimony of Timmy and his fellow hooligans, all of whom had a clear motive to lie, it simply cannot be said that aborting the petitioner's right to fully cross examine one of these three

key witnesses on his expectation of leniency in a pending matter ---which would have been highly relevant to establishing his bias or interest as a witness for the state---was harmless beyond a reasonable doubt.

**2. The Magistrate Judge erred in finding that the trial judge's refusal to allow petitioner to present the testimony of a police witness to establish his consciousness of innocence did not violate Bustamante's Sixth Amendment and fundamental due process rights.**

As a crucial part of his defense, Bustamante called Sergeant Walter Warot of the Woonsocket Police Department, who was one of the officers who escorted him to Rhode Island after he waived extradition. TR 739. Sergeant Warot had written a statement on December 7, 1994 which detailed Bustamante's extremely agitated state upon his return to Rhode Island.

When asked by defense counsel to describe Bustamante's demeanor at the time, Sergeant Warot said he was "upset," "agitated," "combative," "violent," and "frantic" which the Sergeant recorded in his statement. TR 740. The Sergeant added, "He was very upset. He didn't want to go back to the state." Id.

When defense counsel then tried to elicit testimony from Sergeant Warot that Mr. Bustamante repeatedly said that "they were going to kill him" the trial judge sustained the state's objection to the question.

In a side bar conference, defense counsel argued that the testimony was competent evidence of Mr. Bustamante's state of mind, namely, his great fear of returning to Rhode Island because he believed he would be killed by Uncle Chuckie and

the others. TR 742-43.

When the trial judge stated that the evidence could not be admitted counsel made the following offer of proof (reading from Sergeant Warot's report):

> As they were driving he kept saying they were going to kill him. We reassured him that no one was going to kill him…He kept insisting that they were going to kill him. They told him he would be in protective custody. He insisted that hew was going to get killed and pleaded with us in a chant-like repetition, "Please, don't let them kill me. Please don't let them kill me." His attitude then changed to a suicidal attitude saying, pleading, he wanted to kill himself. He kept saying that they were going to kill him because he saw too much.

TR 743.

Trial counsel argued that Bustamante's state of mind at the time was circumstantial evidence of his innocence. TR 744. However the trial judge refused to allow the testimony. Id.

While on cross examination the state was allowed to elicit testimony from Sergeant Warot that Bustamante tried to kick out the back window to the police car, on redirect examination defense counsel was not allowed to ask the Sergeant if the petitioner's violence stemmed from an attempt to kill himself. TR 746-47.

The state of mind exception to the hearsay rule allows:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution,

revocation, identification, or terms of a declarant's will.

R.I. Rule Evid. 803(3).

The reliability of such statements is assured principally by the requirement that the statements must relate to a condition of mind or emotion existing at the time of the statement. 2 McCORMICK ON EVIDENCE §274 at p. 229 (J.Strong, 4th ed. 1992). It is unlikely that the declarant would inaccurately perceive his or her own state of mind. 2 WHARTON'S CRIMINAL EVIDENCE §6:22 at p. 212 (B. Bergman & M. Hollander, eds. 1998). Wharton points out:

> While problems with sincerity or ambiguity may still remain, on balance, such statements are usually admitted and the appropriate weight to be given them is left to the jury.

Id., at 212, citing *United States v. Eisenstein*, 731 F.2d 1540, 1545-46 (11th Cir. 1984).

Post-arrest statements or acts are often admitted against criminal defendants to prove a state of mind called "consciousness of guilt." E.g., *State v. Payano*, 528 A.2d 721 (R.I. 1987) (threats against witnesses); *State v. Gordon*, 508 A.2d 1339 (R.I. 1986) (letter to defendant's girlfriend suggesting flight to avoid prosecution); *State v. Cooke*, 479 A.2d 727 (R.I. 1984) (flight).

Wigmore explains that if guilt leaves its psychological mark, which is termed "consciousness of guilt," then the absence of that mark---"consciousness of innocence"---is some indication of the absence of guilt. Wigmore states:

> Let the accused's whole conduct come in; and whether it tells for consciousness of guilt or for consciousness of innocence, let us take it for what is

> worth, remembering that in either case it is open to varying explanations and not to be emphasized. Let us not deprive an innocent person, falsely accused, of the inference which common sense draws from a consciousness of innocence and its natural manifestations.

