**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ADRIAN BUSTAMANTE** | } | |
| | } | |
| **Plaintiff** | } | |
| | } | |
| **v.** | } | **C.A.: 06-07T** |
| | } | |
| **ASHBELL T. WALL** | } | |
| | } | |
| **Defendant** | } | |

# PETITIONER'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On April 3, 2007, Magistrate Judge Almond filed a Report and Recommendation, in which the Magistrate Judge recommended to this Honorable Court that petitioner's amended petition for writ of habeas corpus be denied and dismissed. This Court granted petitioner an extension of time to file any objections to the Magistrate Judge's Report and Recommendation. Petitioner now submits his objections.

## TRAVEL OF THE CASE

Indictment Number P1/95-1200A filed in the Superior Court of Providence County on April 14, 1995 charged the petitioner, Adrian Bustamante (hereafter "Bustamante"), with three offenses: the kidnapping of John Casserly; the murder of John Casserly; and conspiracy to murder John Casserly. Bustamante's co-defendant, Carlo Belloli, was charged with both the murder and conspiracy to murder.

Bustamante and Belloli were jointly tried by a jury, with the late Justice John Sheehan presiding, in a trial that lasted 11 days. Bustamante moved for a judgment of

acquittal on the kidnapping charge at the conclusion of the state's case, which was granted.

On March 1, 1996 Bustamante and Belloli were each found guilty by a jury of first degree murder and conspiracy to commit murder. After further deliberations, the jury found that the murder involved torture or aggravated battery.

Bustamante's motion for a new trial was heard on March 8, 1996. While denying Bustamante's motion, the trial justice did say that he found some of the state's witnesses to be "extremely credible, and some not to be." App. D, TR 812. On May 31, 1996, Judge Sheehan sentenced Bustamante and Belloli to life without parole on the murder and gave them each a 10 year concurrent sentence on the conspiracy charge.

Bustamante appealed his conviction to the Rhode Island Supreme Court. In an opinion issued on August 2, 2000 the Supreme Court affirmed Bustamante's conviction and sentence of life without possibility of parole. *State v. Bustamante*, 756 A.2d 758.

Bustamante later filed a motion to reduce his life without parole sentence, which was denied by the trial justice. The Supreme Court affirmed the trial judge's denial of the motion to reduce sentence. State v. Bustamante, 793 A.2d 1038 (R.I. 2002).

On February 28, 2001, Bustamante filed a *pro se* application for post-conviction relief in the Superior Court. The trial judge denied Bustmante's application, and Bustamante appealed, *pro se*, to the Rhode Island Supreme Court. The Supreme Court affirmed the denial of Bustamante's application for post-conviction relief. *Bustmante v. Wall*, 866 A.2d 516 (R.I. 2005).

Adrian Bustamante now seeks relief in this Honorable Court.

JURISDICTION AND STANDARD OF REVIEW

The Court's jurisdiction over the instant petition for writ of habeas corpus is under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.

Under the AEDPA, this Court may grant habeas relief if the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 1523 (2000).

# ARGUMENT

**1. The Magistrate Judge erred in finding that the Rhode Island Supreme Court's determination that the trial judge's Sixth Amendment violation was harmless beyond doubt was a reasonable application of federal law.**

There was no physical evidence connecting Adrian Bustamante to the murder. The only evidence linking him to the murder was the testimony of three young hoodlums-----Rene "Buzzy" Gorman, Charles "Little Chuckie" Roy, Jr., and Timothy Gorman---who claimed to be eyewitnesses to the killing. Each gave varying accounts of what happened and each had a motive to lie.

Buzzy Gorman, for three months after the incident, denied being present at the crime scene and refused to give a statement, while his lawyer attempted to negotiate a deal on his behalf. TR 396-97, 401. Buzzy said he knew the strength of the evidence against him and knew that the state would charge him with first degree murder and would seek a sentence of life without parole. TR 399-400. He testified at trial that *his reason for finally implicating Bustamante* was "because they were starting to give me life" and he "was trying to get a deal." TR 440-41; 813.

Little Chuckie Roy gave four different statements as well as testimony to the Grand Jury, later admitting that he either lied or left things out of all of them. TR 145-154, 162, 177. In his first statement when arrested on December 2, 1994, Little Chuckie implicated only Belloli, and Buzzy Gorman in the murder. TR 118-19. He said that Bustamante was somewhere else during the attack, and did not say that Bustamante so much as laid a finger on the victim. TR 117, 119.