2 WIGMORE ON EVIDENCE §293 AT P. 232 (J. Chadbourn, rev. 1979).

Wigmore waxes eloquent in his criticism of the exclusion of consciousness of innocence evidence on the grounds that it might be contrived by the accused:

> Because (we say) this accused person *might* be guilty and therefore *might* have contrived these false utterances, therefore we shall exclude them, although without this assumption they indicate feelings wholly inconsistent with guilt, and although, if he is innocent, their exclusion is a cruel deprivation of a most natural and effective sort of evidence….There is no real reason why a declaration of an existing state of mind, if it would be admissible against the accused, should not also be admissible in his favor, except so far as the circumstances indicate plainly a motive to deceive.

6 WIGMORE ON EVIDENCE § 1732 at 156 (J. Chadbourn, rev 1976). See, also, *United States v. Samaria*, 239 F.3d 228 (2nd Cir. 2001) (defendant's rejection of plea bargain as evidence of consciousness of innocence).

In affirming the trial judge's refusal to allow the introduction of the proffered statements made by petitioner to Sergeant Warot, the RISC concluded in Bustamante's direct appeal that it was an impermissible attempt to introduce testimony before the jury without testifying in his own behalf and subjecting himself to cross examination, *in violation of Rule 803*. 756 A.2d at 764.

With all due respect, the Magistrate Judge erroneously agreed with the RISC that

the proferred evidence was hearsay, and, therefore "there is no claim that Petitioner's federal constitutional rights were violated." (Report & Recommendation, pp. 18-20).

Rule 803 includes no such exception to the state of mind exception contained in subsection (3). The RISC's reasoning that Bustamane's utterances were inadmissable because the statements would not be subject to cross examination reflects a misapprehension of the very fiber of the exceptions to the hearsay rule, which is that under certain circumstances a hearsay statement may possess sufficient circumstantial guarantees of trustworthiness so as to justify admission of the statement even though the declarant is available and could be called to testify. See, Advisory Committee Notes to Rule 803. Furthermore, under the Constitution's Confrontation Clause it is the ACCUSED who is guaranteed the right "to be confronted with the witnesses against him." Article VI, Constitution of the United States.

The Sixth Amendment also guarantees the accused the right present evidence on his own behalf. The RISC's affirmance of the trial judge's exclusion of Bustamante's statements to the police to prove consciousness of innocence, embraced by the Magistrate Judge, was a denial of his right to present a "meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 691 (1986), quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). In accord, *Chambers v. Mississippi*, 410 U.S. 284 (1972).

The United States Supreme Court has held that the right of the accused to present witnesses is "a fundamental element of due process." *Washington v. Texas*, 383 U.S. 14, 19 (1978). The guarantee is thus an essential attribute of the adversary system itself,

*United States v. Nixon*, 418 U.S. 683, 709 (1974), wherein the prosecutor's case must encounter "and survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984).

By being precluded from presenting the testimony of Sergeant Warot about what the petitioner told him as evidence of his state of mind at the time, Bustamante was denied his fundamental due process rights. He should have been allowed to present, through his statements to the police officer, probative circumstantial evidence of consciousness of innocence, i.e., that he was in terrible fear of being killed by Uncle Chuckie and his gang *because he "saw too much*," as opposed to being in fear of returning to Rhode Island to "face the music" as the trial judge remarked. As it was, the jury got to hear only a part of Bustamante's encounter with Sergeant Warot and not the whole story. This was hardly the stuff of a fair trial.

Given the fundamental constitutional right involved and the fact that Bustamante's fate rested entirely on the testimony of three gang members, none of whom ever told the same story twice and all of whom had a motive to lie, the impermissible preclusion of this evidence can hardly be said to constitute harmless error beyond a reasonable doubt.

**3. This Court should decide whether Adrian Bustamante was denied a fundamentally fair sentencing hearing.**

Petitioner was sentenced to life imprisonment without the possibility of parole, based on the testimony of three young hoodlums. Some would argue that Bustamante's sentence is worse than death. The Magistrate Judge summarily dismissed Bustamante's arguments with respect to his sentencing hearing on *res judicata* grounds. (Report & Recommendation, pp. 20-21. Under the circumstances, petitioner submits that this Court should review the fundamental fairness of the sentencing hearing even though the Petitioner did not raise the issue during trial or on appeal.