At trial, in testimony which Little Chuckie claimed was, at long last, the whole truth, he implicated Bustamante in the murder.

Little Chuckie testified at trial that he was sleeping over Uncle Chuckie's (having turned in at around midnight, TR 87), when he was awakened at about 3-4 a.m. by Buzzy and Luis, telling him that someone was getting beaten up at Carlo's TR 89, at which point he and Timmy went over to check it out, TR 90. They saw a guy on the ground bleeding from the head, with Carlo standing over him saying over and over, "I want my money now." TR 90-91. Little Chuckie further testified that Buzzy alone, not Bustamante, repeatedly struck the victim with a flashlight, Carlo stepped on his head, Carlo stabbed him at least ten times, Bustamante stabbed him in the buttocks and on the side of his back with a pocket knife, Timmy was told by Bustamante to stab him "if it makes you feel good", and Luis stabbed him after he was already dead. TR 91-96. Uncle Chuckie, he said, came over to Carlo's too. TR 97.

The third alleged eyewitness was Timothy "Timmy" Gorman, who was only twelve years old at the time of the incident and fourteen years old at the time of trial. TR 266. In cross-examining Timmy, Bustamante's defense counsel elicited that Timmy, despite his young age, had already been adjudicated delinquent on serious charges, was in a detention facility at the time of trial, and still had pending juvenile charges in Massachusetts awaiting disposition. TR 293-94. Timmy admitted that the Massachusetts authorities were aware of his cooperation as a witness in a Rhode Island murder case. TR 294. However, the trial judge prevented defense counsel from inquiring as to Timmy's *expectation* of favorable treatment on the pending Massachusetts charges:

Q. Are you doing what you can to help yourself out with the authorities in Massachusetts?

A. Yes.

Q. And do you not believe that your cooperation in this case will help you out in that regard?

A. Yes.

MS. SOCCIO: Ojbection.

THE COURT: Sustained.

MR. ANDERSON: Your Honor he answered yes.

MS. SOCCIO: Move to strike.

THE COURT: Granted. Disregard that answer, please.

Q. Do you hope that your cooperation here in Rhode Island will help you out in that regard?

MS. SOCCIO: Objection.

THE COURT: Sustained. You can ask him if he's been promised anything.

MR. ANDERSON: I'm sorry.

THE COURT: You can ask him if he's been promised anything but his hopes and desires have no bearing on this case.

MR. ANDERSON: Please note my exception to that ruling.

THE COURT: You have it. Unless you can tie in his testimony with some hope or desire.

TR 296-97.

The Sixth Amendment to the United States Constitution guarantees "[I]n all criminal prosecutions, the accused shall enjoy the right…to be confronted with the

witnesses against him…" Included within the right of confrontation is the right to cross-examine one's accusers. See, e.g., *Davis v. Alaska*, 415 U.S. 308 (1974). The Supreme Court has characterized cross-examination as "one of the safeguards essential to a fair trial, " *Alford v. United States*, 282 U.S. 687, 692 (1931), *accord In re Oliver*, 333 U.S. 257 (1948), as it is "the principal means by which the believability of a witness and the truth of his [or her] testimony are tested." *Davis v. Alaska*, *supra.*

Cross-examination's "denial or significant diminution calls into question the ultimate 'integrity of the fact-finding process.'" *Chambers v. Mississippi*, 410 U.S. 284 (1973), quoting *Berger v. California*, 393 U.S. 314 (1969). Although the scope of cross-examination is subject to the exercise of the trial justice's sound discretion, a trial justice's discretionary authority to limit cross-examination comes into play only once the requirements of the Sixth Amendment have been satisfied.

The courts have particularly been protective of the right of cross examination to search for bias or motive. As the United Supreme Court has said:

> The introduction of evidence of a prior crime is… a general attack on the credibility of a witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness *as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony."* We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionality protected right of cross examination…

*Davis. v. Alaska*, *supra.*, 415 U.S. at 417 (citations omitted) (emphasis supplied).

In particular, a witness' subjective expectation or hope for immunity or leniency is an entirely appropriate subject of inquiry on cross-examination. Indeed, it constitutes reversible error to preclude cross-examination as to the hope of immunity or favorable treatment, even though such hope or expectation was not based on promises, direct or implied, from the prosecution, and even thought it may have been "only a faint glimmer of hope" or an erroneous expectation. Annot., Preventing or Limiting Cross-Examination of Prosecution's Witness As To His Motive For Testifying, 62 A.L.R. 2d 610, 615 (1958). That the witness is testifying in the mere hope of receiving a lighter punishment is always relevant to his possible bias. WHARTON'S CRMIINAL EVIDENCE §9:14 AT 624-25 (B. Bergman & N. Hollander, eds. 15th ed. 1998).