**a. The statutory mandates**

Under Section 12-19-2.1 of the Rhode Island General Laws, once a jury returns a verdict of murder in the first degree the trial judge must instruct the jury to determine whether it has been proven beyond a reasonable doubt that the murder committed by the defendant involved one of the circumstances enumerated in Sections 11-23-2 or 11-23-2.1 as the basis for imposition of a sentence of life imprisonment without parole. Section 11-23-2 enumerates seven different circumstances under which a defendant may be sentenced to life without parole. Section 11-23-2.1 applies to cases where the victim dies as a direct result of kidnapping.

Section 12-19-2.1 states that "[i]f after deliberation the jury finds that one or more of the enumerated circumstances were present, it shall state in writing, signed by the foreperson of the jury, which circumstance or circumstances it found beyond a reasonable doubt." Thereupon the trial judge must conduct a presentence hearing and sentence the

defendant to either life imprisonment or life imprisonment without parole. Section 12-19-2.4 states that "at the presentence hearing, following a finding that one or more of the circumstances enumerated in Sections 11-23-2.1 or 11-23.2 as the basis for imposition of a sentence of life imprisonment without parole was involved in the first degree murder of which the defendant was convicted," and after consideration of aggravating and mitigating factors, the court shall sentence the defendant to either life imprisonment or life imprisonment without parole. Section 12-19-2.4 further states that the trial court "shall state on the record its reasons for imposing its sentence."

**b. The trial judge's failure to instruct the jury on reasonable doubt in the penalty phase**

As noted above, the statute requires that the jury find the existence of one of the enumerated circumstances of Section 11-23-2 *beyond a reasonable doubt*. When the trial judge instructed the jury at this stage, he neglected to include a critical instruction. He failed to tell the jury that they must find that the state proved one or more of the circumstances warranting life without parole *beyond a reasonable doubt*. While the judge did read a special interrogatory to the jury which asked the jury to check "yes" or "no" to whether "the state has proven beyond a reasonable doubt that the murder of John Casserly was committed in the manner involving torture or aggravated battery," the trial judge's actual instruction to the jury was simply as follows:

> I will ask you to retire to your jury room again and decide whether the state has proven either one or both, whichever it is. If it's not, obviously the answer is no, you don't have to do anything, but if it's yes, underline torture or aggravated battery or underline whether it's both. Good luck to you. You may

retire.

TR 791-92.

Of course, the trial judge did instruct the jury on reasonable doubt earlier, in the guilt phase of the trial. However, given the critical nature of the separate penalty phase and what hung in the balance for Adrian Bustamante--- the rest of his life---it was incumbent on the trial judge to instruct the jury that it must find that the state proved one of circumstances warranting a sentence of life without parole and to explain again the often elusive meaning of reasonable doubt. It was wholly unreasonable to assume that without such a specific instruction the jurors would know that they had to hold the state to that standard of proof in making its determination in the penalty phase. It would be clearly violative of petitioner's constitutional right to a fair trial if the jury instruction in the penalty phase impermissibly reduced the state's burden or were so perceived by a jury of ordinary intelligent lay people. See, *State v. Krushnowski*, 773 A.2d 243, 246 (R.I. 2001). The trial judge's failure to instruct the jury that it must find Bustamante guilty of one of the acts permitting a sentence of life without parole *beyond a reasonable doubt* and his failure to explain the meaning of reasonable doubt leaves us with little confidence that the jury made the requisite finding that would permit the trial judge to consider the imposition of a life without parole sentence.

The petitioner was entitled to an instruction on reasonable doubt in the penalty phase and the failure to provide such an instruction violated his right to a fair sentencing hearing.

**c. The trial judge's failure to instruct the jury that the circumstances it was being required to consider would if found to be present permit the imposition of a life sentence without parole.**

Section 12-19.2-1 sets forth each step to be followed in determining whether a defendant will be facing the possibility of a sentence of life without parole. The statute declares that once a jury returns a verdict of first degree murder the court shall instruct the jury---

> to determine whether it has been proven beyond a reasonable doubt that the murder committed by the defendant involved one of the circumstances enumerated in 11-23-2 or 11-23-2.1 as the basis for imposition of a sentence of life imprisonment without parole.