In *Whitton v. State*, 479 P.3d 302 (Alaska 1970), while cross examining a key witness for the prosecution, defense counsel was permitted to ask the witness, Daniel, if he had been promised immunity from the prosecution as to any offenses he may have committed. However, defense counsel was forbidden to ask Daniel whether he *expected* such immunity. Because the court found the undue restriction of cross-examination to be prejudicial to the defense, it reversed the appellant's conviction. The court reasoned that even if a witness unreasonably or mistakenly believes that he will garner favorable treatment, the defense should be allowed to elicit that fact:

> "The witness' belief that his testimony, if favorable to the prosecution, will result in leniency or favorable treatment in connection with the crime committed by him is evidence of motive despite the fact that the witness' belief is mistaken, unreasonable or, indeed, is not based on any words or conduct of the

> prosecution. The test is the witness' expectation or hope of a reward, not the actuality of a promise by the State."

*Id.*, at 317, citing *Arizona v. Little*, 350 P.2d 756, 760 (Ariz. 1960). "What we are speaking of," the court explained, "is bias – the slanting effect upon human testimony of the emotions or feelings of the witness…or the self-interest of the witness in the outcome of the case." *Id.* at 316-17. By showing the witness' expectation or hope to curry favor, said the court, the defense would be able to argue that the witness was predisposed to shade his testimony in favor of the prosecution and against the accused in order to further his own self-interest.

In *State v. Vale*, 666 So.2d 1070 (La. 1996), the state confessed error where the trial judge ruled that, in the absence of an explicit deal or promise on a pending charge, the witness' subjective expectations were irrelevant for purposes of cross-examination into bias and interest in testifying for the state. The court held that to the extent that exposure of a witness' motivation is a proper and important function of the constitutionally protected right of cross-examination, the witness' hope that he will receive leniency is "highly relevant" to establishing his bias or interest as a witness for the state. *Id.* at 1073.

In Bustamante's direct appeal of his conviction, the Rhode Island Supreme Court (RISC) did indeed find that his constitutional guarantees under the Sixth Amendment and article 1, section 10 of the Rhode Island Constitution were violated by the trial judge's preclusion of cross examination of Timmy on his expectation of favorable treatment. 756 A.2d 758, 765 (R.I. 2000). The RISC, however, found the error to be harmless error beyond a reasonable doubt, reasoning that two other eyewitnesses---"Little Chuckie" Roy

and "Buzzy" Gorman---- implicated Bustamante in the crime and therefore Timmy's testimony was *merely cumulative*. *Id*. The RISC employed the harmless-error analysis set out in *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed. 2d 674 (1986).

The Magistrate Judge embraced the RISC's holding that the trial judge's violation of Bustamante's Sixth Amendment rights was "harmless because Gorman's testimony was duplicative and cumulative." (Report & Recommendation, pp. 13-15).

While acknowledging that Confrontation Clause error does not require automatic reversal, in *Van Arsdall* the United States Supreme Court said that "[t]he focus of the prejudice inquiry…must be on the particular witness, not on the outcome of the entire trial." 106 S.Ct. at 1436. "It would be a contradiction in terms to conclude that a defendant denied any opportunity to cross-examine the witness against him nonetheless had been afforded his right to "confrontation" because use of that right would not have affected the jury's verdict." *Id.*

In *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710 (1993), the Supreme Court held that in deciding whether habeas relief must be granted because of constitutional error of the trial type, there must be a showing that the error "had a substantial and injurious effect or influence in determining the jury's verdict." (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

Unlike the case against Carlo Belloli, there was a complete absence of any physical evidence linking Adrian Bustamante to the murder---no DNA, no blood, no hair, and no fiber evidence. The case against Bustamante was built entirely on eyewitness testimony ----that of young Timmy Gorman and two of his confederates who were

admitted liars with a clear motive to finger Bustamante to save their own hides. The finding that Timmy Gorman's testimony was "duplicative" of the eyewitness testimony of the other two scumbags and therefore "cumulative" is belied by the record which shows that they gave contradictory and varying accounts of what happened.