The statutory language plainly requires that the jury not only be instructed to determine whether one of the enumerated circumstances has been proven but that it be told to do so "as the basis for imposition of a sentence of life imprisonment without parole." Given what hangs in the balance, it is imperative that the statutory mandate be followed *without deviation* to ensure that a defendant receives a fair shake--- due process. The failure to instruct the jury that it was to determine if one of the enumerated circumstances was proven *as a basis for the imposition of a sentence of life without parole* deprived Adrian Bustamante of a fair sentencing hearing.

**d. The trial judge impermissibly limited the jury's selection of the special circumstances.**

As noted above, Section 11-23-2 enumerates seven different circumstances which may trigger the imposition of a sentence of life imprisonment without parole. By limiting his instruction to the jury to determine if the state had proven either torture and/or aggravated battery the trial judge was impermissibly suggestive of the special circumstances that might exist and thereby invaded the province of the jury. The statute does not permit such a limited instruction. Rather it plainly requires the trial judge to enumerate all of the special circumstances set forth in Section 11-23-2 and permit the jury to decide which if any were proven beyond a reasonable doubt. The failure to do so deprived petitioner of a fair sentencing hearing.

**e. The trial judge failed to find the existence of one of the special circumstances warranting the imposition of a sentence of life without parole as required by Section 12-19.2-4.**

Section 12-19.2-4 states that "[a]t the presentence hearing, following a finding that one or more of the circumstances enumerated in Section 11-23-2 or 11-23-2.1" exists, the court may impose a sentence of life imprisonment without parole. The statutory language plainly requires that, in addition to the jury, the sentencing judge must also find the existence of one or more of the special circumstances as a precondition to imposing a life without parole sentence. The sentencing judge made the requisite finding,

for example, in *State v. Tassone*, 749 A.2d 1112, 1120-21 (R.I. 2000). However, the trial judge in this case made no such finding at the sentencing hearing. App E, p.16. All the trial judge said at the sentencing hearing was---

> At best, these cases are very difficult. At least they are for me. The Court's impressed by Mr. Bustamante's addressing the Court. But I can't help recalling the testimony. There were 27 stab wounds; and encouraging babies---well, one wasn't a teenager even, to participate in this type of activity on both these defendants' parts.
>
> Mr. Bustamante, on Count 1, the Court sentences you to life imprisonment. That shall be without parole. On Count 2 the Court sentences you to ten years at the Adult Correctional Institution.that is to run concurrent. Mr. Belloli, on Count 1 the Court sentences you to life without parole. On Count 2 the Court sentences you to 10 years. That will be concurrent with the sentences you are presently serving. You both have objections.

*Id.*

In the absence of himself finding the existence of one of the special circumstances, as required by the plain wording of the statute, the trial judge was not permitted to sentence Bustamante to life imprisonment without parole, and, therefore, Adrian Bustamante's sentence was illegally imposed. It is noteworthy that despite the fact that on appeal the RISC conducted its own independent judgment and discretion as to the appropriateness of Bustamante's life without parole sentence, neither did the RISC find the existence of one of special enumerated circumstances. 756 A.2d at 768-69.

With so many errors committed in the sentencing phase of Bustamante's trial, his sentence of life imprisonment without parole fails any test of due process and should therefore be set aside. No less than strict adherence to the statute must be demanded to assure that a criminal defendant facing such extreme punishment receive a fair sentencing hearing.

CONCLUSION

Based on the foregoing petitioner Adrian Bustamante respectfully submits that his conviction and sentence of life imprisonment without parole must be set aside and that he be awarded a new trial.

By his Attorney,

/s/Joseph R. Palumbo, Jr.

R.I. Bar No. 0405

294 Valley Road

Middletown, Rhode Island 02842

Telephone: (401) 846-5200

E-mail address: joseph@palumbolaw.net

**CERTIFICATE OF SERVICE**

I, Joseph R. Palumbo, Jr., hereby certify that I caused to be electronically mailed on the 16th day of May, 2007, the foregoing Objection to **Lauren S. Zurier, Special Assistant Attorney General**, 150 South Main Street, Providence, RI 02903.

/s/ Joseph R. Palumbo, Jr.