Timmy's testimony was, necessarily, a critical part of the state's case against Bustamante: Besides the testimony of the three young hoodlums, there was no other evidence linking him to the crime. The jury couldn't help but place great credence in Timmy Gorman's testimony. The constitutional error committed by the trial justice in aborting Bustamante's right to cross examine young Timmy on his expectation of leniency in a pending matter allowed his testimony to go the jury unchecked for a possible bias for the state. To allow such critical testimony to be considered by the jury as if clean as the driven snow was clearly prejudicial to Bustamante's guaranty of a fair trial.

**2. The Magistrate Judge erred in finding that the trial judge's refusal to allow petitioner to present the testimony of a police witness to establish his consciousness of innocence did not violate Bustamante's Sixth Amendment and fundamental due process rights.**

As a crucial part of his defense, Bustamante called Sergeant Walter Warot of the Woonsocket Police Department, who was one of the officers who escorted him to Rhode Island after he waived extradition. TR 739. Sergeant Warot had written a statement on December 7, 1994 which detailed Bustamante's extremely agitated state upon his return to Rhode Island.

When asked by defense counsel to describe Bustamante's demeanor at the time, Sergeant Warot said he was "upset," "agitated," "combative," "violent," and "frantic" which the Sergeant recorded in his statement. TR 740. The Sergeant added, "He was very upset. He didn't want to go back to the state." Id.

When defense counsel then tried to elicit testimony from Sergeant Warot that Mr. Bustamante repeatedly said that "they were going to kill him" the trial judge sustained the state's objection to the question.

In a side bar conference, defense counsel argued that the testimony was competent evidence of Mr. Bustamante's state of mind, namely, his great fear of returning to Rhode Island because he believed he would be killed by Uncle Chuckie and the others. TR 742-43.

When the trial judge stated that the evidence could not be admitted counsel made the following offer of proof (reading from Sergeant Warot's report):

> As they were driving he kept saying they were going to kill him. We reassured him that no one was going to kill him…He kept insisting that they were going to kill him. They told him he would be in protective custody. He insisted that hew was going to get killed and pleaded with us in a chant-like repetition, "Please, don't let them kill me. Please don't let them kill me." His attitude then changed to a suicidal attitude saying, pleading, he wanted to kill himself. He kept saying that they were going to kill him because he saw too much.

TR 743.

The state of mind exception to the hearsay rule allows:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of a declarant's will.

R.I. Rule Evid. 803(3).

The reliability of such statements is assured principally by the requirement that the statements must relate to a condition of mind or emotion existing at the time of the statement. 2 McCORMICK ON EVIDENCE §274 at p. 229 (J.Strong, 4th ed. 1992). It is unlikely that the declarant would inaccurately perceive his or her own state of mind. 2 WHARTON'S CRIMINAL EVIDENCE §6:22 at p. 212 (B. Bergman & M. Hollander, eds. 1998). Wharton points out:

> While problems with sincerity or ambiguity may still remain, on balance, such statements are usually admitted and the appropriate weight to be given them is left to the jury.

Id., at 212, citing *United States v. Eisenstein*, 731 F.2d 1540, 1545-46 (11th Cir. 1984).

Wigmore explains that if guilt leaves its psychological mark, which is termed "consciousness of guilt," then the absence of that mark---"consciousness of innocence"---is some indication of the absence of guilt. Wigmore states:

> Let the accused's whole conduct come in; and whether it tells for consciousness of guilt or for consciousness of innocence, let us take it for what is worth, remembering that in either case it is open to varying explanations and not to be emphasized. Let us not deprive an innocent person, falsely accused, of the

> inference which common sense draws from a consciousness of innocence and its natural manifestations.

2 WIGMORE ON EVIDENCE §293 AT P. 232 (J. Chadbourn, rev. 1979).

Wigmore waxes eloquent in his criticism of the exclusion of consciousness of innocence evidence on the grounds that it might be contrived by the accused:

> Because (we say) this accused person *might* be guilty and therefore *might* have contrived these false utterances, therefore we shall exclude them, although without this assumption they indicate feelings wholly inconsistent with guilt, and although, if he is innocent, their exclusion is a cruel deprivation of a most natural and effective sort of evidence….There is no real reason why a declaration of an existing state of mind, if it would be admissible against the accused, should not also be admissible in his favor, except so far as the circumstances indicate plainly a motive to deceive.

6 WIGMORE ON EVIDENCE § 1732 at 156 (J. Chadbourn, rev 1976). See, also, *United States v. Samaria*, 239 F.3d 228 (2nd Cir. 2001) (defendant's rejection of plea bargain as evidence of consciousness of innocence).

The Magistrate Judge erroneously agreed with the RISC's conclusion that the proferred evidence was hearsay, and, therefore "there is no claim that Petitioner's federal constitutional rights were violated." (Report & Recommendation, pp. 18-20).

Rule 803 includes no such exception to the state of mind exception contained in subsection (3). The RISC's reasoning that Bustamane's utterances were inadmissable because the statements would not be subject to cross examination reflects a misapprehension of the very fiber of the exceptions to the hearsay rule, which is that under certain circumstances a hearsay statement may possess sufficient circumstantial

guarantees of trustworthiness so as to justify admission of the statement even though the declarant is available and could be called to testify. See, Advisory Committee Notes to Rule 803. Furthermore, under the Constitution's Confrontation Clause it is the ACCUSED who is guaranteed the right "to be confronted with the witnesses against him." Article VI, Constitution of the United States.

The Sixth Amendment also guarantees the accused the right present evidence on his own behalf. The RISC's affirmance of the trial judge's exclusion of Bustamante's statements to the police to prove consciousness of innocence, embraced by the Magistrate Judge, was a denial of his right to present a "meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 691 (1986), quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). In accord, *Chambers v. Mississippi*, 410 U.S. 284 (1972).

The United States Supreme Court has held that the right of the accused to present witnesses is "a fundamental element of due process." *Washington v. Texas*, 383 U.S. 14, 19 (1978). The guarantee is thus an essential attribute of the adversary system itself, *United States v. Nixon*, 418 U.S. 683, 709 (1974), wherein the prosecutor's case must encounter "and survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984).

By being precluded from presenting the testimony of Sergeant Warot about what the petitioner told him as evidence of his state of mind at the time, Bustamante was denied his fundamental due process rights. He should have been allowed to present, through his statements to the police officer, probative circumstantial evidence of

consciousness of innocence, i.e., that he was in terrible fear of being killed by Uncle Chuckie and his gang *because he "saw too much,"* as opposed to being in fear of returning to Rhode Island to "face the music" as the trial judge remarked. As it was, the jury got to hear only a part of Bustamante's encounter with Sergeant Warot and not the whole story. This was hardly the stuff of a fair trial.

Given the fundamental constitutional right involved and the fact that Bustamante's fate rested entirely on the testimony of three gang members, none of whom ever told the same story twice and all of whom had a motive to lie, the impermissible preclusion of this evidence can hardly be said to constitute harmless error beyond a reasonable doubt.

**3. This Court should decide whether Adrian Bustamante was denied a fundamentally fair sentencing hearing.**

Petitioner was sentenced to life imprisonment without the possibility of parole, based on the testimony of three young hoodlums. Some would argue that Bustamante's sentence is worse than death. The Magistrate Judge summarily dismissed Bustamante's arguments with respect to his sentencing hearing on *res judicata* grounds. (Report & Recommendation, pp. 20-21. Under the circumstances, petitioner submits that this Court should review the fundamental fairness of the sentencing hearing even though the Petitioner did not raise the issue during trial or on appeal.

**a. The trial judge's failure to instruct the jury on reasonable doubt in the penalty phase**

Under Section 12-19-2.1 of the Rhode Island General Laws, once a jury returns a verdict of murder in the first degree the trial judge must instruct the jury to determine whether it has been proven beyond a reasonable doubt that the murder committed by the defendant involved one of the circumstances enumerated in Sections 11-23-2 or 11-23-2.1 as the basis for imposition of a sentence of life imprisonment without parole

The statute requires that the jury find the existence of one of the enumerated circumstances of Section 11-23-2 *beyond a reasonable doubt*. When the trial judge instructed the jury at this stage, he neglected to include a critical instruction. He failed to tell the jury that they must find that the state proved one or more of the circumstances warranting life without parole *beyond a reasonable doubt*. While the judge did read a special interrogatory to the jury which asked the jury to check "yes" or "no" to whether "the state has proven beyond a reasonable doubt that the murder of John Casserly was committed in the manner involving torture or aggravated battery," the trial judge's actual instruction to the jury was simply as follows:

> I will ask you to retire to your jury room again and decide whether the state has proven either one or both, whichever it is. If it's not, obviously the answer is no, you don't have to do anything, but if it's yes, underline torture or aggravated battery or underline whether it's both. Good luck to you. You may retire.

TR 791-92.

Of course, the trial judge did instruct the jury on reasonable doubt earlier, in the guilt phase of the trial. However, given the critical nature of the separate penalty phase and what hung in the balance for Adrian Bustamante--- the rest of his life---it was

incumbent on the trial judge to instruct the jury that it must find that the state proved one of circumstances warranting a sentence of life without parole and to explain again the often elusive meaning of reasonable doubt. It was wholly unreasonable to assume that without such a specific instruction the jurors would know that they had to hold the state to that standard of proof in making its determination in the penalty phase. It would be clearly violative of petitioner's constitutional right to a fair trial if the jury instruction in the penalty phase impermissibly reduced the state's burden or were so perceived by a jury of ordinary intelligent lay people. See, *State v. Krushnowski*, 773 A.2d 243, 246 (R.I. 2001). The trial judge's failure to instruct the jury that it must find Bustamante guilty of one of the acts permitting a sentence of life without parole *beyond a reasonable doubt* and his failure to explain the meaning of reasonable doubt leaves us with little confidence that the jury made the requisite finding that would permit the trial judge to consider the imposition of a life without parole sentence.

The petitioner was entitled to an instruction on reasonable doubt in the penalty phase and the failure to provide such an instruction violated his right to a fair sentencing hearing.

**b. The trial judge failed to find the existence of one of the special circumstances warranting the imposition of a sentence of life without parole as required by Section 12-19.2-4.**

Section 12-19.2-4 states that "[a]t the presentence hearing, following a finding that one or more of the circumstances enumerated in Section 11-23-2 or 11-23-2.1" exists, the court may impose a sentence of life imprisonment without parole. The statutory language plainly requires that, in addition to the jury, the sentencing judge must

also find the existence of one or more of the special circumstances as a precondition to imposing a life without parole sentence. The sentencing judge made the requisite finding, for example, in *State v. Tassone*, 749 A.2d 1112, 1120-21 (R.I. 2000). However, the trial judge in this case made no such finding at the sentencing hearing. App E, p.16. All the trial judge said at the sentencing hearing was---

> At best, these cases are very difficult. At least they are for me. The Court's impressed by Mr. Bustamante's addressing the Court. But I can't help recalling the testimony. There were 27 stab wounds; and encouraging babies---well, one wasn't a teenager even, to participate in this type of activity on both these defendants' parts.
>
> Mr. Bustamante, on Count 1, the Court sentences you to life imprisonment. That shall be without parole. On Count 2 the Court sentences you to ten years at the Adult Correctional Institution.that is to run concurrent. Mr. Belloli, on Count 1 the Court sentences you to life without parole. On Count 2 the Court sentences you to 10 years. That will be concurrent with the sentences you are presently serving. You both have objections. *Id.*

In the absence of himself finding the existence of one of the special circumstances, as required by the plain wording of the statute, the trial judge was not permitted to sentence Bustamante to life imprisonment without parole, and, therefore, Adrian Bustamante's sentence was illegally imposed. It is noteworthy that despite the fact that on appeal the RISC conducted its own independent judgment and discretion as to the appropriateness of Bustamante's life without parole sentence, neither did the RISC find the existence of one of special enumerated circumstances. 756 A.2d at 768-69.

With so many errors committed in the sentencing phase of Bustamante's trial, his sentence of life imprisonment without parole fails any test of due process and should therefore be set aside. No less than strict adherence to the statute must be demanded to assure that a criminal defendant facing such extreme punishment receive a fair sentencing hearing.

CONCLUSION

Based on the foregoing petitioner Adrian Bustamante respectfully submits that his conviction and sentence of life imprisonment without parole must be set aside and that he be awarded a new trial.

By his Attorney,

/s/Joseph R. Palumbo, Jr.

R.I. Bar No. 0405

294 Valley Road

Middletown, Rhode Island 02842

Telephone: (401) 846-5200

E-mail address: joseph@palumbolaw.net

**CERTIFICATE OF SERVICE**

I, Joseph R. Palumbo, Jr., hereby certify that I caused to be electronically mailed on the 8th day of June, 2007, the foregoing Objection to L**auren S. Zurier, Special Assistant Attorney General**, 150 South Main Street, Providence, RI 02903.

/s/ Joseph R. Palumbo, Jr.